# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **VALLEY FORGE INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff and Counter-Defendant,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:14-cv-00006-RLM-SLC** |
| | ) | |
| **HARTFORD IRON & METAL, INC., *et al.*,** | ) | |
| | ) | |
| **Defendants and Counter-Claimants.** | ) | |
| | ) | |

## OPINION AND ORDER

Before the Court for an *in camera* review are 185 emails or email threads which

Defendants and Counter-Claimants Hartford Iron & Metal, Inc., and Alan B. Goldberg, doing

business as Hartford Iron & Metal (together, "Hartford Iron"), withheld as privileged in response

to discovery requests by Plaintiff and Counter-Defendant Valley Forge Insurance Company

("Valley Forge").[1]  The emails, which consist of Hartford Iron's communications with

environmental contractors Keramida, Inc. ("Keramida"), and CH2M Hill, Inc. ("CH2M"), were

the subject of a motion to compel filed by Valley Forge (DE 458), which the Court addressed

and ruled on at a hearing in November 2016 (DE 563; DE 568).  When ruling, the Court left the

door open for an *in camera* review of the emails should the parties not be able to resolve what

remained of their discovery dispute after the ruling.  (DE 568 at 8).

---

[1] When submitting the documents for the *in camera* review, Hartford Iron labeled the 185 emails or email threads as "A" documents.  (DE 633-1 at 1-77; DE 633-2 at 1-21).  Together with the "A" documents, Hartford Iron submitted—without leave of Court—123 additional emails or email threads that it labeled as "B" documents.  (DE 633-1 at 78-82; DE 633-2 at 22-24).  Hartford Iron, however, had already represented to Valley Forge in December 2016 that it would produce these 123 documents by January 17, 2017, but Hartford Iron had not done so.  (DE 598 at 3-5; DE 598-1 at 3-6; DE 598-2 at 3-5; DE 636).  Soon after the Court indicated that Hartford Iron's submission of additional documents without leave of Court was "not looked upon favorably" (DE 654 at 4), Hartford Iron produced the "B" documents to Valley Forge.  Therefore, the "B" documents included on the privilege logs are no longer in issue.

The parties ultimately could not resolve their dispute, and on January 10, 2017, the Court granted Valley Forge's motion for an *in camera* review of the emails. (DE 606; DE 614). The issue has been fully briefed, and oral argument has been heard on the motion. (DE 458; DE 459; DE 473; DE 479; DE 563; DE 568; DE 606; DE 614; DE 633; DE 635; DE 636).

Having now completed an *in camera* review of the emails,[2] the Court concludes for the following reasons that the emails are not protected by the attorney-client privilege, but that some of the emails are protected by the work-product doctrine.[3]

## I. FACTUAL AND PROCEDURAL BACKGROUND[4]

Hartford Iron owns and operates a scrap metal recycling operation in Hartford City, Indiana. (DE 6-1 at 1). Valley Forge, Hartford Iron's insurer, filed this suit against Hartford Iron in January 2014, claiming that Hartford Iron had breached a second settlement agreement entered into by the parties in December 2012 that purported to settle the parties' respective rights and duties under certain insurance contracts relating to an environmental clean-up site on Hartford Iron's property. (DE 1).

---

[2] The Court did not find it necessary to review the voluminous attachments submitted with the emails for purposes of ruling on whether the emails were privileged. Performing an *in camera* review of the attachments would be overly burdensome on the Court. The Court asked Hartford Iron's counsel about the attachments at a recent hearing, and Hartford Iron's counsel represented that Valley Forge had already been given "an extensive" portion of the attachments. (DE 663). The Court will not undertake an overly burdensome *in camera* review of a voluminous number of documents where many of the documents have already been produced. Accordingly, the parties will be ORDERED to meet and confer in good faith—applying the legal standards and conclusions articulated herein—to resolve any disputes pertaining to the attachments that may remain following the entry of this Opinion and Order.

[3] At the hearing on November 4, 2016, the Court rejected Hartford Iron's argument that the Keramida and CH2M communications are also protected under an "expert privilege." (DE 563; DE 568; DE 606-1 at 112). Therefore, there is no need to address Hartford Iron's initial claim of an "expert privilege"; nor does Hartford Iron assert an "expert privilege" on its privilege logs. (*See* DE 633-1; DE 633-2).

[4] The factual background of this case is very complicated (the docket entries are now approaching 700) and is known to the parties. Therefore, the Court will summarize only a brief factual background pertinent to the *in camera* review.

The following events precipitated the parties entering into the second settlement agreement:

- In April 2009, Hartford Iron and Valley Forge entered into a settlement allocating responsibilities between them with respect to an agreed order between Hartford Iron and Indiana Department of Environmental Management ("IDEM") that was then adopted by IDEM in May 2009.

- In August 2011, the Environmental Protection Agency ("EPA") sent Hartford Iron a notice of intent to file a civil administrative claim.

- In October 2011, Hartford Iron sued Valley Forge in state court.

- From March 2012 to August 2012, Hartford Iron received correspondence from the EPA regarding civil penalties and environmental remediation to be conducted at the Hartford Iron site.

- In April 2012, IDEM issued a remediation request, directing Hartford Iron to submit a remediation work plan for the site. Hartford Iron did so in July 2012.

(DE 6-1 at 1).

## A. The Relevant Terms of the Second Settlement Agreement

Under the terms of the second settlement agreement, Valley Forge was authorized to appoint new defense counsel, subject to Hartford Iron's approval, to represent Hartford Iron with respect to the EPA and IDEM claims and the remediation work plan for the site. (DE 6-1 at 2-3). The defense counsel's duties were described in the agreement as follows:

Anticipated tasks include legal work to defend Hartford Iron against the EPA and IDEM claims, to handle negotiations with the agencies, to supervise the environmental consultant, and to represent Valley Forge's recognized interests in controlling the costs and obtaining agency approval of the most cost effective remediation alternative that protects Hartford Iron's interests at the site.

(DE 6-1 at 2). The second settlement agreement also provided that Valley Forge could replace its current environmental consultant, HydroTech Corporation, with another environmental consultant, August Mack Environmental, Inc. ("August Mack"). (DE 6-1 at 2). August Mack's

duties were described in the agreement as follows:

> August Mack will carry out, at [Valley Forge's] expense, the Remediation Work Plan (July 31, 2012) for the Property, as approved or modified by IDEM and/or EPA. August Mack may initiate requests for amendment or modification. Prior to Remediation Work Plan approval, August Mack's work will include: (i) effective immediately, prevention of illegal stormwater discharges; (ii) installation and operation of a temporary stormwater treatment system pursuant to the Industrial Wastewater Treatment Construction Permit; and (iii) treatment and/or off-site disposal of contaminated stormwater currently in storage tanks on site and disposal of drummed wastes currently in storage. August Mack will also modify the Remediation Work Plan to incorporate agency comments, and will prepare and implement future work plans as required by IDEM or EPA for subsequent steps in the site remediation.

(DE 6-1 at 3).

## B. Relevant Facts as to Keramida

In December 2013, Valley Forge appointed Attorney Jamie Dameron as Hartford Iron's defense counsel pursuant to the terms of the second settlement agreement. (DE 455-6 at 1 ¶ 2). Dameron had approximately nine years experience in private practice largely focusing on environmental law and about 20 years experience "as a professional with clients performing environmental cleanups"; Dameron was an "environmental consulting geologist" prior to practicing law. (DE 45-55 at 1 ¶ 3).

Dameron soon concluded that there were serious problems in the stormwater collection system constructed by August Mack. (DE 373-6 at 1-2 ¶ 4). By March 2014, Dameron conveyed her concerns to Hartford Iron and Valley Forge and advised that they "obtain other perspectives on the maintenance and operation of [the stormwater] system" (DE 45-25) from "other storm water consultants" (DE 45-24), such as Keramida (DE 45-25). More particularly, Dameron wrote:

> August Mack sent an email yesterday indicating that it would like to send the

certified operator out to the site to do a system inspection. . . . This has me thinking specifically about the approach of getting different perspectives and useful information in the short term and then using that information to build on longer term solutions.

I suggest that the outside storm water consultant also do a system inspection identifying issues, improvements and any other recommendations. I will initiate this with a phone call and brief RFP for those interested. We will move forward with a scope/retention letter from this office with a follow up providing system information on the pending sump/pump installs, flow diagram, other system details including past regulatory/collection challenges. If we see value, then the next part of this effort is to solicit proposals for certain improvements/alternatives and the operation and maintenance. This second proposal would be based on the information learned during the inspection scope. These tasks may evolve slightly as I discuss the initial inspection scope with the consultants, but I wanted to provide an idea for the framework.

. . . .

We will soon be discussing the noncompliance events and how to achieve effective and efficient storm water treatment with IDEM, and possibly EPA. I am recommending this storm water treatment assessment effort because it will likely offer value now on a number of defense-related regulatory issues as well as promote efficiency in treating the industrial storm water.

(DE 45-24).

Near that same time, Dameron sent an email to Keramida, stating:

The requested proposal and work for inspection of storm water collection and treatment system are for the purpose of facilitating legal advice to Hartford Iron; therefore, the work must be done such that legal privileges are preserved, unless otherwise directed by me. The facility is also under agency enforcement so the work is being performed in the midst of litigation and in anticipation of additional litigation. Please do not disclose any communications or work, including this email, to any third parties. Take reasonable steps necessary to ensure confidentiality. I recommend marking all communications - Confidential: Privileged Attorney-Client Communication/Work Product. I am requesting a proposal with an SOQ for system inspection services and an inspection report. . . . A goal of this effort is to evaluate and improve system operation in the short term and ensure that it is adaptable for changes to the storm water expected during and after IDEM directed soil remediation. If selected for these services, invoices will be sent to my firm . . . . Direct billing to the insurers may be more practical in the future, should Keramida be selected to provide additional storm water consulting

and system operation services.

(DE 473-10).  In April 2014, Dameron's law firm, with Valley Forge's approval, hired

Keramida.  (DE 455-6 at 2 ¶ 5).

In June 2014, Keramida summarized its findings from its evaluation and inspection of the

Hartford Iron site and identified necessary changes to the stormwater system.  (DE 45-26; DE

455-6 at 2 ¶ 5).  That same month, Dameron followed up with Valley Forge on her

recommendation "to develop a planned storm water treatment system to replace the current ad

hoc arrangement," stating that "Keramida has expertise in this field that [August Mack] appears

to be missing."[5]  (DE 45-19 at 1).

In November 2014, Keramida completed a design plan for stormwater control at Hartford

Iron, indicating that installing an effective stormwater control system would be "a substantial

construction project."  (DE 173-2 at 2 ¶¶ 5, 31).

In December 2014, IDEM issued a violation letter to Hartford Iron based on illegal

discharges of stormwater at the site from the existing August Mack system.  (DE 173-2 at 8 ¶

32).

In April 2015, Dameron in an email discussed Valley Forge's recent approval of "an

$832,000 budget for work to intercept PCB-contaminated stormwater at the Hartford Iron site to

prevent stormwater from running into the public street with every significant rain or snow melt."

(DE 373-6 at 19).  She proposed a meeting with Valley Forge and Keramida "regarding the work

---

[5]  In her February 2015 affidavit, Dameron stated that she "hired Keramida Environmental with the approval of [Valley Forge] based on [her] opinion that it has substantially more expertise than [August Mack] regarding control of stormwater."  (DE 45-55 at 4 ¶ 14).  One year later, in a February 2016 affidavit, Dameron stated that her firm hired Keramida as an "expert stormwater contractor" and that she incorporated Keramida's recommended changes into her "defense planning for Hartford Iron."  (DE 373-6 at 2 ¶ 5).

to install the most appropriate engineering solution to intercept the stormwater and to provide the most effective storage of the stormwater pending treatment." (DE 373-6 at 19).

In July 2015, IDEM approved the November 2014 plan, provided regulatory comments and instructions, and required further planning documents within 30 days.[6] (DE 173-2 at 8 ¶ 35; DE 367-3 at 20-23). Keramida then incorporated IDEM's comments in the required planning documents. (DE 173-2 at 8 ¶ 35; DE 367-3 at 26-30).

In September 2015, Keramida sent a letter to Hartford Iron summarizing "its estimates of services and construction costs related to the installation of a storm water management system for the [Hartford Iron] facility." (DE 479-4 at 1). Keramida indicated that "[s]tandard construction contracts will be executed between Hartford Iron and Keramida," with Keramida's duties to include "on-site technical oversight, sampling activities, laboratory analysis, contractor management, compilation of bid packages, review of bids, laboratory costs and payment from the . . . funding provided by [Valley Forge]." (DE 479-4 at 3). Hartford Iron accepted the terms of Keramida's proposal and retained Keramida. (DE 459-5 at 1-2; DE 473-11). The terms of the agreement included that, "[i]n light of the pending litigation," Keramida was to "communicate only with Hartford Iron and Hartford Iron's counsel" and "make all reasonable efforts to maintain privilege and confidentiality of such communications." (DE 473-11 at 5).

That same month, Hartford Iron submitted a noncompliance notification report to IDEM, stating that August Mack and Valley Forge "designed and operate a defective, one-of-a-kind system for collection and treatment of PCB-contaminated industrial stormwater at the Hartford

---

[6] Dameron suspended most of her defense work as of July 15, 2015, due to Valley Forge's failure to pay her fees after January 2015. (DE 173-11 at 3-4).

Iron site," and that "Keramida Environmental is ready to carry out an IDEM-approved plan for a properly designed, industry-standard collection and treatment system." (DE 274-9 at 1-2). Near that same time, Hartford Iron's counsel, Attorney Mark Shere, sent a letter to Valley Forge's counsel, seeking a "pre-construction deposit of $469,200" so that Keramida could "start construction of the IDEM-approved stormwater control system and start the IDEM-approved 'two-grid' excavation." (DE 191-5 at 1).

In May 2016, Dameron wrote in an email to Valley Forge that August Mack had "put in place a defective storm water system that is incredibly expensive to operate month-to-month." (DE 455-17 at 2). She further indicated that "[a] new system, designed by Keramida, Inc. and approved by IDEM, will correct the defects in August Mack's work and stop the runaway costs." (DE 455-17 at 2).

### C. Additional Relevant Facts as to CH2M

In April 2014, Dameron stated in an email to CH2M:

> Thanks for your time on the phone today. The site is in IDEM and USEPA enforcement. Please take steps to keep proposal and project information confidential as I am requesting services for the purposes of providing legal services to my client, Hartford Iron . . . .

> As we discussed, site-wide soil remediation (via phases of excavation) will require relocation of scrapyard operations into a quadrant where soil has been excavated. There are also storm water compliance and related drainage aspects that are important for the relocated operations site and plan work. We are seeking an SOQ and proposal for industrial/engineering design services.

(DE 473-13 at 1). The following month, Dameron informed Valley Forge that CH2M was "working on its design services proposal for grading/stormwater routing/operations relocation during remediation . . . ." (DE 479-6).

In June 2014, Dameron forwarded to Valley Forge and Hartford Iron, CH2M's "proposal

for design services related to the excavation and disposal of polychlorinated biphenyl (PCB)-impacted soils, storm water control, and moving operations and associated infrastructure to Area 1 at the Hartford Iron . . . facility." (DE 479-7 at 2). Hartford Iron's remediation work plan for IDEM was later revised to reflect that CH2M would complete soil testing and installation of the permanent groundwater monitoring wells, carry out initial excavation of certain grid areas, and backfill the grids and install physical barriers to prevent cross-contamination. (DE 173-8 at 5-6).

In March 2015, Dameron's firm entered into a "standard agreement for professional services" with CH2M for the provision of the services identified in CH2M's proposal. (DE 473-12).

## II. THE ATTORNEY-CLIENT PRIVILEGE

### A. *Applicable Legal Standard*

"The attorney-client privilege protects communications made in confidence by a client to [its] attorney in the attorney's professional capacity for the purpose of obtaining legal advice." *Jenkins v. Bartlett*, 487 F.3d 482, 490 (7th Cir. 2007) (citation omitted). The elements of the attorney-client privilege are: "(1) where legal advice was sought; (2) from a professional legal advisor in his capacity as such; (3) the communications relating to that purpose; (4) made in confidence; (5) by the client; (6) are at his instance permanently protected; (7) from disclosure by himself or by the legal advisor; (8) except the protection may be waived."[7] *Long v. Anderson Univ.*, 204 F.R.D. 129, 134 (S.D. Ind. 2001) (citing *United States v. Evans*, 113 F.3d 1457, 1461

___

[7] "[F]ederal courts presiding over a diversity action . . . look to state law, not federal law, in determining the existence and scope of the attorney-client privilege." *Bartlett v. State Farm Mut. Auto. Ins. Co.*, 206 F.R.D. 623, 626 (S.D. Ind. 2002) (citations omitted). Here, the parties do not dispute that Indiana law applies. In contrast, federal law governs the work-product doctrine. *See* Fed. R. Civ. P. 26(b)(3); *Urban Outfitters, Inc. v. DPIC Cos.*, 203 F.R.D. 376, 379 (N.D. Ill. 2001).

(7th Cir. 1997); *Lahr v. State*, 731 N.E.2d 479, 482 (Ind. Ct. App. 2000)).

The attorney-client privilege "should be strictly confined within the narrowest possible limits." *Hamdan v. Ind. Univ. Health N., LLC*, No. 1:13-cv-00195-WTL-MJD, 2014 WL 2881551, at *2 (S.D. Ind. June 24, 2014) (quoting *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983). "The party seeking protection from the privilege has the burden to establish all of the essential elements." *Id.* (citing *United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991)).

The attorney-client privilege can extend to consultants hired by the attorney on behalf of a client. *See Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co.*, 460 F. Supp. 2d 915, 919 (S.D. Ind. 2006) ("Indiana deems communications between clients and agents of the client's attorney and communications between the client's and attorney's agents privileged." (citing *Brown v. State*, 448 N.E.2d 10, 14 (Ind. 1983))); *see also In re Witham Mem'l Hosp.*, 706 N.E.2d 1087, 1090-91 (Ind. Ct. App. 1999).

> Just as communications made directly between an attorney and his or her client are privileged, so too are communications between attorneys and the experts or investigators they hire on behalf of a client, as well as communications between agents of the client and agents the attorney hires on behalf of a client. The attorney-client privilege attaches to communications between the client and the agent of the attorney, as long as 1) the communication involves the subject matter about which the attorney was consulted and 2) the agent was retained by the attorney for the purpose of assisting the attorney in rendering legal advice to or conducting litigation on behalf of the client.

*In re Witham Mem'l Hosp.*, 706 N.E.2d at 1090-91 (citing *Brown*, 448 N.E.2d at 14).

However, "[o]nly where the document or communication is primarily concerned with legal assistance does it come within the attorney-client privilege." *Dometic Sales Corp. v. Intertherm, Inc.*, No. S87-81, 1988 WL 492342, at *10 (N.D. Ind. Mar. 28, 1988) (citing *Loctite Corp. v. Fel-Pro, Inc.*, 667 F.2d 577, 582 (7th Cir. 1981) (other citations omitted)).

"[C]ommunications made in the routine course of business, such as transmittal letters or

acknowledgment of receipt letters, which disclose no privileged matters and which are devoid of

legal advice or requests for such advice are not protected." *Id.* (citation omitted).

### B. The Attorney-Client Privilege Does Not Extend to Hartford
### Iron's Communications with Keramida and CH2M

Hartford Iron claims that all of the withheld emails are protected by the attorney-client

privilege, asserting that the emails were confidential communications, between its counsel and

an agent hired by counsel, to aid counsel in providing legal advice to Hartford Iron. Valley

Forge disagrees, contending that the primary purpose in retaining Keramida and CH2M was not

to provide legal advice, but rather, to provide environmental remediation services—that is, to

design and construct a new stormwater control system.

As stated earlier, "[t]he attorney-client privilege may cover communications made to

agents of an attorney . . . hired to assist in the rendition of legal services." *U.S. Postal Serv. v.

Phelps Dodge Ref. Corp.*, 852 F. Supp. 156, 161 (E.D.N.Y. 1994) (alteration in original) (citing

*United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989); *United States v. Kovel*, 296 F.2d

918 (2d Cir. 1961)) (analyzing the issue of whether the communications of an environmental

consultant were privileged);[8] *see also In re Witham Mem'l Hosp.*, 706 N.E.2d at 1090-91.

"[T]he attorney-client privilege can attach to reports of third parties made at the request of the

attorney or the client where the purpose of the report was to put in usable form information

obtained from the client." *Phelps Dodge Ref. Corp.*, 852 F. Supp. at 161 (citation omitted); *see

Heriot v. Byrne*, 257 F.R.D. 645, 666 (N.D. Ill. 2009) ("[T]he attorney-client privilege should be

---

[8] Neither party cites a similar case involving an environmental consultant that was decided under Indiana law; nor has the Court noted such a case in its own research. Therefore, the Court has considered similar cases in other jurisdictions as persuasive authority.

limited to instances where a third party . . . assists a lawyer in giving legal advice, and where the third party's participation was required to enable the attorney to render legal advice." (citation and internal quotation marks omitted)). That is, the attorney-client privilege may attach where the third party—for example, an accountant—acts akin to "a translator who puts the client's information into terms that the attorney can use effectively." *Phelps Dodge Ref. Corp.*, 852 F. Supp. at 161 (citation omitted).

"[W]hat is vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer*. If what is sought is not legal advice but only accounting service . . . or if the advice sought is the accountant's rather than the lawyer's, no privilege exists." *In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000) (alterations in original) (quoting *United States v. Brown*, 478 F.2d 1038, 1040 (7th Cir. 1973)). That is, "when a client's ultimate goal is not legal advice, but is rather accounting, medical, or environmental advice, the privilege is inapplicable." *In re Grand Jury Matter*, 147 F.R.D. 82, 885 (E.D. Pa. 1992); *see also Heriot*, 257 F.R.D. at 666 (same).

Here, although Dameron's firm initially retained Keramida and CH2M, "retention or employment by the attorney alone is insufficient to bring the consultant within the scope of the attorney-client privilege." *AVX Corp. v. Horry Land Co.,* No. 4:07-cv-3299-TWL-TER, 2010 WL 4884903, at *8 (D.S.C. Nov. 24, 2010) (citing *Kovel*, 296 F.2d at 922). As explained above, it is vital that the communication be made "for the purpose of obtaining *legal* advice *from the lawyer*." *Id*. (quoting *Kovel*, 296 F.2d at 922). Here, however, it is quite obvious that Dameron's firm retained Keramida and CH2M for purposes other than "specifically to assist [her] in rendering legal advice." *Phelps Dodge Ref. Corp.*, 852 F. Supp. at 161.

Keramida and CH2M—like HydroTech and August Mack before them—were hired to design, build, and install a stormwater remediation plan that would be acceptable to IDEM and the EPA. In doing so, they "were not simply putting into usable form information obtained from the client." *AVX Corp.*, 2010 WL 4884903, at *9 (citations omitted); *see Occidental Chem. Corp. v. OHM Remediation Servs. Corp.*, 175 F.R.D. 431, 437-38 (W.D.N.Y. 1997) (rejecting plaintiff's claim of attorney-client privilege where the record revealed that the design consultant was retained to formulate a remediation plan for the clean-up site, rather than "specifically to assist [counsel] in rendering legal advice"). In fact, it is evident that the assistance rendered by Keramida and CH2M "was based on factual and scientific evidence obtained through studies and observation of the physical condition of the [Hartford Iron] site, and not through client confidences." *Occidental Chem. Corp.*, 175 F.R.D. at 437.

Moreover, by September 2015, Hartford Iron had entered into a standard construction contract directly with Keramida. Thus, "the environmental consultants were not simply providing technical assistance to the attorneys for the purpose of rendering legal advice, rather they were providing environmental services directly to [Hartford Iron]." *AVX Corp.*, 2010 WL 4884903, at *9; *see ECDC Envtl., L.C. v. N.Y. Marine & Gen. Ins. Co.*, No. 96CIV.6033(BSJ)(HBP), 1998 WL 614478, at *8 (S.D.N.Y. June 4, 1998) (concluding that the consultants were hired to provide analysis of test data and technical assistance concerning the clean-up, not to "translate" technical information transmitted from the plaintiff for the benefit of plaintiff's attorneys). The provision of environmental consulting advice or services falls outside the attorney-client privilege, which is to be "strictly confined within the narrowest possible limits." *Hamdan*, 2014 WL 2881551, at *2; *see AVX Corp.*, 2010 WL 4884903, at *9; *ECDC*

*Envtl., L.C.*, 1998 WL 614478, at *8-9; *In re Grand Jury Matter*, 147 F.R.D. at 84-85 (explaining that the attorney-client privilege is limited in that "when a client's ultimate goal is not legal advice, but rather is . . . environmental advice, the privilege is inapplicable").

It is apparent that Dameron employed language at times in a deliberate effort to bring Keramida and CH2M within the privilege. (*See, e.g.*, DE 473-10; DE 473-13 at 1). But labeling communications as "privileged and confidential" or "attorney-client work product" "does not render the documents privileged when they contain no communication made or work done for the purpose of providing informed legal advice." *In re Grand Jury Matter*, 147 F.R.D. at 87; *see Graff v. Haverhill N. Coke Co.*, No. 1:09-cv-670, 2012 WL 5495514, at *44 (S.D. Ohio Nov. 13, 2012) ("Simply labeling a document as protected by a privilege does not make it so where a party fails to satisfy all of the criteria for the attorney-client privilege.").

In fact, at times, Dameron's role as defense counsel appeared to morph into that of an environmental consultant, most likely due to her extensive experience performing clean ups as an environmental consulting geologist prior to practicing law. (*See* DE 45-55 at 1 ¶ 3). Ultimately, Dameron's initial retention of Keramida did not appear to be because she needed information translated into a useable form so that she could render legal advice; rather, Dameron quickly spotted problems with August Mack's stormwater collection system and urged Valley Forge and Hartford Iron to get a second opinion from another environmental contractor. But "[h]iring lawyers to do consultants' work does not bring a privilege into play." *Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003). "[T]he privilege is limited to situations in which the attorney is acting as a legal advisor—business and financial advice are not protected." *RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209, 217 (N.D. Ill. June 4, 2013) (citing *Burden-Meeks*, 319

F.3d at 899).  The communications to or from Keramida and Hartford Iron's counsel, and to or from CH2M and Hartford Iron's counsel, fail to show "that the communication involved gathering information from client confidences or providing information from the client through the consultant to the attorney for the purpose of assisting the attorney in giving legal advice." *AVX Corp.*, 2010 WL 4884903, at \*10.

Overall, the evidence reflects that Dameron's firm and Hartford Iron retained Keramida and CH2M as environmental contractors for the primary purpose of providing environmental consulting advice and services to Hartford Iron in designing and constructing a new stormwater management system, *not* because Hartford Iron's counsel needed them to "translate" information into a useable form so that counsel could render legal advice.  *ECDC Envtl., L.C.*, 1998 WL 614478, at \*8; *see also In re Grand Jury Proceedings*, 220 F.3d at 571.  As such, Hartford Iron's communications with Keramida and CH2M fall outside the scope of the attorney-client privilege, which is to be narrowly construed.  *See Hamdan*, 2014 WL 2881551, at \*2.  Therefore, the Court will move on to consider whether the emails are protected under the work-product doctrine.

### III.  THE WORK-PRODUCT DOCTRINE

#### A.  Applicable Legal Standard

The work-product doctrine is a qualified privilege and is "distinct from and broader than the attorney-client privilege."  *Caremark, Inc. v. Affiliated Comput. Servs., Inc.*, 195 F.R.D. 610, 613 (N.D. Ill. 2000) (citing *United States v. Nobles*, 422 U.S. 225, 238 (1975)).  "The work-product doctrine protects documents prepared by attorneys in anticipation of litigation for the purpose of analyzing and preparing a client's case."  *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2009) (citations omitted); *see In re Special Sept. 1978 Grand Jury*,

640 F.2d 49, 62 (7th Cir. 1980) ("[T]he work product doctrine may encompass any document prepared in anticipation of litigation by or for the attorney."). As with the attorney-client privilege, "the party invoking the work product privilege bears the burden of establishing that the privilege applies." *State Farm Fire & Cas. Co. v. Nokes*, 263 F.R.D. 518, 523 (N.D. Ind. 2009) (citation omitted).

A party claiming work-product protection must show that the materials sought are: "(1) documents and tangible things; (2) prepared in anticipation of litigation or for trial; and (3) by or for a party or by or for a party's representative." *Boyer v. Gildea*, 257 F.R.D. 488, 490 (N.D. Ind. 2009) (citation omitted); *see Binks Mfg. Co. v. Nat'l Presto Indus., Inc*., 709 F.2d 1109, 1118 (7th Cir. 1983); *Caremark*, 195 F.R.D. at 613-14. "[M]aterials prepared in anticipation of litigation by any representative of the client are protected, regardless of whether the representative is acting for the lawyer." *Caremark*, 195 F.R.D. at 615 (citation omitted); *see also Boyer*, 257 F.R.D. at 490.

"While litigation need not be imminent, the primary motivating purpose behind the creation of a document or investigative report must be to aid in possible future litigation." *Binks Mfg. Co.*, 709 F.2d at 1119 (citation omitted); *see also First Fin. Bank, N.A. v. Citibank, N.A.*, No. 1:11-cv-226, 2012 WL 626272, at *2 (S.D. Ind. Feb. 24, 2012). "[D]ocuments that are created in the ordinary course of business or that would have been created irrespective of litigation are not under the protection of the work product doctrine." *Caremark*, 195 F.R.D. at 614 (citation omitted). Thus, "whether a document is protected depends on the motivation behind its preparation, rather than on the person who prepares it." *Id*. at 615. "[A] document is not privileged if it was initially created with a dual purpose and the litigation purpose is not

primary . . . ." *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 190 F.R.D. 532, 537 (S.D. Ind. 1999) (citation and internal quotation marks omitted).

There are "differing levels of protection for fact and opinion work product." *Appleton Papers, Inc. v. EPA*, 702 F.3d 1018, 1024 (7th Cir. 2012) (citation omitted). "Fact work product consists of factual material while opinion work product consists of the mental impressions, conclusions, opinions, or legal theories of an attorney." *Nokes*, 263 F.R.D. at 523 (citation omitted). The work-product privilege can be overcome as to fact work product if the party seeking the materials shows: (1) a substantial need for the materials, and (2) an inability to obtain the substantial equivalent of the information without undue hardship. *See Appleton Papers, Inc.*, 702 F.3d at 1022 (citing Fed. R. Civ. P. 26(b)(3)(A)(ii)); *Boyer*, 257 F.R.D. at 490-91; *Caremark*, 195 F.R.D. at 614. "But even when a litigant makes the substantial need showing, 'opinion' work product remains protected." *Appleton Papers, Inc.*, 702 F.3d at 1023 (citing Fed. R. Civ. P. 26(b)(3)(B)); *Caremark*, 195 F.R.D. at 614 ("[T]he lawyer's mental processes are required to be protected from disclosure.").

Having said that, "[a]lthough documents and tangibles created by the representative in anticipation o[f] litigation are protected, the underlying facts may be subject to disclosure in ordinary discovery if they are non-privileged." *Vardon Golf Co. v. Karsten Mfg. Corp.*, 213 F.R.D. 528, 534 (N.D. Ill. 2003) (citing *Hickman v. Taylor*, 329 U.S. 495, 513 (1947)). Thus, "[t]he underlying facts contained in [opinion work product] are discoverable pursuant to ordinary discovery process such as interrogatories, document requests and depositions." *Eagle Compressors, Inc. v. HEC Liquidating Corp.*, 206 F.R.D. 474, 479 (N.D. Ill. 2002).

"A majority of courts have held . . . that [once the work-product privilege attaches,] the

privilege endures after termination of the proceedings for which the documents were created, especially if the old and new matters are related." *Hobley v. Burge*, 433 F.3d 946, 949 (7th Cir. 2006) (citations omitted); *see also Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 237 F.R.D. 176, 182 (N.D. Ill. 2006).

### B. The Work-Product Doctrine May Protect Hartford Iron's Communications With Keramida and CH2M

Hartford Iron claims that all of the withheld emails are protected by the work-product doctrine because they were prepared for the purposes of litigation—that is, the IDEM and EPA claims and this lawsuit between the parties. Valley Forge disagrees, asserting that the emails were prepared for the primary purpose of completing environmental remediation at the Hartford Iron site, rather than for litigation purposes.

Valley Forge's attempted parsing of Hartford Iron's environmental remediation efforts from its litigation purposes is unpersuasive. The record suggests that the threat of litigation with IDEM and the EPA "was the motivating factor which moved [Hartford Iron] to complete the clean up of the [Hartford Iron] facility." *Bituminous Cas. Corp. v. Tonka Corp.*, 140 F.R.D. 381, 389 (D. Minn. 1992); *see Graff*, 2012 WL 5495514, at *4 ("If a document is prepared in anticipation of litigation, the fact that it also serves an ordinary business purpose does not deprive it of protection, but the burden is on the party claiming protection to show that anticipated litigation was the driving force behind the preparation of each requested document." (citation and internal quotation marks omitted)). As such, the Court will not separate Hartford Iron's remediation efforts from the IDEM and EPA claims and this litigation.

In that regard, all of the emails with Keramida and CH2M were created *after* the parties became aware of the IDEM and EPA claims and *after* this lawsuit was filed. *See Bituminous*

*Cas. Corp.*, 140 F.R.D. at 389 (comparing *In re LTV Sec. Litig.*, 89 F.R.D 595, 612 (N.D. Tex. 1981) (finding that documents prepared during an SEC investigation were work product), with *Rakus v. Erie-Lackawanna R.R. Co.*, 76 F.R.D. 145 (W.D.N.Y. 1977) (finding that accident reports prepared as required by ICC regulations were generated in the normal course of business)); *see Graff*, 2012 WL 5495514, at *27 (collecting cases and finding that the emails were prepared not in the ordinary course of business, but rather, in response to a potential civil action for alleged violations of a permit to install as set forth in the notice of violation from the state environmental agency); *ECDC Envtl., L.C.*, 1998 WL 614478, at *13-14 (collecting cases that upheld a work-product objection as to communications of an environmental consultant prepared in anticipation of litigation with the EPA or state environmental agency). As such, the work-product doctrine may protect Hartford Iron's communications with Keramida and CH2M.

Having said that, the fact that the communications were prepared in the midst of litigation is not necessarily determinative, as the work-product privilege "requires causation in the sense of the *purpose* or *motivation* for the creation of documents—*i.e.*, the intended use to which the documents were to be put—not causation in the sense of a 'but for' sequence of events or influences." *Stout v. Ill. Farmers Ins. Co.*, 150 F.R.D. 594, 598 (S.D. Ind. 1993); *see Goodyear Tire & Rubber Co.*, 190 F.R.D. at 537 ("[T]he court must determine whether the *primary motivating purpose* behind the creation of a document or investigate report [was] *to aid in possible future litigation*." (second alteration in original; citation and internal quotation marks omitted)). "[E]ven if litigation is imminent, there is no work product immunity for documents prepared in the ordinary course of business rather than for litigation purposes." *Coltec Indus., Inc. v. Am. Motorists Ins. Co.*, 197 F.R.D. 368, 371 (N.D. Ill. 2000); *see also Binks Mfg. Co.*, 709

19

F.2d at 1118. The intent of the work-product doctrine is "to protect the adversarial process by providing an environment of privacy in which a litigator may creatively develop strategies, legal theories, and mental impressions outside the ordinary liberal realm of federal discovery provisions, thereby insuring that the litigator's opponent is unable to ride on the litigator's wits." *Coltec Indus., Inc.*, 197 F.R.D. at 371 (citation omitted).

Accordingly, some categories of documents generally fall outside the scope of the work-product privilege. One example is mere transmittal communications. *See Minter v. Liberty Mut. Fire Ins. Co.*, No. 3:11CV-249-S, 2012 WL 2430471, at *3 (W.D. Ky. June 26, 2012) (rejecting defendant's claim of work-product privilege with respect to "mere transmittal letters that contained no attorney impressions or strategy, but merely transmitted [documents] without any substantive comment")*; Smith ex rel. Smith v. United States*, 193 F.R.D. 201, 214 (D. Del. 2000) ("These are transmittal letters to which no work product privilege would attach."); *Am. Med. Sys., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. CIV.A. 98-1788, 1999 WL 970341, at *4 (E.D. La. Oct. 22, 1999) ("Transmittal documents do not convey any confidential communication and are therefore not privileged."); *ECDC Envtl., L.C.*, 1998 WL 614478, at *15 (excluding from work-product protection cover letters, fax transmittal pages, or letters transmitting copies of documents without comment, all of which did not reveal any legal analysis, research, or litigation strategy). Here, as concluded *infra*, many of the emails reviewed *in camera* by the Court are mere transmittal communications, and thus, are not protected work product.

Another category of documents outside the scope of the work-product doctrine are communications dealing with merely administrative, logistical, or scheduling matters. *See*

*Keaton v. Hannum*, No. 1:12-cv-00641-SEB-MJD, 2013 WL 1818993, at *7 (S.D. Ind. Apr. 29, 2013) (stating that a discussion regarding the scheduling and rescheduling of a deposition was not work product); *MapleWood Partners, L.P. v. Indian Harbor Ins. Co.*, 295 F.R.D. 550, 621 n.282 (S.D. Fla. July 16, 2013) (declining to afford work-product protection to emails concerning administrative or scheduling matters); *Pic Grp. v. LandCoast Insulation, Inc.*, No. 1:09-CV-662KS-MTP, 2010 WL 1741703, at *2 (S.D. Miss. Apr. 28, 2010) (finding that communications relating "merely to logistical matters, such as scheduling meetings or conference calls" were not work product); *Leach v. Quality Health Servs.*, 162 F.R.D. 499, 502 (E.D. Pa. 1995) ("We find it unlikely that the billing records would be protected by the attorney work product doctrine. . . . Billing records are commonly created in the regular course of business, which removes them from this doctrine's coverage."); *Stout*, 150 F.R.D. at 598 (explaining that while requests and bills for litigation services were created because of the anticipated litigation, they were not created for the purpose of *preparing* for litigation, and thus, were not work-product protected). Here, as concluded *infra*, many of the emails reviewed *in camera* by the Court merely pertain to administrative, logistical, or scheduling matters, and thus, are not protected work product.

Ultimately, only a portion of the emails submitted for *in camera* review constitute protected work product. The Court's *in camera* ruling on the 185 emails or email threads is set forth in the next two sections of this Opinion and Order.[9]

---

[9] On its privilege log, Hartford Iron indicates that every email is also protected under the "joint defense" privilege. (*See* DE 633-1; DE 633-2). Hartford Iron, however, makes no effort to elaborate in its privilege log or its briefs about the applicable legal standard for the "joint defense" privilege or how it applies to any specific emails. Presumably, in listing the "joint defense" privilege, Hartford Iron was referring to the common interest doctrine.
"Although occasionally termed a privilege itself, the common interest doctrine is really an exception to the rule that no privilege attaches to communications between a client and an attorney in the presence of a third person."

## C. In Camera *Ruling on the Keramida Documents as to the Work-Product Doctrine*

After an *in camera* review of the emails, the Court rules as follows with respect to whether Hartford Iron's emails or email threads with Keramida are protected by the work-product doctrine:

| Keramida Doc. No. | Protected Under the Work-Product Doctrine? |
|---|---|
| A1 | Yes, as to Belcredi 4:43 email, which is factual information pertaining to investigation/remediation. No, as to rest of thread, which pertains to scheduling. |
| A2 | Yes. Factual information pertaining to investigation/remediation. |
| A3 | Yes, as to Belcredi 10:51 email, which is factual information pertaining to investigation/remediation. No, as to rest of thread, which pertains to scheduling. |
| A4 | Yes, as to Belcredi 10:51 email, which is factual information pertaining to investigation/remediation. No, as to rest of thread, which pertains to scheduling. |

---

*United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007) (citation omitted); *see McNally Tunneling Corp. v. City of Evanston*, No. 00 C 6979, 2001 WL 1246630, at *2 (N.D. Ill. Oct. 18, 2001) ("The common interest doctrine is not an independent source of confidentiality. Rather, it simply extends the protection afforded by other doctrines, such as the attorney/client privilege and the work product rule." (citations omitted)). "For that reason, the common interest doctrine only will apply where the parties undertake a joint effort with respect to a common legal interest, and the doctrine is strictly limited to those communications made to further an ongoing enterprise." *BDO Seidman, LLP*, 492 F.3d at 815 (citing *Evans*, 113 F.3d at 1467); *see BASF Aktiengesellschaft v. Reilly Indus., Inc.*, 224 F.R.D. 438, 442 (S.D. Ind. 2004) ("To maintain the privilege, the common interest must be a legal interest, not merely a business or financial interest." (citation omitted)). "Of course, to assert the common interest doctrine as a shield to production, the parties asserting it must first establish that the underlying documents or communications withheld were otherwise privileged before the common interest arose." *Dexia Credit Local v. Rogan*, 231 F.R.D. 268, 273-74 (N.D. Ill. 2004) (citation omitted).

　　Due to its failure to argue the common interest privilege with any specificity, Hartford Iron has failed to carry its burden of establishing that any emails fall within the common interest doctrine. *See Evans*, 113 F.3d at 1461 ("The party seeking to invoke the privilege bears the burden of proving all of its essential elements." (citation omitted)). In any event, with the exception of perhaps responding to a subpoena served by Valley Forge on the environmental contractors, Keramida and CH2M do not have a common legal interest with Hartford Iron, as Keramida and CH2M are not parties to this lawsuit. As explained above, simply having a business or financial interest is insufficient to invoke the privilege. Therefore, the Court need not further address Hartford Iron's claim of a "joint defense" privilege.

| | |
|---|---|
| A5 | Yes, as to Dameron 5:03 email, which is factual information pertaining to investigation/remediation. No, as to rest of thread, which pertains to scheduling. |
| A6 | Yes, as to Dameron 8:16 and 11:22 emails, which include attorney thought processes pertaining to investigation/remediation. Moot, as to the Dameron 2:35 email that was disclosed in B9 and B14. |
| A7 | Yes. Factual information and attorney thought processes regarding investigation/remediation. |
| A8 | Yes. Factual information regarding investigation/remediation. |
| A9 | Moot as to Dameron 9:59 email that was already disclosed in B14. No, as to rest of thread, which is transmittal and scheduling emails. |
| A10 | Moot. Already disclosed in B9. |
| A11 | No. Transmittal email. |
| A12 | Yes, as to Belcredi 11:11 email, which is comments on draft communication regarding investigation/remediation. No, as to rest of thread, which is transmittal emails. |
| A13 | No. Email thread pertains to scheduling. |
| A14 | Yes. Factual information pertaining to remediation. |
| A15 | Yes. Factual information pertaining to remediation. |
| A16 | No. Transmittal email. |
| A17 | Moot. Already disclosed in B25. |
| A18 | No. Email pertains to scheduling/administrative/invoicing. Similar emails concerning billing/invoicing were already disclosed in B4-B8, B10, B24, B45, B49, and B55. |
| A19 | Yes, as to Dameron 4:18, 4:04, and 3:59 emails, which is factual information pertaining to investigation/remediation. No, as to rest of thread, which is a transmittal email and a forwarded August Mack email. |
| A20 | Moot. Already disclosed in B28. |
| A21 | No. Email pertains to scheduling. |
| A22 | No. Email pertains to scheduling. |
| A23 | No. Email pertains to scheduling. |

| | |
|---|---|
| A24 | Yes, as to Belcredi 9:57 email, which is factual information pertaining to investigation/remediation.  No, as to rest of thread, which pertains to scheduling. |
| A25 | No.  Transmittal email. |
| A26 | No.  Transmittal email. |
| A27 | No.  Transmittal emails. |
| A28 | No.  Transmittal emails. |
| A29 | No.  Transmittal emails. |
| A30 | No.  Transmittal emails. |
| A31 | No.  Email pertains to scheduling. |
| A32 | No.  Transmittal email. |
| A33 | No.  Transmittal email. |
| A34 | No.  Email pertains to scheduling. |
| A35 | No.  Transmittal email. |
| A36 | No.  Email pertains to administrative/invoicing. |
| A37 | No.  Transmittal email. |
| A38 | Yes.  Reveals attorney thought processes pertaining to investigation/remediation. |
| A39 | Yes, as to Shere 8:29 and Belcredi 4:38 emails, which reveal factual information pertaining to remediation.  No, as to rest of thread, which pertains to scheduling. |
| A40 | Yes, as to Shere 11:50 email, which reveals attorney comments on draft correspondence.  Yes, as to Shere 8:29 and Belcredi 4:38 emails, which reveal factual information pertaining to remediation.  No, as to rest of thread, which pertains to administrative/scheduling. |
| A41 | No.  Transmittal email. |
| A42 | Yes, as to Shere 12:03 email, which reveals attorney thought processes.  No, as to rest of thread, which pertains to administrative matters or was already disclosed in B36. |
| A43 | Yes.  Reveals attorney thought processes pertaining to remediation. |
| A44 | No.  Email pertaining to scheduling. |

| | |
|---|---|
| A45 | Yes, as to Shere 11:22, 11:23, and 10:58 emails, which reveal attorney thought processes on draft correspondence. Yes, as to Belcredi 11:31 email, which is factual information pertaining to remediation. No, as to rest of thread, which includes forwarded Valley Forge emails, administrative/invoicing issues, and transmittal emails. |
| A46 | Yes, as to Shere 11:08 and 12:37 emails, which reveal attorney thought processes on draft correspondence. No, as to rest of thread, which is transmittal emails or pertains to administrative/invoicing. |
| A47 | Yes, as to Shere 12:58 email, which reveals draft correspondence by attorney. Moot, as to rest of thread, which was already disclosed in B42. |
| A48 | No. Pertains to scheduling. Also moot, as forwards email that was already disclosed in B43-B44. |
| A49 | Yes. Reveals attorney thought processes on draft correspondence. |
| A50 | Yes, as to Shere 9:00, 4:20, and 3:56 emails, which reveal attorney thought processes. No as to rest of thread, which was exchanged with Valley Forge or pertains to administrative/invoicing. |
| A51 | Yes, as to Dameron 12:33 and 12:34 emails, which reveal legal strategy as to remediation and payment terms. No, as to rest of thread, which was sent to IDEM or is transmittal email. |
| A52 | Yes, as to Shere 12:16 email, which reveals legal strategy as to remediation and payment terms. No, as to rest of thread, which is transmittal email. |
| A53 | No. Transmittal email. |
| A54 | No, as to Shere 5:34 and 11:19 emails, which are transmittal emails. Yes, as to Belcredi 4:28 email, which contains draft correspondence. |
| A55 | No. Transmittal email. |
| A56 | Yes, as to Shere 6:23, 11:16, and 6:47 emails, which reveal attorney comments on draft correspondence. Yes, as to Belcredi 3:29, 11:03, and 3:04 emails, which is factual information pertaining to remediation. No, as to rest of thread, which forwards Valley Forge or IDEM emails or are transmittal emails. |
| A57 | No. Transmittal emails and forwards IDEM email. |

| | |
|---|---|
| A58 | Yes, as to Shere 10:48 email, which reveals attorney thought processes and legal strategy pertaining to remediation.  Yes, as to Belcredi 7:28 email, which contains factual information pertaining to remediation. |
| A59 | No.  Transmittal emails and forwards email with IDEM or waste management. |
| A60 | Yes, as to Shere 12:31 email, which reveals attorney mental impressions.  No, as to rest of thread, which is transmittal emails and forwarded email with EPA.  Moot, as to portion of thread that was already disclosed in B53-54. |
| A61 | No.  Transmittal, administrative, and scheduling emails. |
| A62 | Yes, as to Strahl 2:55 email, which reveals legal strategy.  No, as to rest of thread, which pertains to scheduling. |
| A63 | Yes, as to Strahl 2:55 email, which reveals legal strategy.  No, as to rest of thread, which pertains to scheduling. |
| A64 | No.  Transmittal email. |
| A65 | No.  Pertains to administrative/scheduling. |
| A66 | No.  Pertains to administrative/invoicing.  Similar emails concerning billing/invoicing were already disclosed in B4-B8, B10, B24, B45, B49, and B55. |
| A67 | No.  Pertains to administrative/invoicing.  Similar emails concerning billing/invoicing were already disclosed in B4-B8, B10, B24, B45, B49, and B55. |
| A68 | Yes.  Factual information pertaining to remediation. |
| A69 | No.  Pertains to scheduling. |
| A70 | No.  Pertains to scheduling. |
| A71 | No.  Transmittal and scheduling email.  Forwards Valley Forge emails. |
| A72 | No.  Transmittal and scheduling email.  Forwards Valley Forge email. |
| A73 | No.  Transmittal email and forwards August Mack email. |
| A74 | Yes, as to Shere 10:49 email, which reveals attorney mental impressions.  No, as to rest of thread, which is transmittal email and forwards Valley Forge email. |
| A75 | No.  Transmittal emails and forwards August Mack email. |

| | |
|---|---|
| A76 | No.  Transmittal email. |
| A77 | No.  Does not pertain to legal assistance. |
| A78 | Yes.  Factual information pertaining to investigation/remediation. |
| A79 | See A147. |
| A80 | See A148. |
| A81 | No.  Transmittal and scheduling emails. |
| A82 | No.  Does not pertain to legal assistance. |
| A83 | No.  Email pertains to scheduling. |
| A84 | No.  Transmittal email. |
| A85 | No.  Transmittal email. |
| A86 | No.  Emails pertain to scheduling.  Forwards IDEM email. |
| A87 | No.  Transmittal email.  Forwards invoices.  Similar emails concerning billing/invoicing were already disclosed in B4-B8, B10, B24, B45, B49, and B55. |
| A88 | No.  Emails pertain to scheduling and forward August Mack email. |
| A89 | No.  Pertains to administrative/invoicing.  Similar emails concerning billing/invoicing were already disclosed in B4-B8, B10, B24, B45, B49, and B55. |
| A90 | No.  Pertains to administrative/invoicing.  Similar emails concerning billing/invoicing were already disclosed in B4-B8, B10, B24, B45, B49, and B55. |
| A91 | Yes, seeks legal advice regarding billing/invoicing. |
| A92 | Yes, as to Shere 9:28 email, which is factual information pertaining to investigation/remediation.  No, as to the rest of the thread, which is forwarded IDEM emails. |
| A93 | Yes, as to Shere 9:34 email, which is factual information pertaining to remediation.  No, as to rest of thread, which pertains to scheduling. |
| A94 | Yes, as to Shere 9:34 email, which is factual information pertaining to remediation.  No, as to rest of thread, which pertains to scheduling and transmittal emails. |

| | |
|---|---|
| A95 | No. Email with IDEM. Moot, as to portion of thread that was already disclosed in B64. |
| A96 | No. Email pertains to scheduling. |
| A97 | No. Email pertains to scheduling. |
| A98 | Yes, as to Shere 9:42 email, which reveals attorney mental impressions. No, as to rest of thread. |
| A99 | Yes. Factual information pertaining to remediation. |
| A100 | No. Transmittal email. |
| A101 | Yes. Reveals attorney thought processes and draft affidavit. |
| A102 | No. Transmittal email. Forwards Valley Forge documents. |
| A103 | No. Emails pertain to scheduling. |
| A104 | No. Transmittal email. |
| A105 | No. Emails pertain to scheduling. |
| A106 | No. Transmittal and scheduling emails. |
| A107 | No. Transmittal and scheduling emails. |
| A108 | No. Transmittal and scheduling emails. |
| A109 | Yes, as to Belcredi 3:33 email, which is factual information pertaining to investigation/remediation. No, as to rest of thread, which are transmittal emails or forwards August Mack/IDEM emails. |
| A110 | Yes. Factual information pertaining to remediation. |
| A111 | No. Emails pertain to scheduling and forwards emails exchanged with IDEM. |
| A112 | No. Transmittal email. Forwards emails exchanged with EPA. |
| A113 | No. Transmittal email. Forwards information exchanged with IDEM. |
| A114 | No. Transmittal email. Forwards information exchanged with IDEM. |
| A115 | Yes, as to Shere 9:41 email, which reveals attorney comments on draft correspondence. No, as to rest of thread, which is transmittal email. |
| A116 | No. Pertains to administrative/invoicing. Similar emails concerning billing/invoicing were already disclosed in B4-B8, B10, B24, B45, B49, and B55. Forwards brief that was filed with Court. |

| | |
|---|---|
| A117 | No. Pertains to administrative matters. |
| A118 | Yes, as to Belcredi 11:11 email, which reveals factual information pertaining to remediation. No, as to rest of thread, which is transmittal email. |
| A119 | Yes, as to Shere 9:42 email, which reveals attorney thought processes on remediation. Yes, as to Belcredi 11:11 email, which is factual information pertaining to remediation. No, as to rest of thread, which is transmittal emails. |
| A120 | No. Transmittal emails. |
| A121 | No. Transmittal emails. |
| A122 | No. Emails pertain to administrative/scheduling. |
| A123 | Yes, as to Belcredi 12:36 email, which is factual information pertaining to remediation. No, as to rest of thread, which is transmittal email. |
| A124 | No. Pertains to administrative/invoicing. Similar emails concerning billing/invoicing were already disclosed in B4-B8, B10, B24, B45, B49, and B55. |
| A125 | No. Pertains to administrative/invoicing. Similar emails concerning billing/invoicing were already disclosed in B4-B8, B10, B24, B45, B49, and B55. |
| A126 | No. Pertains to administrative/invoicing. Similar emails concerning billing/invoicing were already disclosed in B4-B8, B10, B24, B45, B49, and B55. |
| A127 | No. Email pertains to scheduling. |
| A128 | Yes, as to last sentence of Shere 1:16 email, which reveals attorney mental impressions. No, as to rest of Shere email and forwarded email. |
| A129 | No. Pertains to administrative/invoicing. Similar emails concerning billing/invoicing were already disclosed in B4-B8, B10, B24, B45, B49, and B55. |
| A130 | Yes. Reveals attorney thought processes and legal strategy regarding subpoenas. |

| | |
|---|---|
| A131 | No, as to Shere 8:23 email, which is a transmittal email.  Yes, as to Shere 10:36 email, which reveals attorney thought processes and legal strategy regarding subpoenas. |
| A132 | No.  Email pertains to scheduling. |
| A133 | Yes, as to Shere 5:25 email, which contains attorney mental impressions regarding remediation.  No, as to rest of thread, which forwards Valley Forge email. |
| A134 | Yes, as to Shere 5:25 email, which reveals attorney mental impressions regarding remediation.  No, as to rest of thread, which forwards Valley Forge email. |
| A135 | No.  Transmittal email. |
| A136 | Yes, as to Shere 5:25 email, which reveals attorney mental impressions regarding remediation.  No, as to rest of thread, which is transmittal emails. |
| A137 | No.  Transmittal emails. |
| A138 | No.  Transmittal emails. |
| A139 | No.  Email pertains to scheduling. |
| A140 | No.  Transmittal email and pertains to administrative/invoicing.  Similar emails concerning billing/invoicing were already disclosed in B4-B8, B10, B24, B45, B49, and B55. |
| A141 | No.  Transmittal email and pertains to administrative/invoicing.  Similar emails concerning billing/invoicing were already disclosed in B4-B8, B10, B24, B45, B49, and B55. |
| A142 | No.  Pertains to administrative/invoicing.  Similar emails concerning billing/invoicing were already disclosed in B4-B8, B10, B24, B45, B49, and B55. |
| A143 | No.  Transmittal emails. |
| A144 | No.  Transmittal emails. |
| A145 | No.  Transmittal email. |
| A146 | No.  Pertains to administrative/invoicing.  Similar emails concerning billing/invoicing were already disclosed in B4-B8, B10, B24, B45, B49, and B55.  Forwards Valley Forge emails. |

| A147 | Yes, as to Dameron 10:15 email, which reveals factual information and attorney mental impressions regarding remediation.  No, as to rest of thread, which is transmittal email. |
| A148 | Yes, as to Dameron 11:15 email, which reveals factual information and attorney mental impressions regarding remediation.  No, as to rest of thread, which is transmittal email. |
| A149 | No.  Pertains to administrative/invoicing.  Similar emails concerning billing/invoicing were already disclosed in B4-B8, B10, B24, B45, B49, B55.  Forwards email exchanged with third parties. |
| A150 | Yes.  Dameron 3:48 and 11:15 emails reveal attorney mental impressions regarding investigation/remediation.  Belcredi 2:35 email reveals factual information regarding investigation/remediation. |

### D.  In Camera *Ruling on the CH2M Documents as to the Work-Product Doctrine*

After an *in camera* review of the emails, the Court rules as follows with respect to whether Hartford Iron's emails or email threads with CH2M are protected by the work-product doctrine:

| CH2M Doc. No. | Protected Under the Work-Product Doctrine? |
| --- | --- |
| A1 | No.  Transmittal letter.  Similar information regarding subpoena already disclosed in B4 and B6-B8. |
| A2 | No.  Scheduling email.  Similar information regarding subpoena already disclosed in B4 and B6-B8. |
| A3 | No.  Pertains to administrative/invoicing.  Similar information regarding invoices and payments already disclosed in B3, B12-B16, and B23-B24. |
| A4 | Yes, as to Shere 2:41 email, which reveals attorney thought processes pertaining to draft motion.  No, as to rest of thread, which is transmittal letter. |
| A5 | No.  Transmittal letter.  Similar information regarding invoices and payments already disclosed in B3, B12-B16, and B23-B24. |

| | |
|---|---|
| A6 | No. Transmittal letter. |
| A7 | Moot. Already disclosed in B11. |
| A8 | No. Pertains to administrative/scheduling. Forwards Valley Forge email. Similar information already disclosed regarding Coyle in B12. |
| A9 | Yes, as to Shere 1:14 email, which reveals attorney mental impressions. No, as to rest of thread. |
| A10 | No. Transmittal letter forwarding email that was sent to Valley Forge. Similar information regarding invoices and payments already disclosed in B3, B12-B16, and B23-B24. |
| A11 | Yes, as to Weber 2:15 email, which includes CH2M draft response to correspondence. No, as to forwarded Valley Forge email. |
| A12 | Yes, as to last sentence of Shere 2:33 email, which reveals attorney mental impressions. No, as to rest of thread, which is transmittal or forwarded Valley Forge emails. |
| A13 | No, pertains to administrative/invoicing. Similar information regarding invoices and payments already disclosed in B3, B12-B16, and B23-B24. |
| A14 | No. Transmittal letter. Moot, as to forwarded email already disclosed in B17-B19. |
| A15 | Yes, as to Andrae 9:58 email, which contains factual information pertaining to remediation. No, as to Weber 10:15 email, which pertains to scheduling. Moot, as to rest of thread, which was already disclosed in B20-B21. |
| A16 | Yes, as to Andrae 9:58 email, which contains factual information pertaining to remediation. Moot, as to the rest of the thread, which was already disclosed in B20-B21. |
| A17 | Yes. Factual information pertaining to remediation. |
| A18 | No. Scheduling email. |
| A19 | Yes. Factual information pertaining to remediation. |
| A20 | No. Scheduling and transmittal emails. |
| A20.5 | Moot. Was disclosed in B29. |
| A21 | Yes, as to Shere 9:38 email, which is factual information pertaining to remediation. |

| A22 | No, as to Dameron 1:40 email, which is transmittal email.  Yes, as to diagram. |
|---|---|
| A23 | Yes.  Factual information pertaining to remediation. |
| A24 | Yes, as to Dameron 3:56 and 3:48 emails, which reveal factual information and attorney mental impressions. |
| A25 | No.  Email pertains to scheduling. |
| A26 | No.  Transmittal email. |
| A27 | Yes.  Contains attorney thought processes. |
| A28 | Yes, as to Dameron 1:45 email, which reveals attorney mental impressions or legal strategy.  Yes, as to Schwan 10:32 email, which is factual information pertaining to remediation. |
| A29 | No.  Transmittal emails.  Forwards August Mack emails. |
| A30 | Yes, as to Dameron 3:30 email, which reveals attorney thought processes.  No, as to rest of thread, which is transmittal and scheduling emails. |
| A31 | No.  Emails pertain to scheduling. |
| A32 | No.  Email pertains to scheduling. |
| A33 | No.  Transmittal and scheduling emails. |
| A34 | No.  Transmittal and scheduling emails. |
| A35 | No.  Transmittal and scheduling emails. |
| A36 | Yes.  Reveals attorney thought processes regarding remediation. |

As a final note, as explained earlier, fact work product may be discoverable if the party seeking the materials shows:  (1) a substantial need for the materials, and (2) an inability to obtain the substantial equivalent of the information without undue hardship.  *See Appleton Papers, Inc.*, 702 F.3d at 1022 (citations omitted); *Boyer*, 257 F.R.D. at 490-91; *Caremark*, 195 F.R.D. at 614.  While Valley Forge has briefly alluded to a substantial need to discover the fact work product and an inability to obtain the information (*see* DE 479 at 12), Valley Forge's

arguments on that front have not been developed, and thus, the Court will not address Valley Forge's undeveloped assertion at this juncture.

## IV.  CONCLUSION

After an *in camera* review, the Court CONCLUDES that Hartford Iron's communications with environmental contractors Keramida and CH2M are not protected by the attorney-client privilege, but are, in part, protected by the work-product doctrine.  Hartford Iron is ORDERED to produce the non-privileged documents to Valley Forge on or before April 28, 2017.  The parties are ORDERED to meet and confer in good faith—applying the legal standards and conclusions articulated herein—to resolve any disputes pertaining to the attachments that may remain after the entry of this Opinion and Order.

SO ORDERED.

Entered this 14th day of April 2017.

/s/ Susan Collins   
Susan Collins,
United States Magistrate Judge