UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| VALLEY FORGE INSURANCE COMPANY, ) | |
| ) | |
| Plaintiff/Counter-Defendant, ) | |
| ) | |
| v. ) | No. 1:14-cv-00006-WCL-SLC |
| ) | |
| HARTFORD IRON & METAL, INC., *et al.*, ) | |
| ) | |
| Defendants/Counter-Claimants. ) | |

**OPINION AND ORDER**

Before the Court for an *in camera* review are 19 emails which Plaintiff and Counter-Defendant Valley Forge Insurance Company ("Valley Forge") withheld as privileged in response to discovery requests by Defendants and Counter-Claimants Hartford Iron & Metal, Inc., and Alan B. Goldberg, doing business as Hartford Iron & Metal (together, "Hartford Iron"). The emails are communications during the period of June 20, 2014, to June 27, 2014, among Kathleen Coyle, a claims consultant for Valley Forge; Melissa King, of Resolute Management, Inc.; and several of Valley Forge's attorneys: Margaret Benson, an in-house attorney with Valley Forge; Barry Cope of Bingham Greenebaum Doll LLP; and Steve Schulwolf, Thomas Ferguson, and Jan Michaels, all of Michaels Schulwolf & Salerno PC.

The emails are part of a motion to compel filed by Hartford Iron (DE 737), which the Court addressed at a hearing on December 20, 2017 (DE 748). At the close of the hearing, the emails were submitted for an *in camera* review, and the Court took the matter under advisement. (DE 748). Having now completed the *in camera* review, the Court will GRANT IN PART and DENY IN PART Hartford Iron's motion to compel disclosure of the 19 emails.

# I. FACTUAL AND PROCEDURAL BACKGROUND[1]

In December 2012, Hartford Iron and its insurer, Valley Forge, entered into a second settlement agreement that purported to settle the parties' respective rights and duties under certain insurance contracts relating to an environmental clean-up site on Hartford Iron's property. (DE 675 at 2). The site is the subject of enforcement actions by the Indiana Department of Environmental Management ("IDEM") and the United States Environmental Protection Agency ("EPA"). (DE 675 at 3).

In December 2013, Valley Forge appointed Attorney Jamie Dameron as Hartford Iron's defense counsel pursuant to the terms of the second settlement agreement. (DE 675 at 4). Dameron quickly spotted problems with the stormwater collection system constructed by August Mack Environmental, Inc. ("August Mack"), and urged Valley Forge and Hartford Iron to get a second opinion from other environmental contractors, including Keramida, Inc. ("Keramida"). (DE 675 at 4). In April 2014, Dameron's law firm hired Keramida with Valley Forge's approval. (DE 675 at 6).

In June 2014, Keramida summarized its findings from its evaluation and inspection of the Hartford Iron site and identified necessary changes to the stormwater system. (DE 675 at 6). That same month, Dameron recommended to Valley Forge that Keramida replace August Mack as soon as possible to coordinate review and approval of a new stormwater collection system, because Keramida had expertise that August Mack lacked. (DE 675 at 6). Dameron warned Coyle that "[i]t would be a serious mistake, and a likely waste of dollars in the seven figures, to

---

[1] The factual background of this case is very complicated (the docket entries are now in excess of 750) and is known to the parties. Therefore, the Court will summarize only a brief factual background pertinent to the *in camera* review.

delay in directing Keramida to move forward on the basis as soon as practical." (DE 455-6 ¶ 7).

Hartford Iron contends that the "serious mistake" that Dameron warned Coyle of in June 2014 has now become a reality. (DE 737 at 13). According to Hartford Iron, Valley Forge's alleged delay in approving Keramida's work and Valley Forge's freeze on contractor payments delayed construction of the necessary stormwater system by more than two years and wasted nearly $10 million on ineffective stormwater controls. (DE 737 at 13).

The 19 emails submitted for *in camera* review are communications among Coyle, King, and counsel from June 20, 2014, to June 27, 2014, pertaining to the Keramida stormwater system and a June 24, 2014, phone call between Dameron and Coyle. Hartford Iron argues that these emails are not protected by the work-product doctrine or the attorney-client privilege and are relevant to its counterclaims against Valley Forge for breach of contract and bad faith claims management. (DE 737 at 19-20). Hartford Iron further argues that even if the emails constitute work product, Hartford Iron has a substantial need for the emails and is unable to obtain the substantial equivalent of this information without undue hardship. (DE 737 at 19).

## II. THE WORK-PRODUCT DOCTRINE

### *A. Applicable Legal Standard*

The work-product doctrine is a qualified privilege and is "distinct from and broader than the attorney-client privilege."[2] *Caremark, Inc. v. Affiliated Comput. Servs., Inc.*, 195 F.R.D. 610, 613 (N.D. Ill. 2000) (citing *United States v. Nobles*, 422 U.S. 225, 238 (1975)). "The work-product doctrine protects documents prepared by attorneys in anticipation of litigation for the

---

[2] Federal law governs the work-product doctrine. *See* Fed. R. Civ. P. 26(b)(3); *Urban Outfitters, Inc. v. DPIC Cos.*, 203 F.R.D. 376, 379 (N.D. Ill. 2001).

purpose of analyzing and preparing a client's case." *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2009) (citations omitted); *see In re Special Sept. 1978 Grand Jury*, 640 F.2d 49, 62 (7th Cir. 1980) ("[T]he work product doctrine may encompass any document prepared in anticipation of litigation by or for the attorney."). As with the attorney-client privilege, "the party invoking the work product privilege bears the burden of establishing that the privilege applies." *State Farm Fire & Cas. Co. v. Nokes*, 263 F.R.D. 518, 523 (N.D. Ind. 2009) (citation omitted).

A party claiming work-product protection must show that the materials sought are: "(1) documents and tangible things; (2) prepared in anticipation of litigation or for trial; and (3) by or for a party or by or for a party's representative." *Boyer v. Gildea*, 257 F.R.D. 488, 490 (N.D. Ind. 2009) (citation omitted); *see Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1118 (7th Cir. 1983); *Caremark*, 195 F.R.D. at 613-14. "[M]aterials prepared in anticipation of litigation by any representative of the client are protected, regardless of whether the representative is acting for the lawyer." *Caremark*, 195 F.R.D. at 615 (citation omitted); *see also Boyer*, 257 F.R.D. at 490.

"While litigation need not be imminent, the primary motivating purpose behind the creation of a document or investigative report must be to aid in possible future litigation." *Binks Mfg. Co.*, 709 F.2d at 1119 (citation omitted); *see also First Fin. Bank, N.A. v. Citibank, N.A.*, No. 1:11-cv-226, 2012 WL 626272, at *2 (S.D. Ind. Feb. 24, 2012). "[D]ocuments that are created in the ordinary course of business or that would have been created irrespective of litigation are not under the protection of the work product doctrine." *Caremark*, 195 F.R.D. at 614 (citation omitted). Thus, "whether a document is protected depends on the motivation

4

behind its preparation, rather than on the person who prepares it." *Id*. at 615. "[A] document is not privileged if it was initially created with a dual purpose and the litigation purpose is not primary . . . ." *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 190 F.R.D. 532, 537 (S.D. Ind. 1999) (citation and internal quotation marks omitted).

There are "differing levels of protection for fact and opinion work product." *Appleton Papers, Inc. v. EPA*, 702 F.3d 1018, 1024 (7th Cir. 2012) (citation omitted). "Fact work product consists of factual material while opinion work product consists of the mental impressions, conclusions, opinions, or legal theories of an attorney." *Nokes*, 263 F.R.D. at 523 (citation omitted). The work-product privilege can be overcome as to fact work product if the party seeking the materials shows: (1) a substantial need for the materials, and (2) an inability to obtain the substantial equivalent of the information without undue hardship. *See Appleton Papers, Inc.*, 702 F.3d at 1022 (citing Fed. R. Civ. P. 26(b)(3)(A)(ii)); *Boyer*, 257 F.R.D. at 490-91; *Caremark*, 195 F.R.D. at 614. "But even when a litigant makes the substantial need showing, 'opinion' work product remains protected." *Appleton Papers, Inc.*, 702 F.3d at 1023 (citing Fed. R. Civ. P. 26(b)(3)(B)); *Caremark*, 195 F.R.D. at 614 ("[T]he lawyer's mental processes are required to be protected from disclosure.").

Having said that, "[a]lthough documents and tangibles created by the representative in anticipation o[f] litigation are protected, the underlying facts may be subject to disclosure in ordinary discovery if they are non-privileged." *Vardon Golf Co. v. Karsten Mfg. Corp.*, 213 F.R.D. 528, 534 (N.D. Ill. 2003) (citing *Hickman v. Taylor*, 329 U.S. 495, 513 (1947)). Thus, "[t]he underlying facts contained in [opinion work product] are discoverable pursuant to ordinary discovery process such as interrogatories, document requests and depositions." *Eagle*

5

*Compressors, Inc. v. HEC Liquidating Corp.*, 206 F.R.D. 474, 479 (N.D. Ill. 2002).

### B. *Some of the 19 Emails Are Protected by the Work-Product Doctrine*

Valley Forge claims that all of the withheld emails are protected by the work-product doctrine because they were prepared for purposes of litigation—that is, this lawsuit between the parties filed in January 2014, the second settlement agreement entered into by the parties in December 2012, and the IDEM and EPA enforcement actions. Hartford Iron, however, characterizes the emails as communications with "coverage counsel" pertaining to claims management decisions of whether to proceed with the Keramida stormwater work, which are decisions made in the ordinary course of business by an insurance company. Hartford Iron emphasizes that courts generally have not applied the work-product doctrine to routine claims work performed by an attorney for an insurer in the regular course of business to arrive at a claims decision regarding insurance coverage. *See, e.g., Harper v. Auto-Owners Ins. Co.*, 138 F.R.D. 655, 663 (S.D. Ind. 1991).

Hartford Iron's attempt to parse Valley Forge's environmental remediation efforts from its litigation purposes in this case is unpersuasive. As the Court previously held in an Order dated April 14, 2017 (DE 675), the record suggests that the threat of litigation with IDEM and the EPA "was the motivating factor which moved [Hartford Iron] to complete the clean up of the [Hartford Iron] facility." *Bituminous Cas. Corp. v. Tonka Corp.*, 140 F.R.D. 381, 389 (D. Minn. 1992); *see Graff v. Haverhill N. Coke Co.*, No. 1:09-cv-670, 2012 WL 5495514, at *4 (S.D. Ohio Nov. 13, 2012) ("If a document is prepared in anticipation of litigation, the fact that it also serves an ordinary business purpose does not deprive it of protection, but the burden is on the party claiming protection to show that anticipated litigation was the driving force behind the

6

preparation of each requested document." (citation and internal quotation marks omitted)). As such, the Court will not separate the remediation efforts from this litigation, the second settlement agreement, and the IDEM and EPA claims for purposes of determining privilege issues. (*See, e.g.*, DE 298 at 18 ("That defense and remediation activities are inextricably intertwined is also reflected in the 2012 agreement itself, which specifies that defense counsel's duties include overseeing the environmental contractors doing the remediation work.")).

All of the emails at issue were created after this lawsuit was filed, after the parties entered into the second settlement agreement, and after the parties became aware of the IDEM and EPA claims. *See Bituminous Cas. Corp.*, 140 F.R.D. at 389 (comparing *In re LTV Sec. Litig.*, 89 F.R.D 595, 612 (N.D. Tex. 1981) (finding that documents prepared during an SEC investigation were work product), with *Rakus v. Erie-Lackawanna R.R. Co.*, 76 F.R.D. 145 (W.D.N.Y. 1977) (finding that accident reports prepared as required by ICC regulations were generated in the normal course of business)); *see Graff*, 2012 WL 5495514, at *27 (collecting cases and finding that the emails were prepared not in the ordinary course of business, but rather, in response to a potential civil action for alleged violations of a permit to install as set forth in the notice of violation from the state environmental agency); *ECDC Envtl., L.C. v. N.Y. Marine & Gen. Ins. Co.*, No. 96CIV.6033(BSJ)(HBP), 1998 WL 614478, at *13-14 (S.D.N.Y. June 4, 1998) (collecting cases that upheld a work-product objection as to communications of an environmental consultant prepared in anticipation of litigation with the EPA or state environmental agency).

Having said that, the fact that the communications were prepared in the midst of litigation is not necessarily determinative, as the work-product privilege "requires causation in

7

the sense of the *purpose* or *motivation* for the creation of documents—*i.e.*, the intended use to which the documents were to be put—not causation in the sense of a 'but for' sequence of events or influences." *Stout v. Ill. Farmers Ins. Co.*, 150 F.R.D. 594, 598 (S.D. Ind. 1993); *see Goodyear Tire & Rubber Co.*, 190 F.R.D. at 537 ("[T]he court must determine whether the *primary motivating purpose* behind the creation of a document or investigate report [was] *to aid in possible future litigation*." (second alteration in original; citation and internal quotation marks omitted)). "[E]ven if litigation is imminent, there is no work product immunity for documents prepared in the ordinary course of business rather than for litigation purposes." *Coltec Indus., Inc. v. Am. Motorists Ins. Co.*, 197 F.R.D. 368, 371 (N.D. Ill. 2000); *see also Binks Mfg. Co.*, 709 F.2d at 1118. The intent of the work-product doctrine is "to protect the adversarial process by providing an environment of privacy in which a litigator may creatively develop strategies, legal theories, and mental impressions outside the ordinary liberal realm of federal discovery provisions, thereby insuring that the litigator's opponent is unable to ride on the litigator's wits." *Coltec Indus., Inc.*, 197 F.R.D. at 371 (citation omitted).

Accordingly, some categories of documents generally fall outside the scope of the work-product privilege. One example is mere transmittal communications. *See Minter v. Liberty Mut. Fire Ins. Co.*, No. 3:11CV-249-S, 2012 WL 2430471, at *3 (W.D. Ky. June 26, 2012) (rejecting defendant's claim of work-product privilege with respect to "mere transmittal letters that contained no attorney impressions or strategy, but merely transmitted [documents] without any substantive comment"); *Smith ex rel. Smith v. United States*, 193 F.R.D. 201, 214 (D. Del. 2000) ("These are transmittal letters to which no work product privilege would attach."); *Am. Med. Sys., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. CIV.A. 98-1788, 1999 WL 970341, at

*4 (E.D. La. Oct. 22, 1999) ("Transmittal documents do not convey any confidential communication and are therefore not privileged."); *ECDC Envtl., L.C.*, 1998 WL 614478, at *15 (excluding from work-product protection cover letters, fax transmittal pages, or letters transmitting copies of documents without comment, all of which did not reveal any legal analysis, research, or litigation strategy).

Another category of documents outside the scope of the work-product doctrine are communications dealing with merely administrative, logistical, or scheduling matters. *See Keaton v. Hannum*, No. 1:12-cv-00641-SEB-MJD, 2013 WL 1818993, at *7 (S.D. Ind. Apr. 29, 2013) (stating that a discussion regarding the scheduling and rescheduling of a deposition was not work product); *MapleWood Partners, L.P. v. Indian Harbor Ins. Co.*, 295 F.R.D. 550, 621 n.282 (S.D. Fla. July 16, 2013) (declining to afford work-product protection to emails concerning administrative or scheduling matters); *Pic Grp. v. LandCoast Insulation, Inc.*, No. 1:09-CV-662KS-MTP, 2010 WL 1741703, at *2 (S.D. Miss. Apr. 28, 2010) (finding that communications relating "merely to logistical matters, such as scheduling meetings or conference calls" were not work product).

Having reviewed these legal principles, the Court finds as follows concerning whether the 19 emails are protected by the work-product doctrine:

| 6.20.14 1:33 p.m. | From Michaels to Benson, Coyle, and King[3] | Work product. Factual information and attorney thought processes regarding Keramida's report and Dameron role as defense counsel. |

---

[3] The Court has not included the names of the individuals who were copied on these emails, but these individuals are shown at DE 737-21.

| | | |
|---|---|---|
| 6.20.14 2:10 p.m. | From Coyle to Michaels, King, and Benson | Work product regarding Keramida report and environmental contractors. |
| 6.20.14 2:59 p.m. | From Ferguson to Coyle | Work product. Attorney thought processes regarding Keramida report and Dameron. |
| 6.23.14 11:21 a.m. | From Ferguson to King, Coyle, and Michaels | First paragraph pertains to scheduling/administrative matters and is not work product. Second paragraph is work product, as is factual information pertaining to Keramida report and upcoming Dameron call. |
| 6.23.14 11:28 a.m. | From Coyle to Ferguson, King, and Michaels | Work product regarding Keramida report and upcoming call with Dameron. |
| 6.23.14 11:27 p.m. | From King to Ferguson, Coyle, and Michaels | Not work product. Pertains to scheduling/administrative matters. |
| 6.24.14 7:46 a.m. | From Coyle to King, Ferguson, and Michaels | Not work product. Pertains to scheduling/administrative matters. |
| 6.24.14 7:57 a.m. | From Michaels to King and Coyle | First, second, and fifth paragraphs are not work product, as they pertain to scheduling/administrative matters. Third and fourth paragraphs are work product, as they reveal attorney thought processes regarding upcoming Dameron call. |
| 6.24.14 8:00 a.m. | From Coyle to Michaels and King | Work product pertaining to upcoming Dameron call. |
| 6.24.14 8:26 a.m. | From King to Coyle | Not work product. Pertains to scheduling/administrative matters. |
| 6.24.14 8:29 a.m. | From Michaels to Coyle and King | Work product. Factual information regarding upcoming Dameron call. |
| 6.26.14 4:58 p.m. | From Ferguson to Coyle and King | Work product. Reveals attorney thought processes and legal strategy regarding Dameron call. |
| 6.26.14 5:16 p.m. | From King to Ferguson and Coyle | Work product pertaining to stormwater system. |

| 6.26.14 6:07 p.m. | From Ferguson to King and Coyle | Work product. Reveals attorney thought processes and legal strategy regarding response to Dameron and Keramida report. |
|---|---|---|
| 6.27.14 9:33 a.m. | From Coyle to Ferguson and King | Work product. Proposed response to Dameron regarding Keramida report. |
| 6.27.14 9:52 a.m. | From King to Ferguson and Coyle | Not work product. Transmittal email. |
| 6.27.14 10:11 a.m. | From Ferguson to King and Coyle | Work product. Reveals attorney thought processes regarding proposed response to Dameron regarding Keramida report. |
| 6.27.14 1:43 p.m. | From Michaels to Coyle and King | Work product. Reveals attorney thought processes and legal strategy regarding proposed response to Dameron and Keramida report. |
| 6.27.14 1:50 p.m. | From King to Michaels and Coyle | Not work product. Transmittal email. |

*C. Hartford Iron Has Not Shown a Substantial Need for the Work Product and an Inability to Obtain the Substantial Equivalent of the Information Without Undue Hardship*

Hartford Iron argues that even if the emails are work product, they should still be produced because it has a "substantial need" for the materials to prove its breach of contract and bad faith claims, and it is unable to obtain the substantial equivalent of the information without "undue hardship." Fed. R. Civ. P. 26(b)(3). More particularly, Hartford Iron claims that it needs these emails to prove that Valley Forge wasted almost $10 million in ineffective storm water controls because it "allowed its litigation/coverage counsel to be de facto claims managers" and "block[ed] the work of Dameron and Keramida." (DE 737 at 20; *see, e.g.*, DE 508 ¶¶ 98, 107-109, 114, 121-122, 126).

Apparently, Hartford Iron is seeking the 19 emails as evidence to support its theory that

11

Coyle was communicating with Valley Forge's counsel about the remediation, and that such communication was a conflict of interest that breached the terms of the second settlement agreement. Having reviewed the emails *in camera*, the Court acknowledges that the emails are relevant to Hartford Iron's allegations of a conflict of interest concerning Hartford Iron's claim that Valley Forge's counsel were communicating with Coyle about the remediation.

Yet, it is no secret that Coyle was communicating with these lawyers about the remediation, as Hartford Iron has repeatedly emphasized as much throughout this litigation and Coyle testified so in her deposition. (DE 737-19 at 33 ("Q. You were consulting with other counsel about the defense? A. Correct."); DE 737-21). For example, in its brief in support of the motion to compel, Hartford Iron reiterates that Dameron "received e-mails from [Coyle] where she forgot to delete the lawyer's e-mail she copied." (DE 737 at 14 (quoting 455-6 ¶ 8)). Other examples include Dameron's statement that she asked for a meeting with Coyle to discuss the Keramida system in April 2015, but Valley Forge's litigation lawyers responded to the request, rather than Coyle (DE 455-6 ¶ 17); and Dameron's statement that she asked Valley Forge "many times since 2014 to provide [her] with a member of management whom [she] could contact about Hartford Iron issues and payments who is fully separated from the [Valley Forge] litigation lawyers in this case," but that Valley Forge "refused every one of those requests through its litigation lawyers, or it ignored the requests" (DE 455-6 ¶ 20). Simply put, while it is obvious that Coyle was communicating with counsel from June 20, 2014, to June 27, 2014, the Court is not persuaded by Hartford Iron's attempt to put these counsel solely in a box labeled "coverage counsel" as Hartford Iron defines the term. (*See* DE 737 at 15-16 ("'The standard, accepted practice is that the insurer does not share information about claims management with

coverage counsel, and coverage counsel does not share information about coverage disputes with the claims manager.'" (quoting DE 737-20 at 23))).

As District Judge Miller acknowledged in December 2015, it is readily apparent that the "defense and remediation activities are inextricably intertwined" in this case. (DE 298 at 18). Hartford Iron's attempt to overcome the work-product doctrine for the point of showing that Coyle was communicating with Valley Forge's counsel does not establish a substantial need for the emails or an inability to obtain the substantial equivalent of the information without undue hardship, Fed. R. Civ. P. 26(b)(3), as there is other evidence establishing the existence of such communications. Thus, Hartford Iron has not shown, nor is it readily apparent to the Court, that Hartford Iron has a substantial need for the *content* of these communications.

And with respect to Hartford Iron's claim of bad faith, District Judge Miller explained in his Order dated January 4, 2017, that "[b]ecause Valley Forge, upon learning of its ethical obligations, attempted to meet them by eliminating its control of the defense and remediation, Hartford Iron's conflict-based allegations don't result in bad faith." (DE 609 at 10). Rather, "[t]o proceed on the bad faith claim, Hartford Iron must show that Valley Forge acted with 'furtive design or ill will.'" (DE 609 at 11 (quoting *Mitchell v. Mitchell*, 695 N.E.2d 920, 925 (Ind. 1998)). As such, only Hartford Iron's misrepresentation-based bad faith claim survived Valley Forge's motion to dismiss. (DE 609 at 12). The 19 emails at issue occurred in June 2014 at a time when "a good faith dispute [still existed] over whether Valley Forge, in carrying out the settlement agreement while litigating against Hartford Iron, could still control the remediation and defense." (DE 609 at 10). Considering this time frame, and having reviewed the content of the 19 emails *in camera*, the Court is not persuaded that Hartford Iron has established a

"substantial need" for these emails with respect to its misrepresentation-based bad faith claim.

Therefore, Hartford Iron's request that the Court compel Valley Forge to produce the emails will be DENIED as to those emails or portions of emails that the Court has concluded are work product, and will be GRANTED as to the emails or portions of emails that the Court has concluded are not work product. At this juncture, the Court finds it unnecessary to reach Valley Forge's assertion that the emails are also protected by the attorney-client privilege.[4]

### III. CONCLUSION

Having completed an *in camera* review of the 19 emails, the Court, for the foregoing reasons, GRANTS IN PART and DENIES IN PART Hartford Iron's motion to compel (DE 737) Valley Forge to produce the 19 emails among Coyle, King, and Valley Forge's counsel. Valley Forge is ORDERED to produce Iron the emails that are not work product to Hartford Iron on or before February 13, 2018.

SO ORDERED.

Entered this 6th of February 2018.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge

---

[4] "The attorney-client privilege protects communications made in confidence by a client to [its] attorney in the attorney's professional capacity for the purpose of obtaining legal advice." *Jenkins v. Bartlett*, 487 F.3d 482, 490 (7th Cir. 2007) (citation omitted). The elements of the attorney-client privilege are: "(1) where legal advice was sought; (2) from a professional legal advisor in his capacity as such; (3) the communications relating to that purpose; (4) made in confidence; (5) by the client; (6) are at his instance permanently protected; (7) from disclosure by himself or by the legal advisor; (8) except the protection may be waived." *Long v. Anderson Univ.*, 204 F.R.D. 129, 134 (S.D. Ind. 2001) (citing *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997); *Lahr v. State*, 731 N.E.2d 479, 482 (Ind. Ct. App. 2000)). "[C]ommunications made in the routine course of business, such as transmittal letters or acknowledgment of receipt letters, which disclose no privileged matters and which are devoid of legal advice or requests for such advice are not protected." *Id.* (citation omitted).