**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **VALLEY FORGE INSURANCE COMPANY,** | ) | |
| **Plaintiff and Counter-Defendant,** | ) | |
| v. | ) | **Hon. William C. Lee, Judge** |
| **HARTFORD IRON & METAL, INC.,** *et al.,* | ) | **Cause No. 1:14-cv-6-WCL-SLC** |
| **Defendants and Counter-Plaintiffs.** | ) | |

**VALLEY FORGE INSURANCE COMPANY'S BRIEF IN SUPPORT OF
ITS MOTION TO EXCLUDE CERTAIN TESTIMONY OF PAUL F. AMORUSO**

Plaintiff and Counter-Defendant Valley Forge Insurance Company ("Valley Forge"), by and through its counsel, files this brief in support of its Motion to Exclude Certain Testimony of Paul F. Amoruso pursuant to Federal Rule of Evidence 702. Counsel for Defendant and Counter-Plaintiff Hartford Iron & Metal, Inc. ("Hartford Inc.") retained Amoruso, who is a former insurance claims handler, to offer opinions related to claims practices and procedures in this case. If that were the extent of Amoruso's opinions, then Valley Forge would not question his qualifications under Rule 702, even though it disputes the correctness of his claims-handling opinions and conclusions.

Although issues concerning claims practices will be before the trier of fact in this case, so will other significant issues, including environmental engineering issues related to the remediation of the Hartford Iron site and the implementation of a stormwater management system; and coverage issues concerning which party is financially responsible for the remediation of the Hartford Iron site, and to what extent. Valley Forge retained experts with backgrounds in, and a thorough comprehension of, the applicable fields, including hydrogeology. Instead of also retaining experts in these areas, Hartford Inc.'s counsel has sought to have the former claims handler Amoruso offer opinions on these other topics that are clearly beyond his knowledge, training, and experience. In fact, Amoruso goes so far as to opine on the reliability and effectiveness of environmental engineering proposals for a

stormwater management system, despite having no knowledge, training, education, or experience in this area, and based in part on his supposition of what Valley Forge's retained hydrogeologist with 40 years of experience must have been "misunderstanding" and "not realiz[ing]." Similarly, Amoruso provides a legal interpretation of contractual terms that not only infringes on the province of the Court and renders some terms meaningless while ignoring the plain meaning of others, but does so, in part, on his ostensible divining of the underwriter's intent more than 40 years ago.

Quite tellingly, Amoruso's two expert reports bear a striking resemblance to the arguments Hartford Inc.'s counsel has repeatedly made during this case, which may explain why Hartford Inc.'s counsel refused to let Amoruso testify about whether he actually authored the opinions he claims as his own:

| | | |
|---|---|---|
| Q: | Okay did you draft both of these, [reports] 1, and 2? | |
| Mr. Shere: | Objection. Calls for work product. Drafts are not discoverable. I instruct the witness not to answer. | |
| Mr. Hodyl: | I wasn't asking about drafts. | |
| Mr. Hodyl: | Did you – did you draft – Did you author these two, 1 and 2? That's my question. | |
| A: | The opinions in 1 and 2 are my opinions. | |
| Q: | Right. But as far as actually typing out these documents, are these documents that you yourself wrote? | |
| Mr. Shere: | Objection, asked and answered. Objection, calls for work product information about the drafting process of preparing these reports. I instruct the witness not to answer. | |

(Dec. 6 Depo. Trans., attached as Exhibit 1, at 15:2-18). It may further explain why Amoruso has identified his compensation for "file review," for "trial and deposition testimony," and "for travel," but not for writing the reports. (*See* Oct. 2, 2017 Report, attached as Exhibit 2 at 39; Nov. 6, 2017 Report, attached as Exhibit 3). It may also explain why Amoruso's reports read like a legal brief.

The opinions of Amoruso that stray far beyond his area of experience and knowledge are not the product of sound, careful, and independent research and analysis, but are instead based on conjecture, one-sided (and incomplete) data, and subjective beliefs, which may or may not have

originated as his own. Further compounding the problem is the fact that Amoruso neither possessed

nor made any effort to obtain any specialized knowledge that could potentially qualify him as an expert

and make his opinions of some value to the trier of fact in comprehending evidence or determining a

fact in issue. Accordingly, the Court should preclude Amoruso's opinions that are the subject of

Valley Forge's motion because he is not qualified to make them, he did not employ a trustworthy

methodology to reach them, and they are of no assistance to the Court, thus rendering the testimony

unreliable and inadmissible under Rule 702.

## I.        AMORUSO'S BACKGROUND AND THE OPINIONS AT ISSUE

Amoruso's experience in the field of insurance is handling and managing claims, and the focus

of Valley Forge's motion is not his purported "claims handling" opinions.[1] Valley Forge's motion is

directed solely at those opinions Amoruso has been retained to provide on matters far afield from

insurance claims practices, including environmental engineering and contract interpretation.

### A.    Amoruso's Environmental Opinions

Amoruso has no educational or work background in hydrogeology or any other environmental

science. (*See* CV attached to Ex. 2; Ex. 1 at 84:18-22). He has no education or training as an engineer.

(*See* CV attached to Ex. 1). He has never designed or constructed a stormwater management system,

nor does he have any experience with a claim involving the type of system present at the Hartford

Iron site. (*See* Ex. 1 at 287:17-23 (Q. "How many of those claims involved a proposal to direct

contaminated storm water off the site to another location?" A. "Offhand right now, I can't think of

any.")). Despite the foregoing, Amoruso offers environmental argument, conclusions, and opinions

---

[1] Although Valley Forge does not contest Amoruso's qualifications to opine about general claims-handling matters, it believes his opinions and conclusions in this area are incorrect. Valley Forge recognizes, however, that "the ultimate correctness of the expert's conclusions" is not an issue before the Court in a Rule 702/*Daubert* analysis. *See Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (citations omitted).

peppered throughout his reports, including the following opinions, which all together are referred to in this brief as his "Environmental Opinions":

- On February 26, 2014, IDEM changed its April 17, 2012 instruction that remediation of PCBs should be carried out to the agency's industrial screening level of 7.4 ppm. Instead, the agency set a cleanup level of 1 ppm PCBs 'due to the recent PCB impacted storm water events.' (Ex. 2 at 3).

- [Valley Forge hydrogeology expert Robert] Karls makes a single argument about delay of effective stormwater work. The argument provides no valid basis to attribute this delay to Hartford Iron. This issue illustrates broader failures of methodology in the Karls and [Bernd] Heinze reports. (Ex. 3 at 13, Opinion VIII).

  - Karls says nothing about the supposed fault of Hartford Iron regarding this task, including the failure of Insurer's coverage counsel to negotiate terms with Keramida in 2015. (*Id.* at 14, Opinion VIII.1).

  - Effectively and completely capturing stormwater migrating from the Hartford Iron site is fairly easy and simple. (Ex. 1 at 256:10-14, 21; 323:24-324:1).

  - Claims director J. Alpine ended Insurer's freeze on most contractor payments on or about August 1, 2016, allowing TEI's construction of the effective stormwater controls as well as other work required by IDEM. (*Id.* at 15, Opinion VIII.2).

  - Even after J. Alpine ended the payment freeze to contractors, Insurer failed to provide Hartford Iron the required legal defense to implement the work. (*Id.* at 16, Opinion VIII.3).

  - Karls does not recognize that Keramida substantially revised its technical specifications as of December 7, 2015 to meet IDEM requirements. His lack of knowledge about the facts illustrates the broader failure in his report and the Heinze report to use reliable references and valid methodology to express opinions about claims management. (*Id.* at 16, Opinion VIII.4).

  - Insurer's proposal for a special master was not needed to build effective stormwater controls and would have caused further delay. (*Id.* at 17, Opinion VIII.5).

4

    ○  Under Insurer's insurance policies and the arguments of coverage counsel, Hartford Iron could not reasonably advance substantial funds for effective contractor work in response to Insurer's failure to meet its obligations.  (*Id.* at 19, Opinion VIII.6).

Clearly, Amoruso is not qualified to opine on environmental matters, and his mere repetition of counsel's arguments would be of no value to the trier of fact.

### B. Amoruso's Contract-Interpretation Opinions

Amoruso has never worked as an underwriter or studied, formally or informally, to be an underwriter.  (*See* Ex. 1 at 83:24-84:3; 85:16-18; 235:24-236:2).  In fact, he admits to having never personally underwritten a single insurance policy.  (*See id.*)  He holds himself out as an insurance claims-handling consultant who specializes in "[g]iving opinions and testifying in State and Federal court as to acceptable insurance practices involving claims, insurance agency's [sic], bad faith, workers compensation, insurance principles and practices, [and] proper claims handling."  (Amoruso website, attached as Exhibit 4).  Despite having no underwriting experience or training, Amoruso nonetheless opines that the Court should ignore plain and unambiguous cap language in the Settlement Agreement limiting Valley Forge's financial obligations at the Hartford Iron site, and should instead adopt *his* legal opinion that Hartford Inc. is entitled to nearly $300,000,000 rather than the $15,300,000 in aggregate limits expressly stated in the policies at issue.  Amoruso's opinion revealingly parrots the argument Hartford Inc.'s counsel has repeatedly asserted for more than a year, long before Amoruso issued his first report.  (*E.g.*, Doc. No. 702 (counsel arguing Valley Forge's "misrepresentation of aggregate limits" concerning policies that "provide additional tens or hundreds of millions of dollars of coverage for the environmental damage in this case"); Doc. No. 741-3 at 17-20 (counsel arguing he discovered "a bomb shell" because "[t]here's no aggregate limit.  There's only occurrences")).

Amoruso offers the following opinions, which are referred to in this brief as his "Contract Interpretation Opinions":

- Insurer and its related CNA companies issued liability policies for the Hartford Iron business that provide unlimited aggregate coverage, without reservation of rights, prior to October 24, 1979, resulting in occurrence-based coverage of approximately $298 million using conservative assumptions about the deposit and spread of contamination. (Ex. 2 at 11, Opinion C).

- Insurer made material omissions and misstatements in its late identification of policy years and coverage. (*Id.* at 15, Opinion D).

- The aggregate and occurrence policy limits apply only to certain claims payments. (*Id.* at 17, Opinion E).

- Insurer continues to withhold information about the Coyle Reinsurance Letter, but that letter accurately reflects the lack of aggregate limits for the pre-1979 policies. (Ex. 3 at 10, Opinion VII).

  o Manual adjustments were customary. (*Id.* at 10, Opinion VII.1).

  o Insurer made manual adjustments for Hartford Iron, which it tried to conceal. (*Id.* at 10, Opinion VII.2).

  o Insurer did not use the payroll information submitted by Hartford Iron to calculate rates for its September 1, 1976 policy renewal. (*Id.* at 10, Opinion VII.3).

  o The underwriters of the mid-1970s policies did not intend to have an aggregate. (Ex. 1 at 344:23-345:5).

Amoruso's opinions improperly seek to interpret the contracts at issue, which is the sole province of this Court.

## II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of a dispute concerning two contracts – settlement agreements – between Valley Forge, on one hand, and Hartford Inc. and Alan Goldberg, on the other, which were entered April 17, 2009 ("Settlement Agreement") and December 4, 2012 ("Supplemental Settlement Agreement"), respectively. (*See* Settlement Agreement at Doc. No. 45-4 and Supplemental Settlement Agreement at Doc. No. 6-1). After decades of the scrap-yard business allowing (and ignoring) the migration of polychlorinated biphenyls ("PCBs") and other contaminants into the bare ground, the

6

Indiana Department of Environmental Management ("IDEM") and United States Environmental Protection Agency ("EPA") required Hartford Inc. to remediate the soil on the site and to prevent the spread of contaminants offsite via migration in stormwater.[2]  The Settlement Agreements were generally intended to resolve insurance-coverage disputes between the parties about their respective legal rights and obligations related to that remediation.

Disputes between the parties arose again shortly after the execution of the Supplemental Settlement Agreement.  Valley Forge grew frustrated with Hartford Inc.'s usurpation of control of the defense, including the almost immediate rejection of the appointed defense attorney, the third such experienced attorney rejected in almost as many years.[3]  Valley Forge was also frustrated that Hartford Inc. was obstructing August Mack's ability to effectively and efficiently handle the remediation of the Hartford Iron site, including the stormwater management issue.  After failed attempts to resolve these disputes and secure the rights it had bargained for through the Settlement Agreements, Valley Forge initiated this declaratory-judgment and breach-of-contract lawsuit.

One of the main issues for the trier of fact in this case will be who bears responsibility for the delays regarding the remediation of the Hartford Iron site, including the implementation of a stormwater management system, which primarily falls within the damages and remedies phase (Phase 2) of the Court's bifurcated case schedule.  Hartford Inc. has also concocted a new issue in the case, that despite the parties' agreement that Valley Forge's entire indemnity obligation would be capped based on a reference to "the total of the aggregate liability limits of the Policies," which amounts to approximately $15,300,000, the Court should effectively rewrite the Settlement Agreements and

---

[2] Hartford Inc. has operated a scrap yard business on the site since 2005, and before that, Defendant Alan Goldberg and his father Louis Goldberg each operated scrap yard businesses as sole proprietors dating back to the middle of last century.

[3] Not surprisingly, counsel of record for Hartford Inc. in this case later declared himself Hartford Inc.'s "chosen defense counsel."  (*E.g.*, Doc. No. 455-20 at 35 filing by Mark Shere referencing "Hartford Iron's chosen defense counsel (the undersigned)").

artificially expand the limit twentyfold to almost $300,000,000. (*See* Doc. No. 45-4 at 6). To reach this fantastical conclusion, Hartford Inc. insists that the Court must ignore the indemnity language in the Settlement Agreement and ignore that all the policies, none of which were issued to Hartford Inc., plainly and undisputedly list aggregate limits. With respect to both issues, Hartford Inc. has not retained an environmental expert or an underwriting expert, as Valley Forge has done, but has instead had Amoruso strain well beyond his claims-handling background to opine on matters about which his testimony is entirely unreliable.

## III.    LEGAL AUTHORITIES

Federal Rule of Evidence 702 requires a district court to ensure that proffered expert testimony is both reliable and relevant, and sets forth who may provide expert-opinion testimony. *See* FED. R. EVID. 702; *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-95 (1993) (explaining the framework for assessing expert testimony). Reliability has consistently been the hallmark of the Supreme Court's decisions when evaluating expert testimony under Rule 702. *Hartman v. EMSCO Indus., Inc.*, 758 F.3d 810, 818 (7th Cir. 2014).

All expert testimony under Rule 702 is subject to the *Daubert* analysis. *S.V. Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017); *Lyons v. Leatt Corp.*, 322 F.R.D. 327, 338 (N.D. Ind. 2017). District courts play a gatekeeper role under Rule 702 in which they "must evaluate: (1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." *Gopalratnam*, 877 F.3d at 779 (emphasis in original). A court will not permit a party to introduce expert testimony unless it can establish by a preponderance of the evidence that the testimony satisfies the *Daubert* standard. *Kirk v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017); *see also Bickel v. Pfizer, Inc.*, 431 F. Supp. 2d 918, 920 (N.D. Ind. 2006).

**IV.    ARGUMENT - AMORUSO'S OPINIONS DO NOT SATISFY THE REQUIREMENTS OF RULE 702 AND *DAUBERT* AND MUST BE EXCLUDED**

Amoruso signed two reports that address an array of issues, including environmental and legal contract-interpretation issues, about which he is utterly unqualified to opine and for which he did not bother to conduct even the most basic research.  His methodology, which appears to have started with a predetermined conclusion that he attempted to backfill with subjective beliefs, conjecture, and intentionally selective facts, blatantly runs afoul of the Supreme Court's hallmark for expert-testimony cases – reliability.  *See Hartman v. EMSCO Indus., Inc.*, 758 F.3d 810, 818 (7th Cir. 2014).  For example, although Amoruso has no education, training, or experience about the design and engineering of stormwater management systems, and he did not read any treatises or consult any professionals in the field, he nonetheless gives an opinion regarding which stormwater management proposal "provide[d] a sound engineering for control of stormwater" (Ex. 3 at 13).  Moreover, he based his conclusion, at least in part, on what he divined to be a "misunderstanding of the [stormwater] work" by a hydrogeologist retained as an expert for Valley Forge, who, unlike Amoruso, has a formal education and almost four decades of hands-on experience in the relevant field.  (*See id.* at 16-17).

Similarly, despite the fact (or perhaps because of it) he has zero underwriting experience and training, Amoruso deduced that when the underwriter(s) identified an aggregate limit of $50,000, what the underwriter(s) actually meant was that there should be no aggregate limit at all: "I don't think that was [the underwriters'] intent at all to have an aggregate. … I think they intentionally did not want an aggregate." (Ex. 1 at 344:23-345:5).  Such unqualified and speculative conclusions fail to satisfy each of the three Rule 702 steps articulated by the Seventh Circuit and are precisely what Rule 702 and *Daubert* are designed to preclude.  *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

### A. **Amoruso's Environmental Opinions Should Be Barred**

Amoruso's Environmental Opinions are little more than a poorly camouflaged repetition of legal arguments put forward by Hartford Inc.'s counsel in this case. These arguments concern who bears responsibility for the delayed implementation of an effective stormwater management system. For example, he *argues* that 40-year hydrogeologist Karls's opinion "is defective in several ways"; that Karls fails "to attribute this delay [of the installation of a stormwater management system] to Hartford Iron"; that Valley Forge's payments to contractors in August 2016 allowed for the "construction of the effective stormwater controls"; and that Karls has a "lack of knowledge" of certain facts, and has a "misunderstanding of the [stormwater] work." (*See* Ex. 3 at 13-14, 16). These are arguments, not proper expert opinions. *See Roundy's Inc. v. Nat'l Labor Relations Bd.*, 674 F.3d 638, 648 (7th Cir. 2012) (holding that the proffered expert testimony amounted "to legal arguments that should be presented to the court in counsel's analysis, not expert opinion testimony"). Thus, whether Amoruso's statements related to this issue are treated as opinions or arguments leads to the same conclusion – he lacks any legal basis under Rule 702 or otherwise to proffer them.

### 1. **Amoruso Is Not Qualified**

The central premise of Amoruso's Environmental Opinions is the purported "sound engineering" and "effective[ness]" of the stormwater management system at the Hartford Iron site. When considering Amoruso's lack of any practical experience or academic or technical training in the environmental sciences, including hydrogeology and environmental engineering, it is glaringly obvious that he is not qualified to opine about the engineering or effectiveness of stormwater management systems or other environmental activities. To be clear, Amoruso has no academic or technical training or practical experience in any environmental science. (*See* CV attached to Ex. 2; Ex. 1 at 84:18-22). He has no education or training as an engineer. (*See* CV attached to Ex. 2). Moreover, he admittedly has absolutely no experience with any claims involving the type of stormwater management system

installed at the Hartford Iron site, in which stormwater is captured and routed from an industrial site to an offsite location. (Ex. 1 at 287:17-23).

Moreover, as previously mentioned, Amoruso seeks to buttress his unqualified environmental assessments through some unexplained psychic analysis of Karls's mindset: "his lack of knowledge about the facts"; "his misunderstanding of the [stormwater] work"; his failure to "realize" facts about the stormwater work and that the design of the stormwater system changed; and his "reli[ance]" on the incorrect evidence. (*See* Ex. 3 at 16, 17). In addition to being mere conjecture, there is absolutely nothing in Amoruso's education, training, or background that qualifies him to offer opinions about the mindset, knowledge, or understanding of another expert, particularly a person he has never met and with whom he has never communicated. Thus, Hartford Inc. cannot meet its burden of establishing that Amoruso is qualified to provide his Environmental Opinions.

### 2. Amoruso's Methodology Is Not Reliable

Amoruso's Environmental Opinions include: (1) the "stormwater basin and capture system" "consisted of the only controls ever proposed or implemented at the Hartford Iron site to provide a sound engineering for control of stormwater" (Ex. 3 at 13); (2) the system "provided the only set of stormwater controls for the Site approved by IDEM" (*id.*); (3) the system constituted "effective stormwater controls" (*id.* at 14, 15, 16, 17); and (4) that "[o]n February 26, 2014, IDEM changed its April 17, 2012 instruction that remediation of PCBs should be carried out to the agency's industrial screening level of 7.4 ppm" (Ex. 2 at 3). These conclusions were not reached through "the same level of intellectual rigor that characterizes the practice of an expert" in the field of hydrogeology or environmental engineering. *See Kumho Tire*, 526 U.S. at 152. In fact, they are merely conclusory statements lacking any analysis or discussion linking the opinions and the facts. *See C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 837 (7th Cir. 2015); *see also Salgado v. General Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998) ("Expert reports must include 'how' and 'why' the expert reached a particular

11

result, not merely the expert's conclusory opinions"); *Bickel v. Pfizer, Inc.*, 431 F. Supp. 2d 918, 920-21 (N.D. Ind. 2006) (internal quotes omitted) ("A witness's own training and experience may be the foundation for an expert opinion, but the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts").

For example, during his deposition, Amoruso was questioned about the basis for his conclusion that IDEM had previously set an "industrial screening level of 7.4 ppm" on "April 17, 2012." Even when he was provided with the two-page April 17, 2012 letter that he identified in his report as the purported basis for his conclusion that 7.4 ppm was the "industrial screening level," he could not identify the basis for his conclusion:

> Q:  Can you tell me where, on [the April 17, 2012 letter], does IDEM have an instruction that remediation of PCBs should be carried out to the agency's industrial screening level of 7.4 part per million? Where in this letter?
>
> \*     \*     \*
>
> A:  **I don't see that here**. But 7 was the accepted level at that time.
> Q:  7.4 was the accepted level?
> A:  Yes, sir.
> Q:  Based on what?
> A:  **I couldn't tell you right now**. I honestly can't. I – I'm confident that it was. … I was comfortable with it when I wrote that. I don't remember why or where.
>
> \*     \*     \*
>
> A:  **I don't know, honestly, where I got it from**, to be honest with you. …

(*See* Ex. 1 at 290:7-292:4 (emphasis added)). He also could not state whether his opined soil remediation standard was, in fact, a standard or just a possible consideration by IDEM. (*See* Ex. 1 at 292:17-22). Even more egregious was Amoruso's testimony that he did not even bother to read the deposition transcript from this case of three IDEM employees testifying as IDEM's official designees, who were all personally involved with the Hartford Iron site, and who were deposed a month before he issued his second report. (*See* Ex. 1 293:8-16).

In addition to the foregoing, many of the bases for Amoruso's Environmental Opinions were nothing more than conjecture. For instance, Amoruso could not cite any support for his supposition that all environmental work performed at the Hartford Iron site required IDEM's approval, including August Mack's proposed underground sump. (*See* Ex. 1 326:4-17 (citing his "belief" based on "everything I've seen"); 327:20-328:19 ("I think" August Mack needed approval)). He concluded that August Mack's stormwater management proposal, which he initially appeared not to know about (*see id.* at 285:21-286:5), could not work because, as he conceded, it did "not make any sense to me" (*see id.* at 392:8-13; *see also id.* at 256:10-14 (Amoruso describing the process of capturing and containing contaminated stormwater from the Hartford Iron site as "a fairly easy pollution problem" that is "really simple")). Such conjecture also involved Amoruso's unqualified opinion concerning the mental processes of hydrogeologist Karls, discussed earlier. (Ex. 3 at 16-17).

Hartford Inc. cannot establish that Amoruso's methodology with respect to his Environmental Opinions is reliable because he clearly did not employ the "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *See Kumho Tire*, 526 U.S. at 152. An expert in an environmental science field would, as a practical matter, begin with a foundation of knowledge that Amoruso wholly lacks, merely by the nature of that person's expertise. That expert would nonetheless still study the relevant environmental regulations, review the directly applicable testimony of the governing body (*i.e.*, IDEM), and conduct (or have conducted by a qualified person) the necessary engineering analyses. Amoruso did none of these things, and instead based his opinions on his thoughts, beliefs, and a partial set of facts. Thus, Amoruso's Environmental Opinions should be precluded because Hartford Inc. cannot establish that Amoruso employed a reliable methodology in reaching his conclusions.

13

### 3. Amoruso's Testimony Will Not Assist the Trier of Fact

Under Rule 702, if the "expert's scientific, technical, or other specialized knowledge" does not "help the trier of fact to understand the evidence or determine a fact in issue," then the proffered opinion testimony is precluded. FED. R. EVID. 702; *Hartman*, 758 F.3d at 819. It is hard to imagine how Amoruso's unqualified Environmental Opinions premised on conjecture could be of any assistance whatsoever to the trier of fact. As already established, Amoruso wholly lacks "scientific, technical, or other specialized knowledge" regarding stormwater management issues, hydrogeology, environmental science and engineering, etc. to offer *any* environmental opinions. His arguments, conjecture, and unqualified environmental opinions cannot help the trier of fact in any regard. Thus, under the third step of the Court's gatekeeping analysis, Amoruso's Environmental Opinions should be excluded because they neither concern a fact about which Amoruso possesses scientific, technical, or other specialized knowledge, nor a fact that the Court requires Amoruso's assistance to understand.

### B. Contract-Interpretation Opinions

Hartford Inc.'s counsel has repeatedly asserted a truly specious argument based on a false premise to render the indemnity payment cap that the parties agreed to through the Settlement Agreements meaningless. Amoruso did nothing more than parrot counsel's specious argument in the disguise of an opinion that both infringes on the province of the Court and, as with the Environmental Opinions, was made without the necessary experience, training, education, or knowledge to satisfy Rule 702.

### 1. Amoruso Is Not Qualified

The crux of Amoruso's Contract-Interpretation Opinion is his conclusion that a $50,000 property damage aggregate limit in a 1975-1978 insurance policy should be ignored by the Court and that Valley Forge should be exposed to up to approximately $300,000,000 in potential liability to Hartford Inc., under that policy alone, for its defense and the remediation of the site. This conclusion

is grossly incorrect, and based on shoddy facts and a wholly unreliable methodology, which are discussed in the next section. For purposes of step one of the Court's gatekeeping analysis, however, it is enough to note that: (1) interpretation of a contract, including an insurance policy, is a legal matter for the Court to decide; and (2) Amoruso's claims background does not provide him with the knowledge, experience, training, or education necessary to opine about underwriting matters.

Here, there is no policy-interpretation issue regarding the extent of Valley Forge's indemnity obligation because the Settlement Agreement defined Valley Forge's "Indemnity Payment Cap" as an amount that "shall not exceed the total of the aggregate liability limits of the Policies." (Doc. No. 45-4 at 6). In other words, for all policies issued to Alan Goldberg (no policy was issued to Hartford Inc.) that had stated aggregate limits, those limits should be added together to comprise the "indemnity payment cap." This straightforward calculation requires no "expert" assistance to the trier of fact.

Even if there were a policy-interpretation issue, it would be "'primarily a question of law for the court.'" *Westfield Ins. Co. v. Orthopedic & Sports Med. Ctr. of N. Indiana, Inc.*, 247 F. Supp. 3d 958, 967 (N.D. Ind. 2017) (quoting *Wagner v. Yates*, 912 N.E.2d 805, 808 (Ind. 2009)). Where the provision of an insurance contract is clear and unambiguous, it should be given its plain and ordinary meaning. *See Allgood v. Meridian Sec. Ins. Co.*, 836 N.E.2d 243, 247 (Ind. 2005). *See also Haag v. Castro*, 959 N.E.2d 819, 821-22 (Ind. 2012) (holding that "an ambiguity is not affirmatively established simply because controversy exists and one party asserts an interpretation contrary to that asserted by the opposing party") (internal quotes omitted). Here, the 1975-1978 policy information available plainly identified $50,000 as the property damage liability aggregate. (*See, e.g.*, Limits Changed Endorsement and Certificate of Insurance, attached as <u>Exhibit</u> 5). Accordingly, Amoruso's opinion improperly infringes on the province of the Court and is premised on a false double-assumption of ambiguity – first, that the Settlement Agreement, which plainly stated the extent of Valley Forge's indemnity obligation, is ambiguous; and second, that the 1975-1978 policy, which plainly identified the property damage

liability aggregate, is ambiguous.  The assumption of ambiguity itself is unreliable because Amoruso admitted that he did not evaluate the Settlement Agreement, but rather focused almost exclusively on the Supplemental Settlement Agreement even though the latter expressly incorporated the former:

> A:    … the second [agreement] is where I spent a lot of my time. And as I say, **I didn't really get into one**, just to read it and understand what it was.

(Ex. 1 at 308:14-19 (emphasis added)).

> Q:    If the second settlement agreement doesn't address an issue that's in the first settlement agreement, what's your understanding of – of that – the term in the first agreement?
> [Objection omitted.]
> A:    I don't know.
> Q:    Okay.
> A:    **Never gave it any thought**.  It would be a legal conclusion. I'd have to give it some thought, but I never did.
> Q:    All right.  But you did that – You did do an analysis of the second settlement agreement for purposes of your opinions that are on 21 and 22; is that correct?
> A:    Yes.

(*Id.* at 311:20-312:14 (emphasis added)) (*See also* Doc. No. 6-1 at 4 ("The intent of the parties is for this Second Agreement to supplement, rather than replace, the First Confidential Settlement Agreement and Limited Release (April 17, 2009)").

Moreover, even if expert testimony on the issue were appropriate (which it is not), Amoruso clearly lacks the requisite qualifications to comment on the "customary" practices.  (*See* Ex. 3 at 10). He has never worked as an underwriter or studied, formally or informally, to be an underwriter.  (*See* Ex. 1 at 83:24-84:3; 85:16-18; 235:24-236:2).[4]  In fact, he holds himself out as a person who specializes in claims-handling practices.  (*See* Ex. 4).  Even though he lacks underwriting experience and training, he testified that he did not bother to read or consult treatises on underwriting, and did not examine opinions or analyses by experienced underwriters.  (*See* Ex. 1 at 235:3-17).

---

[4] By comparison, Valley Forge expert James Robertson has a background in underwriting that includes working as an underwriter, teaching underwriting, and authoring publications on underwriting.  (*See* CV attached to Ex. 6).

When analyzing whether an expert is qualified to provide an opinion, the Court must focus on whether the expert's "qualifications provide a foundation for [the expert] to answer a specific question," and "not whether an expert witness is qualified in general." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010). *See also U.S. v. Allen*, 207 F. Supp. 2d 856, 863 (N.D. Ind. 2002) (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)) (advising that "the court should consider a proposed expert's 'full range of practical experience as well as academic or technical training'"). Amoruso's Contract-Interpretation Opinions involve an analysis of terms, operations, and calculations, some of which are archaic/historical (*e.g.*, whether the policy was rated on a remuneration basis), and that are unique to insurance underwriting. (*See* Ex. 3 at 10-12). Analyzing questions of customary underwriting practices, whether a policy was rated on a remuneration basis, whether the premium was calculated based on payroll information, etc. requires something greater than a rudimentary knowledge of the general topic of underwriting, which, at most, is what Amoruso possesses. In other words, the "specific question," as presented by Hartford Inc., concerns particular underwriting matters – namely, whether the 1975-1978 policy was rated on a remuneration basis – about which Amoruso is not qualified to testify even if he is qualified to testify about general insurance issues. *See Gayton*, 593 F.3d at 617.

District courts, including this Court, have routinely distinguished between whether a witness is generally qualified to offer expert testimony concerning an area or field that may be relevant to the case versus whether the witness is qualified to offer the specific testimony proffered. For example, in *Allen*, the Court was trying to determine whether a witness was qualified to offer testimony comparing the impression of a shoe print left inside a burglarized bank with footwear recovered from the defendant at the time of his arrest. 207 F. Supp. 2d at 856. The expert witness was the Police Forensic Examiner who had "five years experience as a forensic examiner," and had "undergone substantial training in the areas of fingerprint, palm print, footwear, tire track and other physical comparisons."

*Id.* at 858, 864. The witness also was "a certified law enforcement instructor" who had "instructed numerous groups in latent fingerprint processing," which the Court noted was "a process similar to the science of footwear impression." *Id.* at 864.

Considering the foregoing, nobody could reasonably dispute that the Forensic Examiner was qualified in the field of forensic science. The Court noted, however, that the issue before it under its *Daubert* and Rule 702 analysis was not whether the witness was generally qualified in the field of forensic science, but whether he was specifically qualified to offer the expert testimony being proffered about impressions evidence. *See id.* The Court noted that it did not know whether the witness was "proficien[t] in obtaining impression evidence, how frequently he utilizes his training in the area of impressions evidence, how often he is proficiency tested, etc." *Id.* "Without such evidence before it, the court cannot conclude with any certainty that [the witness] is qualified to offer an opinion on footwear impression evidence." *Id.*

Applying the Court's analysis in *Allen* to examine whether Amoruso is qualified to offer opinion testimony on whether the 1975-1978 policy was rated on a remuneration basis, it is clear that Amoruso wholly lacks the knowledge, skill, experience, training, or education to offer such testimony. In *Allen*, the Court could not conclude under Rule 702 that the Forensic Examiner was qualified to opine on footwear impression evidence even though the Examiner had specific experience and substantial training in the field and was a certified instructor of a process that the Court acknowledged was "similar to the science of footwear impressions." *Id.* Amoruso, on the other hand, has no experience, education, or "substantial training" as an underwriter. (*See* Ex. 1 at 83:24-84:3; 85:16-18; 235:24-236:2). He did not read or consult treatises on underwriting, did not examine opinions or analyses by experienced underwriters, and is not otherwise a student of underwriting. (*See* Ex. 1 at 235:3-17). As *Allen* illustrates, whether Amoruso is generally qualified in the field of insurance has no bearing on whether he is specifically qualified to opine on questions of underwriting matters. He

clearly is not. *See also Dartey v. Ford Motor Co.*, 104 F. Supp. 2d 1017 (N.D. Ind. 2000) (this Court holding that a metallurgical engineer with decades of experience was qualified to testify about how metal cables failed in a tailgate, but not about alternate designs or whether the cables had a design defect, because that was too far beyond the engineer's scope of expertise).

As the decisions of this Court establish, while Amoruso may generally be qualified to opine about matters concerning claims handling, Hartford Inc. cannot meet its burden of establishing that he is qualified to opine about underwriting matters merely because both claims and underwriting fall within the broad general subject matter of insurance. Consequently, Amoruso's Contract-Interpretation Opinions should be barred.

### 2. Amoruso's Methodology Is Not Reliable

Amoruso's opinion that a three-year policy spanning from October 24, 1975 to October 24, 1978 "provide[s] unlimited aggregate coverage … resulting in occurrence-based coverage of approximately $298 million using conservative assumptions" provides an extreme example of a supposedly independent witness disregarding the intellectual rigor required under Rule 702 and crossing the line from expert witness to party advocate. The methodology Amoruso employed to reach the opinion exemplifies that of a person who first settles on (or is provided with) a predetermined conclusion and then, after-the-fact, searches desperately for facts and data to prop up that conclusion. Hartford Inc. cannot establish the reliability of Amoruso's methodology by a preponderance of the evidence, and thus cannot satisfy Rule 702. *See Gopalratnam*, 877 F.3d at 779.

The Contract-Interpretation Opinions fail to satisfy Rule 702 for several reasons. First, the opinions are based on an incorrect assumption repeatedly asserted by Hartford Inc.'s counsel and now blindly adopted by Amoruso – namely, that there is a policy-interpretation issue before the Court regarding whether and how the aggregate limits of the 1975-1978 policy applies. Beyond the inaccuracy and inappropriateness of the position, if Amoruso is operating from the assumption that

whether and to what extent the aggregate limits of the 1975-1978 policy are in issue, then reliable methodology dictates that he at the very least identify this assumption and the basis for it. *See Salgado*, 150 F.3d at 741 n.6 ("Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions"). The law is clear that an expert cannot merely rely on information provided by a party or counsel, but must independently verify that information prior to using it in any analysis or calculation. *State Farm Fire & Cas. Co. v. Electrolux Home Prods., Inc.*, 980 F. Supp. 2d 1031, 1048 (N.D. Ind. 2013). Amoruso's failure to even identify, let alone explain or verify, his assumption illustrates that his methodology was unreliable from the start and contrary to *Daubert* and Rule 702.

Second, building on the unidentified and unexplained assumption that the 1975-1978 policy and its aggregate limits are at issue, Amoruso concludes that the policy documents, which expressly states there is a $50,000 aggregate limit, in fact means there is almost $300 million in coverage. (*Id.* at 11-13). An expert must use "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. In his first report, Amoruso references a handful of policy documents in relation to his Contract-Interpretation Opinions, but he does not analyze any of them. (*See* Ex. 2 at 11-14). Amoruso instead relies solely on one internal letter written by claims analyst Kathy Coyle in 2013 in which Coyle, in a footnote, (incorrectly) stated that the referenced policies have applicable property damage aggregate limits only if they "were rated on a 'remuneration basis'" and that they "were <u>not</u> rated on a remuneration basis, so there is no applicable [property damage] aggregate limit." (Doc. No. 734-6 at 2).

Amoruso's reliance exclusively on Coyle's letter falls fatally short of the "intellectual rigor" required per Rule 702. As an initial matter, Coyle, like Amoruso, is a claims professional, not an underwriter. (Doc. No. 737-18 at 10:18-12:17). To exercise "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" – here, underwriting – Amoruso should

have at a bare minimum analyzed the relevant policy documents.  He did not.  Amoruso instead relied on a non-underwriter's comment that supported his predetermined conclusion and ignored the policy documents, which identify an aggregate limit for property damage liability.  (*See* Ex. 2 at 11-16; Ex. 5).

Amoruso also fails to explain why he seemingly takes Coyle's underwriting conclusion (which is absent any supporting analysis) as infallible when the crux of his expert reports is aimed at criticizing Coyle's allegedly serious mistakes as a claims handler of the Hartford Iron matter.  Amoruso also fails to even consider, let alone analyze, the impact of Coyle's testimony that, "I really don't have a good understanding of remuneration," thereby conceding that she did not comprehend what she was writing about.  (Doc. No. 737-19 at 221:2-12).  Amoruso selectively cites Coyle's deposition, but tellingly omits any acknowledgment or analysis of Coyle's clear lack of understanding of a material element necessary to reach her (incorrect) conclusion and support his opinions.  Thus, his blind reliance on, and nonobjective framing of, the letter is contrary to good methodological practice and seeks to invade the province of the trier of fact by trying to displace the Court's assessment of the credibility of Coyle's statement with his own partisan conclusions.

The Seventh Circuit has often cited the factors set forth in the Advisory Committee's notes to Rule 702 as helpful tools in evaluating an expert's reliability.  *See, e.g.*, *Gopalratnam*, 877 F.3d at 779-80.  One such factor is "whether the expert has adequately accounted for obvious alternative explanations."  Here, Amoruso failed to acknowledge or account for an obvious alternative explanation; namely, that Coyle – who is not an underwriter and who admitted she did not understand what "remuneration" means, and whose abilities Amoruso otherwise questions – was wrong, and the plain language of the policy documents identifying an aggregate limit for property damage liability was right.  *See Lennon v. Norfolk and Western Railway Co.*, 123 F. Supp. 2d 1143, 1152 (N.D. Ind. 2000) (rejecting expert's methodology that relied on select literature, including a study found to lack sufficient statistical proof).

21

Other than Coyle's letter, Amoruso's first report entirely omits citations and analysis that support his Contract-Interpretation Opinions. For example, Opinion E in Report 1 ("The aggregate and occurrence policy limits apply only to certain claims payments") is comprised primarily of 10 numbered paragraphs over two pages purporting to summarize the "difference between qualifying indemnity payments and other types of payments." (Ex. 2 at 17-18). Yet the section includes no discussion or analysis, and consists of only a series of general conclusions without any application to the facts. (*Id.*) Experts must "connect the dots" between the facts and their opinions, and Amoruso failed to do so here. *See C.W. ex rel. Wood*, 807 F.3d at 837. He offered no explanation of the "how" and "why" he reached his conclusions, just conclusory opinions. *See Salgado*, 150 F.3d at 741 n.6.

As discussed earlier, Amoruso has never been an underwriter. (*See* Ex. 1 at 83:24-84:3; 85:16-18; 235:24-236:2). One could reasonably assume that a person analyzing a topic outside of his area of expertise would consult treatises on the topic or study the opinions of professionals and experts who have worked in the relevant area. Amoruso did neither. (*Id.* at 235:9-17). Moreover, unlike the claims-handling portions of his first report, which reference Amoruso's years of experience as a claims manager (*e.g.*, Ex. 2 at 20), his examination of "extensive information" in connection with his claims analysis (*id.* at 19), and the purported claims standards and procedures "that are thoroughly familiar" to him (*id.* at 19-21), the underwriting portions of his report contain no such references. There is no discussion of Amoruso's experience with underwriting because he does not have any. (*See* Ex. 1 at 83:24-84:3; 85:16-18; 235:24-236:2). There is no reference to his analysis of the available information because he merely relied on Coyle's letter. (*See* Ex. 2 at 11-18). And there is no discussion or analysis of underwriting standards or procedures because he has no experience with them, does not know them, and failed to research them. (*See* Ex. 1 at 235:9-17). Amoruso has in no way satisfied the "intellectual rigor" standard for Rule 702.

22

Perhaps because of the glaring deficiencies in the methodology of his first report, Amoruso purports to "expand" on his Contract-Interpretation Opinions in his second report. (Ex. 3 at 10). Amoruso's expanded opinions further unveil his forced attempt to backfill his pre-determined conclusions with enough "facts" to escape the scrutiny of the Court. His conclusion-first-facts-second approach stands in direct contrast to the thorough analysis required per Rule 702. *See Hartman*, 758 F.3d at 818-19.

Amoruso's second report fails for all the same reasons as the first report, further evidencing a wholesale lack of careful thought and analysis. *See Wood*, 807 F.3d at 834. In the month between the issuance of his two reports, Amoruso did not receive any training or education on underwriting; did not read any treatises or consult any authorities on underwriting (Ex. 1 at 235:9-17); and did not change his reliance on Coyle's flawed and repudiated conclusion (*id.* at 229:5-8 ("that's a document that's got a lot of weight with me")). Having made no effort to educate himself on the specific underwriting issue he was analyzing, he could not possibly be employing "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," as required by *Daubert* and Rule 702. *See Kumho Tire*, 526 U.S. at 152.

Moreover, the rebuttal reports of Valley Forge's underwriting expert James Robertson explain and analyze how Amoruso's Contract-Interpretation Opinions in his reports are replete with unsubstantiated and fatally flawed conclusions about underwriting practices. (*See* Robertson Reports, attached as Exhibits 6 and 7, respectively). Although the Court's gatekeeper function under Rule 702 and *Daubert* does not involve the determination of "the ultimate correctness of the expert's conclusions," it does involve "the soundness and care with which the expert arrived at her opinion." *Wood*, 807 F.3d at 834 (internal quotes omitted). The haphazard nature of Amoruso's underwriting opinions belies any argument that he exercised careful consideration in reaching his opinions.

In addition to the foregoing, the second report, like the first, is striking for its lack of citations, explanations, and analysis. For example, Amoruso referenced his "independent evaluation, based on customary accepted insurance practices," but at no point in the report does he identify any customary underwriting practices. (Ex. 3 at 10-12). Amoruso's testimony further establishes the improperly speculative and subjective bases for his opinions. For example, he testified that he "thinks" the underwriter(s) who wrote the mid-1970s policies did not intend to have an aggregate for property damage liability: "I don't think that was their intent at all to have an aggregate. … I think they intentionally did not want an aggregate." (Ex. 1 at 344:23-345:5). This Court has long held that an expert's subjective beliefs and unsubstantiated speculation must be excluded. *E.g.*, *Smith v. Ford Motor Co.*, 882 F. Supp. 770, 774 (N.D. Ind. 1995).

In *Lennon v. Norfolk and Western Railway Co.*, the plaintiff retained a neurologist to testify that the plaintiff's multiple sclerosis may have been precipitated by a fall. *Id.* at 1151. This Court noted that the neurologist had "conducted no research or studies on MS and more specifically, has not done any research or study on the alleged association between trauma and MS." *Id.* The Court further advised that the neurologist's review of medical literature was "very select," did not include several studies that discounted any association between trauma and MS, but did include a study that was "undermined by its own author because of a lack of sufficient statistical proof." *Id.* at 1151-52. This Court barred the doctor's testimony and criticized his "review of what may be labeled a lopsided perspective of the literature." *Id.* at 1152.

As "lopsided" as it may have been, at least the neurologist in *Lennon* had reviewed *some* medical literature (and, as a neurologist, arguably had the knowledge to understand it). Here, Amoruso has not reviewed any literature concerning underwriting. And where the Court criticized the doctor for relying on a study later undermined by its own author, such criticism is applicable here where the foundation for Amoruso's opinion is Coyle's letter concerning an issue that she conceded she does

not understand.  For all these reasons, Hartford Inc. cannot establish that the Supreme Court's hallmark of reliability has been met with respect to Amoruso's Contract-Interpretation Opinions.

### 3.  <u>Amoruso's Testimony Will Not Assist the Trier of Fact</u>

Given his lack of qualifications and unreliable methodology, no factual issue could be enhanced or clarified for the trier of fact by Amoruso's conjecture in the form of his Contract-Interpretation Opinions.  Even if Amoruso possessed the qualifications and employed a methodology that would potentially render his Contract-Interpretation Opinions reliable, the opinions can be potentially useful to the Court only if the Court finds there is a question of fact regarding Valley Forge's indemnity obligations under the Settlement Agreements.  Whether and how the Settlement Agreements treat Valley Forge's indemnity obligations is a question of law reserved for the Court. *Westfield Ins. Co.*, 247 F. Supp. 3d at 967.  Under the third step of the Court's gatekeeper function, the Contract-Interpretation Opinions are, at best, premature unless and until the Court finds that the Settlement Agreements are ambiguous on the issue of Valley Forge's indemnity payment cap *and* that the aggregate limits of the 1975-1978 policy are ambiguous.

*     *     *

WHEREFORE, for the reasons presented in this brief, Hartford Inc. cannot meet its burden to establish by a preponderance of the evidence that Amoruso's testimony at issue satisfies Rule 702 and the *Daubert* standard, and Valley Forge therefore respectfully requests that this Honorable Court grant Valley Forge's motion and preclude Defendants and Counter-Plaintiffs Hartford Iron & Metal, Inc. and Alan Goldberg from proffering at trial, any hearing, or via motion practice, the opinion testimony of Paul Amoruso as it concerns environmental matters, contract-interpretation, or insurance underwriting, including said opinions presented within sections I (pp. 1-3), III.C (pp. 11-14), III.D (pp. 15-16), and III.E (pp. 17-18) of Amoruso's report dated October 2, 2017, and said opinions presented within sections VII (p. 10), VII.1 (p. 10), VII.2 (p. 10), VII.3 (pp. 10-12), VIII (p.

13), VIII.1 (pp. 14-15), VIII.2 (pp. 15-16), VIII.3 (p. 16), VIII.4 (pp. 16-17), VIII.5 (pp. 17-19), and

VIII.6 (pp. 19-20) of Amoruso's report dated November 6, 2017.

Dated:  May 18, 2018                    Respectfully submitted,

                                        VALLEY FORGE INSURANCE COMPANY

                                        By: _____
                                            Richard A. Hodyl

                                        Joseph A. Hinkhouse
                                        Richard A. Hodyl
                                        Joshua A. Boggioni
                                        HINKHOUSE WILLIAMS WALSH LLP
                                        180 N. Stetson Avenue, Suite 3400
                                        Chicago, Illinois 60601
                                        Telephone: 312.784.5400
                                        Facsimile: 312.575.5499

                                        Philip E. Kalamaros
                                        HUNT SUEDHOFF KALAMAROS, LLP
                                        301 State Street, 2nd Floor
                                        St. Joseph, MI 49085
                                        Telephone: 269.983.4405
                                        Facsimile: 269.983.5645

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 18, 2018, the foregoing was served on counsel

of record via the Court's ECF system.

                                        _____
                                        Richard A. Hodyl