**PAUL F. AMORUSO C.P.C.U.**
P.O. Box 981
8 Old Mattapoisett Neck Road
Phone: (508) 758-3274; Fax: (508) 536-6808

34 Barstow Street
Mattapoisett, MA  02739
Phone: (508) 644-1074; Fax: (744) 377-3856
Email:  pfasrvp@comcast.net

# EXPERT REPORT

*Dated:  October 2, 2017*

**VALLEY FORGE INSURANCE CO.**
v.
**HARTFORD IRON & METAL, INC.**

**In the United States District Court**
**Northern District of Indiana**
**Fort Wayne Division**
**Cause No.  1:14-CV-006-WCL-SLC**

## Table of Contents

I.    Introduction...................................................................................1

II.   Witness Qualifications / Professional Background...............................4

III.  Statement of Opinions.....................................................................7

    A.    Insurer and its related CNA companies issued liability policies for the Hartford Iron business that provide **$15 million of coverage**, without reservation of rights, from 1987 to 2000................................................7

    B.    Insurer and its related CNA companies issued liability policies for the Hartford Iron business that provide **$350,000 of coverage**, without reservation of rights, from 1978 to 1985.....................................................9

    C.    Insurer and its related CNA companies issued liability policies for the Hartford Iron business that provide **unlimited aggregate coverage**, without reservation of rights, prior to October 24, 1979, **resulting in occurrence-based coverage of approximately $298 million** using conservative assumptions about the deposit and spread of contamination..........11

    D.    Insurer made material omissions and misstatements in its late identification of policy years and coverage....................................................................15

    E.    The aggregate and occurrence policy limits apply only to certain claims payments................................................................................................17

    F.    Insurer failed to follow customary accepted insurance practices in its management of Hartford Iron's insurance claim. Insurer substituted unusual, ineffective, and unreliable procedures contrary to Hartford Iron's interests.........................................................................19

        1.    Insurance management of environmental claims is subject to customary accepted practices that are well established in the industry.....19

        2.    The terms of the Second Settlement follow these customary accepted insurance practices and provide added protections to Hartford Iron as policyholder...............................................................................21

        3.    Insurer failed to follow these customary accepted insurance practices and additional protections in its management of Hartford Iron's insurance claim. Insurer substituted unusual, ineffective, and unreliable procedures contrary to Hartford Iron's interests......................................25

IV.    Documents / Information Considered ............……………………………………………34

V.    Compensation ……………………………………………………………………....39

VI.    Case List…………………………………………………………………………….39

VII.    Additional Discovery and Rebuttal…………...…………………………...…………..42

## I.    Introduction and Background:

I have been retained by Shere & Shere LLP of Indianapolis, Indiana to review the insurance claims handling methods, since December 4, 2012, of Valley Forge Insurance Company (Insurer) on behalf of Hartford Iron & Metal, Inc. (Hartford Iron), which operates a scrap yard in Hartford City, Indiana (Site).

The scrap yard has been a family owned business since the 1950s. It is now in its third generation. Insurer issued policies to Alan B. Goldberg /dba Hartford Iron & Metal during the 1975 to 2000 period. These policies were issued by Insurer itself and by related insurance companies that operate under the "CNA" trade name. The CNA companies also issued policies for the Hartford Iron business in the name of Alan B. Goldberg's father, Louis Goldberg, from at least 1972 to 1975.

Insurer reports that it does not have employees. The CNA claims personnel handling Hartford Iron's claims are employees of another CNA insurer, Continental Casualty Company. Insurer's policy obligations to Hartford Iron are guaranteed by Continental Casualty, as documented in a January 26, 2012 letter from Brian A. Frankl.

On July 7, 2008, Hartford Iron provided notice to Insurer regarding third-party claims by the Indiana Department of Environmental Management (IDEM). The IDEM claims that are important for insurance purposes concern the obligation to investigate and remediate contaminants deposited and spread across the Site during the policy periods.

On October 28, 2008, Insurer agreed to defend the IDEM claims relating to the Site under a detailed "reservation of rights." Such reservations are a common part of insurance claims handling and are discussed in my opinions below.

Insurer's defense of the IDEM claims resulted in a settlement between Hartford Iron and IDEM, in the form of an administrative Agreed Order dated May 27, 2009 (2009 IDEM Order). Under the 2009 IDEM Order, Hartford Iron became obligated to respond to past contamination at the Site by preparing and carrying out (a) an IDEM-approved "site assessment plan" and (b) an IDEM-approved "remediation work plan."

Effective at the same time as the 2009 IDEM Order, Insurer and Hartford Iron entered into a settlement between themselves (First Settlement). Among other things, Insurer obligated itself under the First Settlement to pay "Agreed Order Costs," which included the costs to develop and carry out the site assessment plan and remediation work plan. The First Settlement included disclaimer language in Section 3.5 that it "is not intended to nor will it be construed as an insurance policy construction or interpretation." It continues that it "will not be used for any purpose whatsoever to create, prove, or interpret any alleged obligations under any policies."

On August 4, 2011, the U.S. Environmental Protection Agency (U.S. EPA) issued a Notice of Intent to File Civil Administrative Complaint (2011 EPA Notice) based on a specific type of contaminant at the Site, polychlorinated biphenyls (PCBs). As EPA described, PCBs are highly toxic chemical compounds that bioaccumulate in the environment. As EPA also described,

Congress adopted the Toxic Substance Control Act (TSCA) in 1976, which included prohibitions on the manufacture, processing, and distribution of PCBs.

A few days later, on August 8, 2011, Hartford Iron sent Insurer notice regarding the EPA claim and requested defense without reservation of rights. Hartford Iron sent Insurer a further notice on September 22, 2011. Coverage counsel for Insurer responded on September 27, 2011, stating that the claim by U.S. EPA was a separate matter not subject to the First Settlement or to the 2009 IDEM Order. On October 27, 2011, Hartford Iron filed a state court complaint seeking, among other things, for Insurer to defend and indemnify under its insurance policies regarding the U.S. EPA claim and the 2009 IDEM Order.

While the state court lawsuit was pending, IDEM issued a PCB Remediation Request to Hartford Iron on April 17, 2012. This request included findings by the agency that PCB contamination appears to be wide spread on the property and that "the facility appears to still be having difficulty with preventing off-site migration of those PCBs due to surface/storm water runoff." IDEM described the work on the Site up to that date, which included asphalt pavement and a sediment trapping system for stormwater, as "only temporary stop gap measures to address this situation." IDEM further determined that the ongoing impacts to human health and the environment created an unreasonable risk at the site, and it directed Hartford Iron to conduct appropriate remedial activities to remove that risk, including remediation of PCBs "at concentrations exceeding RISC industrial default closure levels." The agency requested that Hartford Iron "submit a specific plan discussing the method it will use to remove this risk." IDEM sent this PCB Remediation Request directly to Hartford Iron and also to HydroTech Environmental Consulting & Engineering (HydroTech), which was then doing the investigation and work at the site under the First Settlement. U.S. EPA separately issued a letter a month earlier, on March 19, 2012, discussing the stormwater discharges and directing submittal of a work plan to help mitigate PCB contaminated stormwater discharge. On July 31, 2012, HydroTech submitted to IDEM and EPA a draft Remediation Work Plan for review, in response to the PCB Remediation Request and EPA letter. On August 22, 2012, U.S. EPA sent correspondence and a draft Consent Agreement with a revised penalty demand of $219,568.

On December 4, 2012, Insurer and Hartford Iron resolved the state court lawsuit by entering into a second settlement (Second Settlement) regarding the insurance claims. Unlike the First Settlement, the Second Settlement provided Insurer's agreement to defend and indemnify Hartford Iron "without reservation of rights" under its insurance policies. The Second Settlement also differs by omitting the disclaimer language that the First Settlement "is not intended to nor will it be construed as an insurance policy" or that the First Settlement "will not be used for any purpose whatsoever to create, prove, or interpret any alleged obligations under any policies."

Insurer also accepted additional obligations, beyond the policy language, that included payment of the penalty related to the 2011 EPA Notice. This penalty was eventually determined to be in the amount of $189,580, which included claims by EPA of illegal discharge of PCBs from the Site through stormwater. Insurer's payment of this penalty is the only cost identified under the Second Settlement as constituting "indemnity" against policy limits.

The Second Settlement does not refer to the First Settlement term "Agreed Order Costs." Instead, the Second Settlement specifies that Insurer is obligated to provide Hartford Iron defense and

indemnity with respect to the "IDEM Claim" and the "EPA Claim," which are newly defined terms. Insurer also accepted a separate obligation under the Second Settlement "effective immediately" to ensure the "prevention of illegal discharges of stormwater" at the Site.

At the time of the Second Settlement, IDEM was still reviewing the July 31, 2012 Remediation Work Plan submitted by HydroTech, and the final contents of that plan depended on IDEM's response. In the Second Settlement, Insurer further agreed to carry out the July 31, 2012 Remediation "as approved or modified by IDEM and/or EPA." The Second Settlement also contained related terms requiring Insurer to "modify the Remediation Work Plan to incorporate agency comments." and to "prepare and implement future work plans as required by IDEM or EPA for subsequent steps in the site remediation."

The Second Settlement allowed Insurer to replace HydroTech as environmental consultant at the site with another consultant, August Mack Environmental, Inc. (August Mack or AME). After December 4, 2012, August Mack continued to struggle with stormwater control, and numerous stormwater violations were reported to IDEM after that date. On February 26, 2014, IDEM changed its April 17, 2012 instruction that remediation of PCBs should be carried out to the agency's industrial screening level of 7.4 ppm. Instead, the agency set a cleanup level of 1 ppm PCBs "due to the recent PCB impacted storm water events." Meanwhile, August Mack made little or no progress in the remediation of the Site.

Insurer filed this lawsuit in federal court on January 10, 2014. This report provides my Opinions relating to Insurer's claims management and coverage obligations since the Second Settlement on December 4, 2012.

## II.    **Witness Qualifications/ Professional Background:**

A copy of my *Curriculum Vitae* is attached hereto as *Exhibit 1*.

I am currently self-employed as an insurance and business consultant. I have over 46 years of experience working in the insurance industry for several major insurance companies. From 1969 to 1989, I was employed by Liberty Mutual Insurance Company ("Liberty"). I began my association with Liberty as a casualty claims adjuster, handling personal, commercial, automobile, commercial business, workers' compensation, and first- and third-party claims. I was involved in my first pollution claim in 1971 while working in the Bridgeport, Connecticut office of Liberty involving asbestos and PCBs plus other toxic chemicals in the southeastern Connecticut area and other areas attached to companies that Liberty insured in and around southeastern Massachusetts. Later in my career, I was involved in the New Bedford Harbor clean-up site while working as a claims manager for Liberty in New Bedford, Massachusetts and other sites in the New Bedford area involving pollutants including PCB clean-ups and other materials classified as pollutants by the EPA.

After I left the Bridgeport, Connecticut office for Liberty, I was promoted to a claims supervisor in Liberty's Providence, Rhode Island office supervising a unit of 14 people and had several pollution site exposures working in that office. From Providence, I was transferred to Liberty Mutual's home office in Boston, Massachusetts. As a Claims Examiner, I was responsible for all 50 States, Canada, Mexico, and Puerto Rico for flammable fabrics. I was responsible for the specific states of Minnesota, Oklahoma, Arkansas, Ohio, and Iowa for all commercial and personal insurance claims issues. During my tenure as a Claims Examiner, I was responsible for the claims handling of thousands of claims in litigation and pre-litigation on issues of coverage, liability, and damages.

I was promoted and transferred to Liberty's New Bedford, Massachusetts office as a Claims Manager. At that time, Liberty was one of the largest insurers in the United States. The New Bedford office processed thousands of liability claims per year including pollution claims under my direct supervision and Liberty Mutual's self-contained pollution unit in Boston. During my management, the office grew from one of Liberty's smaller offices to the 15th largest of 465 offices in the country. I was responsible for all personal, commercial, workers' compensation, homeowners, and first- and third-party claims. I was actively involved with Liberty's home office on several major pollution issues including the New Bedford Harbor PCB clean up. I was a member of a risk management team charged with evaluating risk and controlling potential losses.

After my employment with Liberty, I joined Trust Group Inc., which owned Trust Insurance Company ("Trust") as Vice President of Claims. I remained with Trust from 1989 to 1999. During my tenure with Trust, I established and wrote a claims manual for uniform claims handling, established guidelines for the proper procedures for new business, wrote underwriting processes and procedure manuals, and was responsible for underwriting operations. I established a training program for the training of over 1,200 technicians and wrote the training procedural manual on claims handling and coverage evaluation. I also developed a home office claims department to oversee unusual claims issues.

4

In 1992, I assumed the position of Senior Vice President and member of the Board of Directors with Trust. In that capacity, I established the audit practice group to monitor high exposure claims. I also established an agency audit program, which I personally led, in reviewing the practices of independent agents in their writing of personal and commercial insurance policies for Trust.

While at Trust, I was a member of two organizations that were under the auspices of the Insurance Commissioner that had control over policy interpretation and the writing of insurance policies. As a member of the Automobile Insurers Bureau Legal Committee, I assisted in writing the Massachusetts Automobile Policy. From 2000 to 2001, I was employed by Ladd Financial Group, Inc. ("Ladd"), at the request of the Massachusetts Insurance Commissioner, who was monitoring the company for financial concerns. Ladd owned New England Fidelity Insurance Company ("New England Fidelity"). In the capacity of Vice President of Claims at New England Fidelity, I wrote the claims procedural manual, established a claims audit program for all coverage claims, and established authority levels for paying and denying of claims.

From 2001 to the present, I have been self-employed as an Insurance Consultant. In that capacity, I have represented Liberty at hearings before the Massachusetts Insurance Commissioner and examined insurance practices for compliance with standards and procedures for the State of Vermont Insurance Department. I have testified at trials in State and Federal Courts in Massachusetts and many other states, as to usual and customary accepted insurance practices, evaluated insurance company procedures, provided guidance for proper claims handling, and provided insight into claims handling and insurance policy issues for law firms.

Since 2003, I have also worked as an instructor at the SAVAL Learning Center and the Massachusetts Insurance Library, the teaching arm for the insurance industry in Massachusetts. I have taught insurance operations, claims adjuster case handling, ethics, Chartered Property Casualty Underwriter ("CPCU") courses, and other various industry courses.

For the last 25 years, I have made decisions on the acceptance or rejection of claims handling. I have personally handled and supervised thousands of pollutant issues during my career at Liberty.

I have taught more than 100 classes on commercial liability, claims handling, insurance policy interpretation, and other proper claims handling practices for policies with coverage questions. I have given presentations to attorneys, agents, brokers, and the Massachusetts Insurance Commissioner's staff on the proper way to handle claims.

I have not published any books, treatises, papers, etc. within the last 10 years.

*Additional qualifications:*

- I am a Massachusetts, Florida, Vermont, Connecticut, New Jersey, and Minnesota, insurance producer licensed to sell personal and commercial lines of insurance;
- I am a licensed public adjuster in Massachusetts;
- I have conducted seminars for attorneys, insurance agency staff, and regulatory authorities on coverage and operational issues;

- I have conducted training sessions for the Massachusetts Insurance Commissioner's staff on case handling;
- I am a Chartered Property Casualty Underwriter earning my designation in 1980;
- I am an instructor at the Massachusetts Insurance Library, teaching insurance operations, CPCU courses on issues related to coverage, risk management, ethics, and insurance operational issues.
- My titles in the insurance industry have included: Claims Adjuster, Supervisor, National Claims Examiner, Claims Manager, Vice President of Claims, Senior Vice President of Claims, Senior Vice President of Operations, Individual Producer, and Public Adjuster.

## III.   Statement of Opinions:

**A.   OPINION:**    *Insurer and its related CNA companies issued liability policies for the Hartford Iron business that provide **$15 million of coverage**, without reservation of rights, from 1987 to 2000.*

Insurer issued the following primary coverage from 1987 to 2000, all under policy number 200603155:

| Policy Period | Coverage | CNA underwriter |
|---|---|---|
| 03/6/87-10/1/87 | $1 million aggregate/$500,000 occurrence | Transcontinental Ins. Co. |
| 10/1/87-10/1/88 | $1 million aggregate/$500,000 occurrence | Transcontinental Ins. Co. |
| 10/1/88-10/1/89 | $1 million aggregate/occurrence | Valley Forge Ins. Co. |
| 10/1/89-10/1/90 | $1 million aggregate/occurrence | Valley Forge Ins. Co. |
| 10/1/90-10/1/91 | $1 million aggregate/occurrence | Valley Forge Ins. Co. |
| 10/1/91-10/1/92 | $1 million aggregate/occurrence | Valley Forge Ins. Co. |
| 10/1/92-10/1/93 | $1 million aggregate/occurrence | Valley Forge Ins. Co. |
| 10/1/93-10/1/94 | $1 million aggregate/occurrence | Valley Forge Ins. Co. |
| 10/1/94-10/1/95 | $1 million aggregate/occurrence | Valley Forge Ins. Co. |
| 10/1/95-10/1/96 | $1 million aggregate/occurrence | Valley Forge Ins. Co. |
| 10/1/96-10/1/97 | $1 million aggregate/occurrence | Valley Forge Ins. Co. |
| 10/1/97-10/1/98 | $1 million aggregate/occurrence | Valley Forge Ins. Co. |
| 10/1/98-10/1/99 | $1 million aggregate/occurrence | Valley Forge Ins. Co. |
| 10/1/99-10/1/00 | $2 million aggregate/$1 million occurrence | Continental Cas. Co. |

These policies provide total aggregate coverage of $15 million. Under the Second Settlement, Insurer is required to defend and indemnify Hartford Iron without reservation of rights under these policies for this coverage amount.

Insurer admits the above policies and limits in its June 24, 2013 letter from claims consultant K. Coyle to the claims administrator for a reinsurer (the Coyle Reinsurance Letter). Coyle confirmed these admissions in her February 2017 deposition (vol. 2, pages 219-223 and exhibit 74).[1] Insurer also acknowledges the Valley Forge Ins. Co. policies in its representations in the First Settlement.

Insurer's response to discovery requests on July 11, 2017 further admits $15.3 million in coverage. Insurer represents in the response that it has paid $11,551,646, leaving $3,674,814 in remaining coverage. These latter figures raise separate issues discussed in Opinion III.E below. For purposes of Opinion A, Insurer's figures in the discovery response make sense only as a further admission of $15 million in coverage for the "insurance-funded environmental work at the Hartford Iron site" (as requested in the discovery) during the 3/6/87 to 10/1/00 policy periods above.

---

[1] A second version of the Coyle Reinsurance Letter is dated September 13, 2013 and appears in the discovery materials from Insurer with Bates Nos. 153539-44. The June 24, 2013 version has a handwritten marking that it was also sent on 5/5/14, which Coyle confirmed in her deposition.

I reserve the right to provide year-by-year Opinions of the voluminous underlying policy records in the event Insurer seeks to reverse its prior admissions. My partial review so far of these voluminous records is consistent with the coverage described above.

At the time the above policies were issued, the scrap yard business was run as a sole proprietorship, and the policies were issued in the name of Alan B. Goldberg /dba Hartford Iron & Metal. Alan B. Goldberg subsequently incorporated the business and remains the main stockholder.

On September 4, 2013, Alan B. Goldberg assigned his accrued insurance rights to Hartford Iron & Metal, Inc., the incorporated business. Such assignments are well recognized and are typically valid once the claim has become fixed and accrued, as here. In addition, the Second Settlement defines "Hartford Iron" as including both Alan B. Goldberg as sole proprietor and the incorporated business, and Insurer's obligation to defend and indemnify without reservation of rights applies to both.

These policies provide liability coverage for third-party claims concerning the current effects of past environmental contamination, under well-known and accepted principles of Indiana insurance. As identified in Section I above, the Second Settlement further requires Insurer to provide coverage for the "IDEM Claim" and the "EPA Claim." The IDEM Claim is defined as the PCB Remediation Request Letter, dated April 17, 2012 from IDEM and the 2009 IDEM Order, which are referenced in Section I. The EPA Claim is defined as EPA's Notice of Intent to File Civil Administrative Complaint (August 4, 2011), EPA's letter requesting a work plan for PCB wastes (March 19, 2012), and EPA's draft consent order (August 22, 2012), which are also referenced in Section I.

**B.**    **OPINION:**    *Insurer and its related CNA companies issued liability policies for the Hartford Iron business that provide $350,000 of coverage, without reservation of rights, from 1978 to 1985.*

In the Coyle Reinsurance Letter, Insurer admits the following primary coverage from 1979 to 1981, under the policy numbers listed below:

| Policy Period | Coverage | CNA underwriter |
|---|---|---|
| 10/24/78-10/24/79<br>Policy No. L1528613 | $50,000 aggregate/occurrence | Continental Ins. Co. |
| 10/24/79-10/24/80<br>Policy No. L1666387 | $50,000 aggregate/occurrence | Continental Ins. Co. |
| 10/24/80-10/24/81<br>Policy No. L3660273 | $50,000 aggregate/occurrence | Continental Ins. Co. |
| 10/24/83-10/24/84<br>Policy No. L1735659 | $50,000 aggregate/occurrence | Continental Ins. Co. |

Based on Insurer's admission, these policies provide total aggregate coverage of $200,000. Insurer's admission of $15.3 million of coverage in its discovery response appears to incorporate this additional $200,000.

In addition, discovery from Insurer provides documentation regarding the following policies and policy periods:

| | | |
|---|---|---|
| 10/24/81-10/24/82 | $50,000 aggregate/occurrence | Continental Ins. Co. |
| 10/24/82-10/24/83 | $50,000 aggregate/occurrence | Continental Ins. Co. |
| 10/24/84 - 1985 | $50,000 aggregate/occurrence | Continental Ins. Co. |

The second and third of these policies are shown in the following documents:

a.    A "Policy Order" form dated August 3, 1983 is marked as an annual renewal of the prior policy period, which would have started 10/24/82. This document appears in discovery at VFIC064594.

b.    The September 12, 1984 letter from Bonham Insurance Agency to Continental Insurance Company, Liability Department, identifies policy number 1736036 as "expiring October 24th" and asks Insurer to "prepare and forward the renewal," which would have begun10/24/84. This document appears in discovery at Insurer's doc. no. 009414.

c.    The Liability Insurance Daily Report contains handwritten notations showing annual renewal of the above policy for the 10/24/84 to 10/24/85 period. This document appears in discovery at Insurer's doc. no. 009405.

My Opinion is that the above documents are the type commonly used to reconstruct prior policy periods. In the absence of contrary documentation, none of which I have seen, these documents show the one year policy renewals both before and after the (admitted) 10/24/83-10/24/84 policy period.

My Opinion is also that the documents and admissions show a continuous insurance relationship between Continental Insurance Co. and Hartford Iron, as described below, throughout the period 1969 to the 10/24/84 renewal. Insurer does not appear to have produced documents concerning the single policy year period of 10/24/81 to 10/24/82. In the absence of contrary documentation, my opinion is that it is not reasonable to exclude this single year from what is otherwise a continuous and documented 15-year relationship.

I have listed the policy coverage for the periods 1981-83 and 1984-85 periods consistent with Insurer's description of the coverage for the adjacent years (80-81 and 83-84). As best as I can determine, Insurer does not include any coverage for these 1981-83 and 1984-85 periods in its discovery admission of $15.3 million of total coverage.

For purposes of this Opinion, and in light of Insurer's other admissions, I have not re-examined Insurer's characterization of the policies it acknowledges during the above time periods, including Insurer's claimed application of aggregate limits to these policies. I have also adopted Insurer's characterization of these policies for purposes of the three policy years it does not acknowledge. As above, I reserve the right to revise my opinions and provide year-by-year analysis of the underlying policy records in the event Insurer seeks to reverse its prior admissions. If needed, this further analysis is likely to require that Insurer disclose the contents of contemporaneous records regarding these policies that Insurer blacked out in its discovery. See, for example, the documents at nos. VFIC061517-20.[2]

---

[2] The kind of information Insurer blacked out includes Rating Data that is important to the calculation of premiums, including rate modifications that were commonly made manually. For example, Insurer blacked out this Rating Data in its Policy Order, dated August 3, 1983, as produced at VFIC061520, but it revealed the Rating Data in this particular document as produced at VFIC064594.

**C.**    **OPINION:**    *Insurer and its related CNA companies issued liability policies for the Hartford Iron business that provide **unlimited aggregate coverage**, without reservation of rights, prior to October 24, 1979, **resulting in occurrence-based coverage of approximately $298 million** using conservative assumptions about the deposit and spread of contamination.*

In the Coyle Reinsurance Letter, Insurer admits the following primary coverage from 10/24/75 to 1/024/78, under the policy numbers listed below:

| Policy Period | Coverage | CNA underwriter |
|---|---|---|
| 9/1/76-10/24/78<br>Policy No. L3414442 | No aggregate/$50,000 occurrence | Continental Ins. Co. |
| 10/24/75-9/1/76<br>Policy No. L3414442 | No aggregate/$5,000 occurrence | Continental Ins. Co. |

Insurer also represents that this coverage was based on its standard insurance form 6682B, which is for Manufacturer's and Contractor's Liability Insurance. This representation is consistent with the handwritten entry on the 3 year renewal form for this policy, dated July 26, 1978 (Insurer discovery no. 118899).

In addition, discovery from Insurer provides documentation regarding the following policies and policy periods:

| | | |
|---|---|---|
| 10/24/72-10/24/75<br>Policy No. L4449628 (Louis A. Goldberg DBA Hartford Iron & Metal) | No aggregate/$5,000 occurrence | Continental Ins. Co. |
| 10/24/69-10/24/72<br>Policy No. L4449628 (Louis A. Goldberg DBA Hartford Iron & Metal) | No aggregate/$5,000 occurrence | Continental Ins. Co. |

The 10/24/72 - 10/24/75 policies are documented on two Statements of Adjusted Premium, dated 11/21/75 and 12/11/75. These documents appear in discovery at VFIC118911 and VFIC118918. These policies are further documented on a Payroll Report dated November 13, 1975 and signed by Louis Goldberg. This document appears in discovery at VFIC118916. Insurer's policy review notes (VFIC062103) state it is likely that a $5,000 occurrence limit applied during the 1972-75 period, which is consistent with the subsequent coverage being a renewal of the 1972-75 policy.

The policy period from 1969 to 1972 is shown on Insurer's Policy Order document, VFIC064888. This document is for the renewal of the Hartford Iron policy beginning 10/24/83. The top sections of this document contain background information about the policy, including the information that the policy was "first written" in 1969. The 1969-72 policy period is also shown by the Policy Order documents dated August 25, 1975 (VFIC118908) and October 1, 1979 (VFIC118926). These Policy Order documents are each marked with the "Inception Year" as 1969. The initial coverage date of 10/24/69 is further supported by the three year policy

11

periods used by Insurer from 1972-75 and 1972-78. The 10/24/69 inception date is based on a single 3 year policy being issued prior to the 10/24/72 policy.

In the Coyle Reinsurance Letter, Insurer admits "there is no PD [property damage] aggregate limit for the early Hartford Iron policies." Insurer also admits a policy limit per occurrence of $50,000 from September 1, 1976 to October 24, 1978, and $5,000 per occurrence prior to September 1, 1976.

The absence of an aggregate limit "for the early Hartford Iron policies" is consistent with common underwriting practices at the time. These practices changed during the 1980s precisely because of the large coverage amount, as in the present situation, that arises from numerous occurrences. The massive coverage that results from numerous occurrences is especially common with respect to environmental claims that come within the scope of policies from the 1970s and earlier. Environmental investigation, remediation, and other work is often an enormously expensive process that takes years or even decade to complete.

The unlimited aggregate for the early Hartford Iron policies means that coverage applies to each "occurrence" under the policy document, which in this case is Insurer's Form 6682B. The language of this form is included in Insurer's discovery production at VFIC061660-61. The standard and customary practice in the industry is that the language of a coverage form does not change from year to year. When new coverage terms are adopted, a new firm number is also assigned. The example Form 6682B is from a subsequent year (possibly 1980-81 based on the policy number), but the language would be identical for earlier periods where the form was used.

Form 6682 does not define the term "occurrence." Based on available information about the company's operations, new contamination was deposited many times each working day, consisting of differing chemical constituents (e.g. lead, waste oil, PCBs, heavy metals, VOCs, SVOCs), in differing concentrations, in different locations. These different types and levels of contamination were then disbursed many times a day to new locations and new depths in soil. Alan Goldberg testifies by affidavit about these operations in the early 1970s as follows:

> We probably had 20 to 50 different customers a day in the 1970's. They brought different types of scrap, in a pickup truck or a semi truck that they drove onto the site. We didn't have a truck scale then, so I sent them to a feed mill to weigh their trucks. Then they would come back and dump the scrap or we would unload it by hand. There was no particular place to unload. We often tried to dump it near the alligator shear. But if that area was filled up, we would unload it somewhere else, anywhere on the property that was available .

He continues:

> After we'd unload from the customer's truck, we moved the scrap with a payloader. Payloaders are also called bucket loaders or front-end loaders because they have a big bucket in front. It's a big piece of equipment with large wheels. To move scrap with a payloader, you need to get the bucket under it and lift or you can push it like you would with a bulldozer. Most people can't tell the difference between a payloader and a bulldozer.

Most of the time when you lift scrap or push it with a front loader you are also lifting or moving a portion of the ground or scrap underneath. We were constantly using the payloader to bring the scrap to the alligator shear and to move and combine different piles of scrap before and after cutting. The alligator shear was like a huge pair of scissors for cutting the scrap with an electric motor. The alligator shear was constantly cutting whatever you put into it. If the alligator shear was busy, we torched up the pieces where they were. The torch was about 3 foot tall; you would light the tip and heat the metal to melt it. By moving the torch along the metal you could cut it up. This was very common; we used the torch all over the site every day. Then we piled the pieces and moved them later with the payload er to store until it could be taken to a buyer. It must have been 20 times a day that we'd move the cut scrap.

For really large pieces, we circled them with a chain and dragged them across the site. Or we torched them where they were dumped and cut them into smaller pieces. If it was cast iron, we used a sledgehammer to break it up. For copper, I put it in barrels that we moved with the payloader. We would work in all weather, but it was slower in bad weather or snow.

Alan Goldberg also described working seven day weeks, including "work almost every Sunday" that included torching steel, moving and cutting scrap and scrap piles, and doing equipment maintenance. He also testified about working most holidays. I have been self-employed since 2001, and I know the long hours that often come with owning a business.

Similarly, the project manager for HydroTech, the agreed environmental consultant under the First Settlement, testified by affidavit about contaminants requiring investigation and remediation in soil at the Site include arsenic, copper, lead, thallium, petroleum by-products, and each of several different PCB Aroclors. He described this contamination as "especially challenging" due to its "widespread dispersal…. across the surface and subsurface." He explained that "this wide dispersal is the result of contamination that occurred over the course of decades and that spread at the site during each heavy rainfall and through movement of soil as part of the scrap operations at the site."

Based on these facts, my Opinion is that it is very conservative and understated to treat the Hartford Iron business as operating 350 days per year from 1969 through the 1970s, with an average of six occurrences per day of environmental damage to property. Indeed, twice or four times this number of occurrences would be perfectly reasonable. This large number of occurrences is not unusual when it comes to environmental liabilities, and it is why the early policies without aggregate limits are such a well recognized and serious coverage matter in the industry.

Form 6682B contains a single sentence limiting the scope of occurrences. That sentence states: "For the purpose of determining the limit of the company's liability, all bodily injury and property damage arising out of a continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." I am familiar with this type of occurrence language in older policies, and my Opinion is that it does not limit the number of occurrences for purposes of coverage under Insurer's policies. The facts here do not concern

"exposure" to "general conditions," but rather to the numerous instances of dumping, cutting, torching, and spreading scrap materials. These materials were not "substantially the same" but rather consisted of many different types with different kinds of chemicals in different concentrations and in different forms. By way of comparison, this is not a slowly leaking tank at a gasoline station, where the same product leaks out of the same container in a relatively slow and predictable manner in a fixed location over years.

My Opinion is that Insurer may not reduce its coverage liability for the Hartford Iron site based on the occurrence language in the form. Even more, insurers usually must show that policy language is clear and unambiguous if they wish to take advantage of limiting language. This standard is not necessary to my opinion, but certainly reinforces it.

Based on the conservative approach described above, the occurrence-based coverage for Hartford Iron under Insurer's policies prior to October 24, 1979 is approximately:

- $210 million from September 1, 1976 to September 1, 1978

- $17 million from September 1, 1978 to October 31, 1978

- $40 million from October 24, 1972 to September 1, 1976[3]

- $31 million from October 24, 1969 to October 24, 1972[4]

This coverage is without reservation of rights under the Second Settlement. Additional coverage would apply to policies issued to Louis A. Goldberg prior to October 24, 1969.

As described above, I have not re-examined Insurer's characterization of the policies it acknowledges during the above time periods, including Insurer's admissions in the Coyle Reinsurance Letter that the early policies are not subject to aggregate limits. It would be quite unusual, however, for policies during this time frame to have such limits. As above, I reserve the right to revise my opinions in the event Insurer seeks to reverse its prior admissions.

---

[3] Applying the coverage for this period in the same manner as for the immediately subsequent years, including the $5,000 limit per occurrence.

[4] Same as note 3.

**D.   OPINION:**          *Insurer made material omissions and misstatements in its late*
                          *identification of policy years and coverage.*

Under customary accepted insurance practices, Insurers have an obligation to identify all policy
periods and terms and to share this information with the policyholder.

Insurer was obligated to identify past policies in response to the initial notice of claim on behalf
of Hartford Iron dated July 7, 2008 (included in Section I references). This notice was directed to
CNA and asked Insurer to check its records to identify all policy periods and provide the
underlying policies.

Insurer also had the obligation under Section II.G of the Second Settlement to "use its best
efforts to confirm additional policy years from Valley Forge and other [commercial liability]
policies from other CNA affiliated companies."

In the Coyle Reinsurance Letter, Insurer admitted on June 24, 2013 that "Hartford Iron has
argued consistently that there was evidence that the CNA insurance companies wrote numerous
other policies [beyond the ones identified by Insurer] that also would have provided coverage for
the environmental impairment of its property."

More than a year after the Second Settlement, Insurer sent Hartford Iron a January 14, 2014 letter
from one of its coverage lawyers, attorney Barry Cope (the Cope Letter). This letter identified
additional policies and policy years. Insurer did not provide this letter until after filing the
present lawsuit on January 10, 2014. The Cope Coverage Letter has material omissions and
misstatements.

The Cope Letter states that the policies for the period October 24, 1975 to October 24, 1978 have
a "$25,000 aggregate" until September 1, 1976, and a "$50,000/occ & agg" thereafter. This is a
serious misstatement. In fact, Insurer had in its possession documentation that the policies during
this period have no aggregate. Prior to the date of the Cope Letter, Insurer admitted in the Coyle
Reinsurer Letter the "no aggregate" nature of these policies. After the date of the Cope Letter,
Insurer continued to rely on the Coyle Reinsurer Letter, sending it again to the reinsurer in May
2014. (See Coyle deposition, volume II, page 223). Coyle also confirmed the accuracy of the
Coyle Reinsurance Letter as of the February 2017 date of her deposition (again on page 223).
Coyle further testified that Cope himself was working as coverage counsel and provided
information for the Coyle Reinsurance Letter (pages 219-23). The representations in the Cope
Letter regarding aggregate limits are material misstatements based on the information in the
Coyle Reinsurer Letter and based on Coyle's subsequent testimony.

Insurer did not provide the Coyle Reinsurance Letter to Hartford Iron until late December 2016,
as part of a 15,201 page set of electronic files, extending from Bates no. 31571 to 49850. The
Coyle Reinsurance Letter is labeled as Bates no. 38416 as part of this group.

The Cope Letter also omits material information regarding policies issued for the period
10/24/82-10/24/85. It contains no information about these policy periods at all. Insurer was
aware of the policy for 10/24/83-10/24/85, as reflected in the Coyle Reinsurance Letter.

The Cope Letter also omits material information in its description for the policy period October 24, 1978 - October 24, 1979 with the words "limits not confirmed." Insurer identified these limits without qualification in the Coyle Reinsurer Letter. In addition, a File Summary Form from Insurer (VFIC009416) with a print date of 08/16/01 identifies the $50,000 policy limit for property damage accompanied by the label "Policy Confirmed."

The Cope Letter also omits material information in Insurer's possession at the time regarding the policies for the period 10/24/72-10/24/75. Hartford Iron identified this omission to Insurer in correspondence on February 24, 2014. Insurer responded by letter dated May 13, 2014 from its additional coverage and litigation counsel, Jan Michaels. He admitted that Insurer had evidence of these policies. Michaels also repeated the misrepresentation regarding aggregate limits in the Cope letter.

**E.**    **OPINION:**    *The aggregate and occurrence policy limits apply only to certain claims payments.*

The aggregate and occurrence policy limits identified in Opinions A, B, and C apply only to "indemnity" payments by Insurer that satisfy several qualifying criteria under usual and customary accepted insurance practices. Other types of payments by Insurer relating to Hartford Iron are not subject to policy limits. The difference between qualifying indemnity payments and other types of payments is summarized in the following numbered paragraphs:

1.    Under the Hartford Iron policies, the policy limits do not apply to amounts spent on "defense" of the environmental regulatory claims against Hartford Iron.

2.    The policy limits do not apply to charges for work that are "temporary stop gap measures" (see, for example, the letter from IDEM on April 12, 2012) or that merely maintained the *status quo* at the Hartford Iron site. Under customary accepted insurance practices, it is part of the defense when a claim is kept in a holding pattern to allow time for the remedy to be developed and implemented.

3.    The policy limits do not apply to charges for prevention of illegal stormwater discharges, which is an independent obligation under Section II.D. of the Second Settlement.

4.    The policy limits do not apply to charges where the work was not approved by IDEM or EPA, did not implement an agency-approved work plan, and was not carried out as part of defense counsel's strategy and planning.

5.    The policy limits do not apply to charges for work that was ineffective. Such work does not contribute to resolution of the insurance claim or the IDEM or EPA requirements.

6.    The policy limits do not apply to charges in response to the "IDEM Claim" or the "EPA Claim" under the Second Settlement, unless these charges were also "Agreed Order Costs" under the First Settlement and meet the other criteria outlined in this Opinion. For example, work that was ineffective could not resolve the Agreed Order requirements.

7.    The policy limits do not apply to charges for work that was in breach of Insurer's duties or for work to remedy the damage from such a breach. Damages for breach of an insurer's obligations are not restricted by the indemnity limits of the policy.

8.    The policy limits do not apply to charges for work that was chosen or carried out for purposes other than serving the best interests of the Insured. This includes charges for work chosen or carried out with the participation of coverage counsel, during the period those counsel were conducting or planning litigation against Hartford Iron, and contrary to defense counsel's strategy.

9.     The policy limits do apply to the $189,580 penalty Insurer paid to U.S. EPA to resolve the 2011 EPA Notice. The parties agreed in Section II.C. of the Second Settlement that this charge would be treated by Insurer "as a component of its indemnity obligation under its policies." Other work under the Second Settlement, or other penalties paid by Insurer, do not count against policy limits absent a similar express agreement by the parties.

10.     Some of Insurer's payments are likely to overlap between charges that do not count against policy limits and tasks that do count against policy limits. Customary and accepted insurance practices include apportionment of such intertwined charges to determine the reasonable amount to be charged against policy limits.

I reserve the right to express opinions about whether particular charges may be assessed against policy limits as the amounts and reasons for Insurer's treatment of these charges is identified in discovery.

**F.    OPINION:**    *Insurer failed to follow customary accepted insurance practices in its management of Hartford Iron's insurance claim. Insurer substituted unusual, ineffective, and unreliable procedures contrary to Hartford Iron's interests.*

I have examined extensive information about Insurer's claims management since December 4, 2012, when Insurer agreed to defend and indemnify Hartford Iron without reservation of rights as part of the Second Settlement. Based on my experience, this information shows repeated instances of claims management that were unusual, in many cases practices that I have never seen in my 46 years of experience. The information also shows repeated instances of claims management practices that were ineffective, unreliable, and contrary to Hartford Iron's interests. This Opinion includes the specific instances below, as well as the overall pattern and practice of claims management since December 4, 2012.

1.    Insurance management of environmental claims is subject to customary accepted practices that are well established in the industry.

The overall process for an insurer to manage environmental claims is standard and well established. For claims of significant size, the insurer or the insured almost always hires an environmental attorney and the attorney's firm to serve as defense counsel for the policy holder, paid by the insurer. The insurer has the right to select this attorney when it is handling the claim without a reservation of rights to dispute coverage. The insurer may also choose to accept a lawyer chosen by the insured. This approach can result in savings when, for example, the insured has been working with a lawyer who is familiar with the facts and has an established relationship with the insured. Often, the insurer manages the claim while still reserving rights to dispute coverage. In this situation, the insured is the one who normally chooses the defense counsel. Regardless of who selects the defense counsel, documents or information that are privileged, or that are intended by the insured to be confidential, must not be disclosed to an insurer, absent consent from the insured.[5]

In environmental matters, the standard process is for the defense counsel to supervise the work of one or more environmental contractors to ensure that investigations and eventual remediation are part of a strategic plan that effectively complies with legal requirements. When an environmental regulatory agency is involved, the agency normally reviews and approves (often with revisions) written work plans for investigation and remediation to be carried out by the contractor(s). The agency also reviews and approves reports documenting the work as particular steps are completed, and the agency often adds requirements for more work.

In my experience, the insurer always assigns a claims manager. This person can also be called a claims analyst or a claims consultant or similar titles. This claims manager is typically an employee of the insurer or of a third-party claims administrator. Claims managers do not decide how to defend the insured or what environmental work needs to be done. For example, Insurer has written Litigation Management Guidelines for CNA Environmental and Mass Tort Claims Outside Counsel. These Guidelines instruct defense counsel to obtain the claims manager's

---

[5] See, for example, Defense Research Institute Recommended Case Handling Guidelines, page 3 (discussed below).

consent for any settlements (page 4). The Guidelines do not require approval for other defense tasks or authorize a claims consultant to overrule defense counsel's evaluation or defense counsel's strategic plan for investigation and remediation. Similarly, a well-established industry group, the Defense Research Institute, developed Recommended Case Handling Guidelines for Insurers.[6] These DRI guidelines explain that defense counsel and insurers should "endeavor to agree on the proposed activities" other than settlement, but "in the event of disagreement, the final decision will remain the independent professional judgment of defense counsel." Ref. Doc. No. 18, page 3. More generally, a claims manager is a fiduciary who has the duty to act in the best interest of the insured. Ref. Doc. 4, page 6.[7] My 46 years of experience regarding the role of the claims manager confirms these points.

When the insurer disputes its obligations to the insured regarding a claim, it will always in my experience send a "reservation of rights" letter to the insured. The insurer may then hire attorneys called "coverage counsel" to represent the insurer's position about the matters in the reservation of rights letter. Coverage counsel may also initiate litigation on the insurer's behalf, in the form of a declaratory judgment action, or may defend litigation that the policyholder may bring. Even in the absence of litigation, coverage counsel is never involved in my experience in decisions about environmental investigation or remediation. Coyle similarly testified that coverage counsel have no proper role in making recommendations about environmental work or payment of environmental contractors (v. 2 of her deposition, pages 127-128). The standard, accepted practice is that the insurer does not share information about claims management with coverage counsel, and coverage counsel does not share information about coverage disputes with the claims manager. The reason for this separation is simple. Coverage counsel represents the insurer and cannot be expected to act in the insured's best interest.

Regardless of whether the insurer or the insured selects defense counsel, the insurer sends counsel a retention letter stating the terms of the defense.[8] Once an insurer appoints defense counsel, it is unusual for the insurer to change that counsel in mid-stream. This change may not be made by coverage counsel, and insurer is responsible to ensure that a full and effective defense is provided to the insured during any transition period.

When an environmental claim is ongoing, significant billing disputes are unusual between an insurer and defense counsel or between an insurer and environmental contractor. Environmental claims routinely require years of work by defense counsel and environmental contractors. The attorneys and contractors have a financial interest in avoiding disputes that might halt the flow of this work. Similarly, insurers are very familiar with the substantial cost of this work and very

---

[6] Background regarding DRI appears in the references. DRI's programs include industry seminars. In 2015, Insurer's Vice President and Senior Counsel Brian Frankl served as faculty for a three day DRI seminar. (Frankl deposition, pages 10-12 and exhibit 1). Frankl is also the person who signed the Second Settlement on Insurer's behalf.

[7] K. Coyle deposition, v.2 page 6: "Q: As a claims consultant, do you act as a fiduciary toward the policyholder?" "... A: Always."

[8] K. Coyle deposition, v. 1 page 177: "Q: Can you think of any claim in your experience where one of the CNA companies hired defense counsel but did not send a retention letter?" "A: I don't- I can't think of any, no."

rarely instigate disputes where the overall charges are reasonable for the work performed. It is the insurer's responsibility as part of standard claims management to ensure that any billing disputes between itself and defense counsel or contractors do not interfere with a full and effective defense for the insured or interfere with meeting legal obligations for the environmental work.

For substantial environmental claims, it is also common for more than one insurer's policies to provide coverage. The task of negotiating with other insurers or, if necessary, bringing claims against them is a standard task that may be carried out by defense counsel. This task may also be carried out by an insurer's coverage counsel.

2.    The terms of the Second Settlement follow these customary accepted insurance practices
       and provide added protections to Hartford Iron as policyholder.

My Opinion is that the terms and procedures set forth in the Second Settlement between the Insurer and Hartford Iron are consistent with the customary accepted insurance practices for claims management described above.

This Opinion is not intended to describe the legal meaning of the Second Settlement, only the way that it reflects claims management procedures that are thoroughly familiar to me. The terms of the Second Settlement also provide Hartford Iron with rights and protections beyond the standard protections that apply to insurance policy holders. This Opinion applies to the Second Settlement standing on its own, and also in the context of the earlier First Settlement in April 2009 between the sane parties.

The Second Settlement requires in Section II-D that the Insurer defend and indemnify Hartford Iron (and Alan B. Goldberg /dba Hartford Iron & Metal) "without reservation of rights." This language is always used in my experience to provide a full acknowledgment of coverage by an insurer.

This language typically gives an insurer the right to select defense counsel. The Second Settlement gives Hartford Iron the additional protection that it must consent to Insurer's choice, subject to the requirement that this consent may not be unreasonably refused.

As stated above, it is unusual for an insurer to fire defense counsel in mid-stream. The Second Settlement describes only the hiring of defense counsel, not firing a defense lawyer who has already been chosen. Based on my experience, it does not make sense that an insurer would need the insured's agreement to hire defense counsel but would not need that agreement to fire the same counsel. Similarly, the First Settlement in Section 7.1 requires the "written agreement of [Insurer] VFIC and Hartford Iron" to replace defense counsel.

The Second Settlement also states in Section II-A that defense counsel is expected "to supervise the environmental consultant" and "to handle negotiations" with regulatory agencies. These provisions are consistent with the standard procedure that defense counsel is responsible for the strategic defense planning to ensure that the contractor's work satisfies the applicable environmental legal requirements.

The procedures under the Second Settlement do not include a role for coverage counsel. This is consistent with the requirement for the Insurer to defend and indemnify "without reservation of rights." This acknowledgment of coverage without reservation of rights usually means that coverage counsel has no further involvement in a claim at all. Certainly, in my experience, coverage counsel has no role in the work of the environmental consultant or in negotiating with regulatory agencies.

The Second Settlement includes protections for Hartford Iron that go beyond standard claims management. These additional protections include an unusual commitment by the Insurer in Section III-C to pay the penalty imposed by U.S. EPA for prior violations of PCB standards in stormwater and handling of PCB-containing wastes. This penalty was in the amount of $189,580. In my experience, I have never come across an insurance company paying this kind of regulatory penalty. My experience is consistent with the wording of this obligation in the Second Settlement, which states Insurer's position that "its insurance policies do not cover civil penalties assessed by the agencies" and stresses that its payment is "an accommodation in this case only" (emphasis original). This kind of penalty from U.S. EPA is a "very serious" matter, as Insurer admits (K. Coyle Deposition, page 203).

The additional protections in the Second Settlement for Hartford Iron also include in Section II-D the commitment by Insurer to be responsible "effective immediately" to ensure "prevention of illegal stormwater discharges." In my experience, I have never come across an insurer accepting this kind of additional performance obligation. This obligation makes sense, however, in the unusual context of the $189,580 EPA penalty paid by Insurer and relating to stormwater violations while it was previously defending and directing the work.

Other protections in the Second Settlement also make sense in this context. In addition to preventing illegal stormwater discharges, Insurer is also required in Section II-D to "carry out... the Remediation Work Plan (July 31, 2012) for [Hartford Iron], as approved or modified by IDEM and/or EPA." At the time of the Second Settlement, IDEM was still reviewing this July 31, 2012 Remediation Work Plan, and the final contents of that plan depended on IDEM's response. Consistent with this status, the Second Settlement requires Insurer to "modify the Remediation Work Plan to incorporate agency comments" and to "prepare and implement future work plans as required by IDEM or EPA for subsequent steps in the site remediation." Insurer was thus required to carry out an objective scope of work for remediation based on agency requirements stated in written work plan documents. My experience is that this protection should have prevented most disputes about the remediation work. This protection is also important for defining the insurance tasks that may count against policy limits as described in Opinion E.

The only place the Second Settlement refers to a duty for Hartford Iron "to cooperate" concerns the written work plan to meet IDEM and EPA requirements. The Second Settlement states that Hartford Iron "agrees to cooperate with [Insurer], defense counsel, and August Mack in their efforts to obtain approval for and to implement the most cost effective work plan for the site" (my emphasis). This provision repeats the basic protection, that Insurer must first "obtain approval" from the regulatory agencies for a written work plan and then "implement" the work plan. Hartford Iron is required "to cooperate" with these steps. Hartford Iron's duty to cooperate applies as much to "defense counsel" as it does to Insurer or August Mack. In fact, as identified

above, it is defense counsel who has the responsibility under the Second Settlement to negotiate with the environmental agencies and to supervise August Mack. This provision also provides protection to Hartford Iron by requiring that Insurer's work be "cost effective," or even "most cost effective."

The Second Settlement also imposes a specific duty to cooperate on Insurer, defense counsel, and August Mack. It requires them to "cooperate with Hartford Iron to minimize business disruption in the design and implementation of remedial steps" and to "ensure that the business is able to receive customers and process scrap at all times consistent with its current operations." In my experience, this type of specific duty for an insurer "to cooperate" with its policyholder is unusual and goes beyond the general duty to adhere to customary accepted insurance practices.

The additional protections in the Second Settlement for Hartford Iron also include in Section II-J the requirement for Insurer's environmental consultant, August Mack, to provide transparency by copying Hartford Iron on "all" communications. In my experience, this additional protection for Hartford Iron is also unusual, but is understandable as a way to prevent surprises and to safeguard defense counsel's role in supervising August Mack.

Similarly, the Second Settlement obligates Insurer in Section II-D to require August Mack "to provide advance notice of its work to Hartford Iron," which should have similarly prevented surprises and ensured that the work was consistent with defense counsel's strategy and with an approved Remediation Work Plan.

Consistent with standard practice, the Second Settlement states in Section II-G that Insurer has the right to "present claims and assert equitable contribution from any other insurers whose policies potentially cover" the regulatory claims at Hartford Iron. Less common, Insurer's coverage counsel wrote to Hartford Iron on May 5, 2014 to ask Hartford Iron to present these claims "in its own name." Coverage counsel explained that Hartford Iron "is likely to be much [more] effective" and that Insurer is "under... a handicap" in presenting these claims. Coverage counsel also outlined the nature of this handicap. In essence, Insurer often argues that it is not obligated to provide coverage for environmental claims "in jurisdictions across the country." Coverage counsel was concerned that other insurers, and I would say other policy holders, would be "highly likely to take advantage of this situation" by using Insurer's arguments against it. I understand this claim of handicap based on my own experience concerning insurance claims in jurisdictions across the country. Once coverage counsel identified this handicap, the task of presenting claims to other insurers became the responsibility of defense counsel under standard practice.

The Second Settlement differs from the earlier First Settlement in several ways that are important based on my experience.

Specifically, the First Settlement states in Section 3.3 that Insurer is not making any "admission or acknowledgment of coverage" or any "waiver... of defense to coverage." The First Settlement then repeats in Section 8.1 that Insurer is not making any "admission... of coverage under Policies" to Hartford Iron. This language is basically the opposite of the corresponding language in the Second Settlement, in which Insurer accepted coverage "without reservation of rights."

23

This different language is consistent with the standard practice that insurers may accept coverage under a reservation of rights (First Settlement) or without a reservation (Second Settlement).

Similarly, the First Settlement contains disclaimer language in Section 3.5 that it "is not intended to nor will it be construed as an insurance policy construction or interpretation." It continues that it "will not be used for any purpose whatsoever to create, prove, or interpret any alleged obligations under any policies." Consistent with the above, none of this language appears in the Second Settlement.

The First Settlement also identifies a limited category of costs, called "Agreed Order Costs," that Insurer may apply under Section 5.1 and 5.5 to its policy limits. These Agreed Order Costs are defined as costs under specific sections of the 2009 IDEM Agreed Order, which is an attachment to the First Settlement. The Agreed Order Costs are thus limited to:

> removing certain soil piles (Agreed Order section II-2)

> preparing and carrying out an IDEM-approved site assessment plan (Agreed Order section II-3, II-4, and II-5)

> preparing and carrying out an IDEM-approved remediation work plan (Agreed Order section II-6, II-7, and II-8)

The Second Settlement is consistent with the above in defining most of the work in terms of an IDEM-approved remediation work plan.

The First Settlement and Second Settlement also take different approaches to Insurer's obligations regarding stormwater. As identified above, the Second Settlement contains a "prevention" standard in Section II-D that is "effective immediately" and does not appear in the First Settlement. This prevention standard makes Insurer and its consultant responsible for "prevention of illegal stormwater discharges." By contrast, the First Settlement applies in Section 5.2 only to "<u>investigation</u> of potential migration of past contamination through stormwater" and to "<u>remediation that may be required by IDEM</u> for such stormwater migration" (my emphasis),

The Second Settlement does not contain language that allows prevention costs to be charged against policy limits as an Agreed Order Cost. This prevention task did not clean up the overall site or remediate the source of the contamination and instead basically would have simply maintained the <u>status quo</u> if done effectively. Prior to the Second Settlement, IDEM itself described these prevention steps as a "temporary stop-gap measure" in an agency letter dated April 17, 2012. Based on my experience, it is consistent with standard insurance claims management that the Second Settlement does not identify prevention work as chargeable against policy limits, even if done in a cost effective manner and as part of defense counsel strategy and IDEM requirements.

3.    Insurer failed to follow these customary accepted insurance practices and additional protections in its management of Hartford Iron's insurance claim. Insurer substituted unusual, ineffective, and unreliable procedures contrary to Hartford Iron's interests.

The references in this report include claims correspondence from defense counsel, coverage counsel, and various claims consultants and managers for Insurer. These references include sworn testimony from claims consultant K. Coyle and from defense counsel J. Dameron.

Based on my review of these reference materials, including the example references listed below, Insurer's claims management included practices that I have never seen in my 46 years of experience. The practices described below were contrary to standard claims management. The practices described below were ineffective, unreliable, and contrary to Hartford Iron's interests.

These practices include the following:

a. Insurer departed from customary, accepted practices by using coverage counsel to intervene in claims management and in the policyholder's defense.

b. This intervention is extraordinary, in my experience. It came while were acting as litigation counsel in this lawsuit, which they filed January 10, 2014. This opinion also applies to intervention by coverage counsel while they were preparing the suit.

c. For example, Insurer departed from customary, accepted practices when coverage counsel set required terms and conditions for work by Keramida, Inc. (Keramida) to build stormwater controls required by IDEM and developed as part of defense counsel's strategy.

    Ref:    Amended Affidavit of K. Belcredi, pages 3-6, March 2, 2016
            Coverage counsel letter and attachments, Nov. 4, 2015
            Coverage counsel letter, Sept. 10, 2015
            Coverage counsel letter, July 22, 2015
            Affidavit of Defense Counsel (J. Dameron), pages 2-7, Feb. 4, 2016

d. The scope and detail of the terms and conditions from coverage counsel is extraordinary in my experience (see Nov. 4, 2015 attachments). The terms state that they are not complete, but are to be incorporated in contracts to be developed by coverage counsel with additional terms.

e. The accusatory tone and argument over defense strategy in the above letters from coverage counsel is also extraordinary in my experience. The July 22 letter, for example, includes five pages of accusations. These include the assertion that defense counsel (J. Dameron) made misrepresentations to regulatory agencies (page 2). The accusations also included assertions by coverage counsel of "obvious... refusal to cooperate in good faith" (page 3) and "intentional manipulation" (page 5) by defense counsel and/or the policy holder.

f.  In the July 22 letter, coverage counsel also asserts Insurer's position that it has the "right under the policy language... to refuse to pay costs incurred without its consent" (page 1) and "an ongoing right to control... all aspects of stormwater collection and treatment" (page 5). I have never seen coverage counsel seek to override and criticize the work and strategy of defense counsel like this.

g.  The claims management practices by Insurer reflected in the above letters and affidavit are not consistent with customary and accepted industry practices for defense and indemnity of a policyholder without reservation of rights, or even with a reservation of rights.

h.  Based on court testimony, affidavits, and correspondence of defense counsel (J. Dameron), Insurer's use of coverage counsel to dispute defense strategy and to send accusatory correspondence to defense counsel extended over a period of years.

> Ref:   Defense Counsel Letter (J. Dameron), May 27, 2014
> Affidavit of Defense Counsel (J. Dameron), pages 1-2, Feb. 27, 2015
> Testimony of J. Dameron, pages 125-126, 156-159, 168-619, March 9, 2015
> Affidavit of Defense Counsel (J. Dameron), pages 2-9 and attachments,
> Feb. 4, 2016
> Affidavit of Defense Counsel (J. Dameron), pages 5-7, May 18, 2016

i.  Insurer failed to follow customary accepted insurance practices by sharing confidential defense communications with coverage counsel. For example, defense counsel (J. Dameron) prepared a defense update dated March 24, 2015 with the heading *Legally Privileged and Confidential* and the instruction *Must Not Be Disclosed to Valley Forge Personnel and Counsel not ethically walled-off from VFIC v. Hartford Iron* (emphasis in original). Insurer sent this update to coverage counsel, who prepared their own letter disputing defense counsel's assessment. Coverage counsel then used the confidential update from defense counsel and their response as litigation exhibits against Hartford Iron in this case.

> Ref:   Defense Counsel Privileged and Confidential Letter, March 24, 2015,
> Insurer litigation exhibit 94-13
> Coverage Counsel Letter, April 16, 2015, Insurer litigation exhibit 95-2.

j.  Insurer failed to follow customary accepted insurance practices when defense counsel (J. Dameron) wrote to Insurer on April 23, 2015 and objected to the confidential letter above being provided to coverage counsel. Insurer then shared this objection with coverage counsel. Coverage counsel used the objection as another litigation exhibit against Hartford Iron.

> Ref:   Defense Counsel Privileged and Confidential Letter, April 23, 2015
> Insurer litigation exhibit 94-14

k.  Insurer failed to follow customary accepted insurance practices when it used coverage counsel to meet with IDEM.

      Ref:    Testimony of K. Coyle, pages 104-15, March 9, 2015
              Affidavit of Defense Counsel (J. Dameron), pages 2-3, Feb. 27, 2015
              IDEM Meeting Sign-In and PowerPoint (February 17, 2015)

l.  Insurer failed to follow customary accepted insurance practices by using coverage counsel to intervene in claims management by Insurer's claims consultant, K. Coyle.

m.  Claims counsel intervened in the defense and claims management by sending detailed correspondence to Insurer's Claims Consultant K. Coyle, which she then cut and pasted and sent to Hartford Iron under her own name.

      Ref:    Testimony of J. Dameron, pages 126-129, 138-39, March 9, 2015
              Affidavit of Defense Counsel (J. Dameron), page 2, Feb. 4, 2016
              K. Coyle Deposition, vol. 2, pages 92, 98-100
                  and exhibits 45, 46, Feb. 7, 2012

n.  Coyle testified that she does not know whether every word of many e-mails under her name, after the filing of this lawsuit, were actually written by coverage counsel and copied by her.

      Ref:    K. Coyle Deposition, vol. 2, 100, 117, 125, 130, 146-147, 151, 154, 156, 167, 173, 188 (exhibits 47-66)

o.  The intervention by coverage counsel in the defense includes at least 19 pieces of correspondence between them and K. Coyle from June 20, 2014 to June 27, 2014. This is the period when defense counsel first wrote regarding the requirements for the defense strategy to prevent illegal discharges of stormwater. Each item concerned matters relating to this defense strategy.

      Ref:    Affidavit of Defense Counsel, pages 2-7 and attachments (J. Dameron), Feb. 4, 2016

p.  Through October 2015, K. Coyle sent or received 2,023 communications according to defense counsel selected by Hartford Iron (M. Shere) that Insurer has not disclosed under claim of privilege. Most of these K. Coyle communications were to or from coverage counsel, showing the pervasive nature of their involvement in claims management.

      Ref:    Affidavit of Defense Counsel, pages 2-7 and attachments (J. Dameron), Feb. 4, 2016

q.  In my experience, it is not consistent with customary accepted insurance practices for coverage counsel to communicate with an environmental contractor carrying out defense or remediation.

r.  Defense counsel (J. Dameron) instructed Insurer's environmental contractor August
    Mack not to communicate with Insurer's coverage counsel without her participation or
    authorization. K. Coyle, directed August Mack to disregard this reasonable instruction,
    which she may have cut-and-pasted from coverage counsel themselves.

      Ref:      K. Coyle Deposition, vol. 2, pages 117-119 and exhibit 49
                  Transcript of March 9, 2015 Hearing (J. Dameron), pages 140-42

s.  Defense counsel (J. Dameron) testified that her experience was that August Mack
    received undisclosed instructions from Insurer.

      Ref:      Transcript of March 9, 2015 Hearing (J. Dameron), pages 140-142

t.  Insurer and coverage counsel hired August Mack for litigation support against Hartford
    Iron at the same time August Mack was working at the Hartford Iron site. Invoices show
    August Mack worked with prior coverage counsel and with new litigation counsel who
    began work in the Feb-April 2016 period.

      Ref:      August Mack, Litigation Support Invoices, Feb.-May 2016

u.  Hartford Iron is required to signed and certify regulatory reports to IDEM following
    discharges of untreated stormwater. These reports are the equivalent of sworn witness
    statements. Insurer failed to follow customary accepted insurance practices by instructing
    defense counsel to change the statement by Scott Goldberg of Hartford Iron, who
    witnessed the discharges. Defense counsel testified that these changes would have steered
    blame for the discharges to Hartford Iron itself.

      Ref:      Transcript of March 9, 2015 Hearing (J. Dameron), pages 130-139

v.  Melissa King is a claims consultant for Insurer who participated in Insurer's attempts to
    change Hartford Iron's witness statement. She was also involved in other aspects of
    claims management, including payment of invoices from defense counsel (J. Dameron).

      Ref:      Transcript of March 9, 2015 Hearing (J. Dameron), pages 129-130
                  Claim Consultant Correspondence (M. King), Dec. 22, 2014

w.  M. King's internal correspondence fails to follow customary accepted insurance practices. This correspondence shows open hostility to defense counsel J. Dameron. This correspondence also shows plans by Insurer to engage in "maneuvering" with IDEM to circumvent defense strategy. Correspondence from M. King includes the following:

> "We need to get rid of Jamie Dameron." June 25, 2014

> "This is unacceptable… the photo does not support any claim by you and/or Hartford Iron that a noncompliance event took place." Sept. 23, 2014 [concerning the witness statement above]

> "Let the games from Jamie begin." Oct. 3, 2014 [concerning stormwater discharges related to the witness statement]

> Telling Dameron she must send to Insurer "any and all proposed written communications with IDEM… to review and approve them. You have, once again, ignored this direct instruction." Oct. 9, 2014 [sent during the witness statement issue]

> Warning Dameron that Insurer is "the party who retained you, is paying your fees and has the sole right to control Hartford Iron's defense." Oct. 9, 2014.

> "We will… direct Jamie not to present this Keramida plan [to prevent illegal stormwater discharges] to IDEM." Nov. 5, 2014

> "It will take some maneuvering to get IDEM to initially approve only… portions of the Keramida plan." Nov. 5, 2014

> Writing to J. Dameron that she is being "disingenuous," "not professional," and "follow[ing] your typical strategy of making unsubstantiated claims." Nov. 25, 2014.

> "She is just being unreasonable and making false statements." Dec. 4, 2014

x.  Ordinary and customary standards for insurance payment of charges for defense, remediation, and other environmental work is within thirty days of invoicing. Insurer's claims director J. Alpine agreed in his deposition, "I don't see a reason why within -- a bill couldn't be reviewed within less than 30 days and paid in less than 30 days."

> Ref:    J. Alpine Deposition, pages 48-49

y.  Insurer violated ordinary and customary claims management practices by failing to timely pay charges for the defense contractors Keramida, CH2M Hill, Thompson Environmental, and Muncie Paving. On March 2, 2016, for example, a senior vice-president of Keramida testified by affidavit that Keramida's experience was that it could not rely on Insurer for necessary payments. Defense counsel (J. Dameron) testified by affidavit that CH2M Hill also suspended work due to Insurer's failure to timely pay invoices. On or about August 1, 2016, J. Alpine paid a series of contractor charges that were overdue, in the total amount of $81,184.08, which included charges that were up to 12 months old.

> Ref:    Claims Director Correspondence, July 28, 2016
> Affidavit of Defense Counsel (J. Dameron), pages 10-11, Feb. 4, 2016
> Affidavit of K. Belcredi, page 6, March 2, 2016

z.  Insurer violated ordinary and customary claims management practices, and substantially interfered with defense counsel's work, by failing to timely pay defense charges for its appointed defense counsel J. Dameron. This failure to pay led Dameron's firm to suspend most or all of her defense work for lengthy periods (July 15, 2015 to late July 2017, and November 6, 2014 to March 9, 2015).

> Ref:    Affidavit of Defense Counsel (J. Dameron), page 7, Feb. 4, 2016

aa. Insurer violated ordinary and customary claims management practices by insisting on disclosure by Jamie Dameron of attorney-client privileged information, as well as by seeking to enforce this demand by making it a condition of payment for her firm's defense charges.

> Ref:    Affidavit of Defense Counsel (J. Dameron), page 10, Feb. 4, 2016
> Transcript of March 9, 2015 Hearing (J. Dameron), pages 223-224
> K. Coyle Deposition, vol. 2, 121-124 and exhibit 49

bb. Insurer violated ordinary and customary claims management practices by deciding to pay portions of defense charges for J. Dameron's firm under a standard of whether she submitted "appeal descriptions [that] would pass muster in front of a judge."

> Ref:    Claims Consultant Correspondence (M. King), Dec. 22, 2014

cc. Insurer violated ordinary and customary claims management practices by refusing payment for work by Hartford Iron's chosen counsel (M. Shere and his firm), including for periods when Dameron was unavailable for defense work, or was obstructed in that work by interference from coverage counsel or Insurer's claims consultants, or when a significant risk arose of an "excess judgment" in the form of liability beyond Insurer's claimed policy limits.

> Ref:    Affidavit of Defense Counsel (J. Dameron), pages 9-10, Feb. 4, 2016

dd. In my experience, environmental contractors and insurance defense lawyers want very much to work on complex, multi-year projects like the work at Hartford Iron. The suspensions or withdrawal from work by environmental contractors and by J. Dameron and her firm are very unusual but make sense in the context of claims management that they each viewed as unreliable and subject to litigation-related burdens imposed by coverage counsel.

ee. Insurer has used a large number of lawyers to work on its behalf concerning the Hartford Iron claim. Some of these lawyers have also filled the role of claims consultants, such as Melissa King. Insurer's lawyer Erik Mroz and his firm have an unusually vague and overlapping role regarding this claim.

ff. On November 15, 2016, for example, E. Mroz describes himself as having a limited engagement for Insurer "in connection with the response action only." He specifically wrote that he is not coverage counsel or defense counsel. A month earlier, he wrote on October 18, 2016 to J. Dameron and M. Shere directing them to send him 14 numbered categories of information regarding almost every aspect of the defense and planned remediation at the Site. He also wrote that they should send him all communications to IDEM for approval before sending them to the agency. The prior month, on Sept. 20, 2016, E. Mroz approved a $44,120.99 budget from Thompson Environmental to install six monitoring wells after defense counsel (M. Shere) wrote to IDEM regarding Insurer's failure until then to approve the expected cost. Later, on April 13, 2017, he wrote to lawyers from J. Dameron's prior law firm, who do not represent Hartford Iron, with lengthy arguments about the history of the defense work, including claims about the July 22, 2015 letter from Insurer's coverage counsel (discussed above). Mroz also claimed that it is necessary for him to receive the 14 categories of documents and information from his prior letter, which he expanded to include a 15th numbered category.

    Ref:    Response Counsel Letters, Sept. 20, 2016
               Response Counsel Letter, Oct. 18, 2016
               Response Counsel Letter, Nov. 15, 2016
               Response Counsel Letter, April 13, 2017

gg. Insurer violated ordinary and customary claims management practices in its use of E. Mroz. Insurer appears to have created his role of "response counsel" for the first time here. In 46 years, I have never heard of an attorney appointed by the insurer for "the response action only." Insurer's claims consultant K. Coyle testified at her deposition and detail about the different types of counsel who are part of claims management, and that she has never worked with response counsel. Insurer also refused to answer discovery regarding any instances of prior use of response counsel. I reserve the right to examine additional documents regarding the work of E. Mroz and to develop further opinions if Insurer provides new information about his claimed role.

    Ref:    Insurer Response to Interrogatory No. 1, July 11, 2017
               K. Coyle Deposition, vol. 2, pages 14-22, 29-30 (coverage counsel),
                       23 and 27-28 (in-house counsel), 23-24, 31-32 (Cumis counsel),
                       26-27 (defense counsel) 192-193 (response counsel)

hh. Insurer has written Conflict of Information for Counsel (current version Aug 2017), largely written in terms of protecting its own interests. The policy warns about both ethical and business conflicts as part of insurance defense. Regarding the latter, Insurer states that it "is contacted daily by excellent firms seeking to provide legal services" and it "does not look favorably upon its defense counsel pursuing actions on behalf of persons or entities that are adverse to interests that are insured" by the company.

    Ref:    Conflict of Information for Counsel (Aug 2017) (at CNA.com)

ii. Insurer violated ordinary and customary claims management practices by agreeing to specific performance standards, and then failing to meet them. In the context of a $189,580 penalty from U.S. EPA mainly concerning stormwater violations, Insurer accepted the obligation "effective immediately" to ensure "prevention of illegal stormwater discharges." Based on the regulatory reports, many of which are from August Mack, Insurer failed to meet this obligation on approximately forty separate violation days from January 2013 through July 2017.

    Ref:    Noncompliance and Bypass Reports, Dec. 2013 – July 2017
                Correspondence re stormwater violations, Jan. 2013 – May 2013

jj. IDEM took a series of regulatory actions in response to these discharges, including:

Setting a remediation level for PCBs in soil of 1 ppm "due to the recent PCB impacted storm water events" in a Remediation Work Plan letter on February 26, 2014.

Issuing a Violation Letter on December 23, 2014 with the agency's finding that discharge of untreated stormwater "continues unabated."

Issuing a Commissioner's order on April 5, 2016, in which it found "18 bypasses of the treatment facility" and ordered Hartford Iron to "collect, transport, and properly treat all stormwater discharge," as well as imposing a new state penalty of $60,000.

Filing a Verified Petition for Civil Enforcement in state court in August 2016. The Verified Petition states IDEM's (verified) finding on page 5 that the "storm water control system... failed to adequately control runoff."

kk. Insurer also accepted the performance obligations to "carry out... the Remediation Work Plan (July 31, 2012) for [Hartford Iron], as approved or modified by IDEM and/or EPA," to "modify the Remediation Work Plan to incorporate agency comments," and to "prepare and implement future work plans as required by IDEM or EPA for subsequent steps in the site remediation." Based on the project documents I have seen, I am aware of only a single very limited work plan submitted by August Mack or on behalf of Insurer to IDEM and approved by the agency. This work plan is dated May 12, 2014, and it proposed additional soil testing, without any cleanup or remediation. This work plan was included in an IDEM approval letter dated January 29, 2015.

Ref:    IDEM, Remediation Work Plan Approval, January 29, 2015
        August Mack, Subsurface Investigation and Delineation Work Plan,
        May 12, 2014

ll.  In the performance obligations and the claims management practices described above,
     Insurer took on the unusual role of, in essence, the general contractor for extensive
     environmental work involving complex regulatory requirements that had already been the
     subject of an EPA penalty of $189,580 paid by Insurer. The oddball nature of this
     undertaking magnified the consequences of failing to comply ordinary and customary
     claims management practices.

mm. The above opinions together concern a pattern of claims management by Insurer that is
     extraordinary in my 46 years of experience for the magnitude and pervasiveness of the
     departure from ordinary and customary practices.

## IV.    Documents / Information Considered:

The following lists the documents that support my opinions or were considered by me in forming them:

I. Introduction and Background

1.  Notice of Claim to Insurer, July 7, 2008

2.  Insurer Reservation of Rights Letter, Oct. 28, 2008

3.  First Settlement, April 17, 2009

4.  IDEM Agreed Order, No. 2006-15740-H, May 27, 2009

5.  EPA Notice of Intent to File Civil Administrative Complaint, Aug. 4, 2011

6.  Notice of Claim to Insurer, Aug. 8, 2011

7.  Notice of Dispute to Insurer, Sept. 22, 2011

8.  Letter from Coverage Counsel, Sept. 27, 2011

9.  State Court Civil Complaint, No. 05C01-1110-MI-322, Oct. 27, 2011

10. Letter from B. Frankl re Continental Casualty Co., Jan. 26, 2012

11. EPA, Letter Requesting Work Plan, March 19, 2012

12. IDEM, PCB Remediation Request, April 17, 2012

13. EPA, e-mail and proposed draft Consent Agreement and Final Order

14. Second Settlement, Dec. 4, 2012

15. EPA, Consent Agreement and Final Order, Aug. 22, 2013

16. Coyle Reinsurance Letter (policy years and limits), June 24, 2013

17. IDEM, Remediation Work Plan Letter, Feb. 26, 2014

18. Affidavit of S. Goldberg, Feb. 27, 2015

IIIA-IIIC. Statement of Opinions (above references and the following)

19. Insurer Form 6682B (Manufacturers' and Contractors' Liability Insurance)

20. Policy Order form, August 8, 1975

21. Payroll Report, Nov 11, 2013

22. Statement of Adjusted Premium, Dec. 11, 1975

23. Premium Information, 1975-76, VFIC118900-901

24. 3 Year Policy Renewal, July 26, 1978

25. Policy Order form, Oct. 1, 1979

26. General Policy Inf. Coding, Oct. 24, 1979

27. Policy Order form, Aug. 8, 1983 VFIC064594 (full)

28. Policy Order form, Aug. 8, 1983, VFIC064888 (blacked out)

29. Example blacked-out policy documents, 1983-84, VFIC061517-20

30. Bonham Letter Requesting Annual Renewal, Sept. 9, 1984

31. Liability Ins. Daily Report, 1984-85 renewal, VFIC009405

32. Affidavit of P. Cory Smith, HydroTech Project Mgr., Feb. 22, 2012

33. Coyle Reinsurer Letter, June 24, 2013 (deposition exh. 74)

34. Assignment of Insurance Rights, Sept. 4, 2013

35. Cope Letter, Jan. 1, 2014

36. Transcript and exhibits, Deposition of K. Coyle, Feb. 6-7, 2017

37. Affidavit of A. Goldberg, Feb. 21, 2017

38. Insurer response to Interrogatories, July 11, 2017

39. Policy Review Notes, undated, VFIC062102-113

IIID-IIIF(2). Statement of Opinions (above references and the following)

40. Defense Research Inst., Recommended Case handling Guidelines, 2000

41. File Summary Form, August 16, 2001, VFIC009416

42. CNA, Litigation Management Guidelines for EMTC Outside Counsel, Sept. 1, 2004

43. A History of DRI – Service the Defense Bar, 2005
(http://dri.org/docs/default-source/default-document-library/dri-history2005.pdf)

44. IDEM, PCB Remediation Request, April 17, 2012

45. Cope Letter, January 14, 2014, Coyle dep. Exhibit 75

46. Letter from Hartford Iron re 1970s policies, February 24, 2014

47. Coverage Counsel Letter (J. Michaels) re claims against other insurers, May 5, 2014

48. Coverage Counsel Letter (J. Michaels) re 1970s policies, May 13, 2014

49. Insurer production transmittal re Coyle Reinsurance Letter, December 30, 2016

50. Transcript and Exhibits, Deposition of B. Frankl, January 23, 2017

IIIF(3). Statement of Opinions (above references and the following)

51. Affidavit of K. Belcredi, Keramida, July 21, 2015

52. Affidavit of K. Belcredi, Keramida, March 2, 2016

53. Affidavit of Defense Counsel (J. Dameron), Feb. 4, 2016

54. Affidavit of Defense Counsel (J. Dameron), May 18, 2016

55. Affidavit of Defense Counsel (J. Dameron), Feb. 27, 2015

56. Affidavit of Defense Counsel (M. Shere), Feb. 11, 2016

57. Defense Counsel Letter (J. Dameron), May 27, 2014

58. Defense Counsel Privileged and Confidential Letter, March 24, 2015

59. Defense Counsel Privileged and Confidential Letter, April 23, 2015

60. Transcript of March 9, 2015 Hearing

61. IDEM, Remediation Work Plan Approval, January 29, 2015

62. IDEM, Violation Letter, December 23, 2014

63. IDEM, Notice and Order of the Commissioner, April 5, 2016

64. IDEM, Verified Petition for Civil Enforcement, August 2016 and Chron Case
    Summary

65. IDEM Meeting Sign-In and PowerPoint (February 17, 2015)

66. Claim Consultant Correspondence (M. King), June 25, 2014, Oct. 3, 2014, Oct. 9,
    2014, Nov. 5, 2014, Nov. 25, 2014, Dec. 4, 2014, Dec. 22, 2014

67. Claim Director Correspondence, July 28, 2016

68. J. Alpine Deposition, April 12, 2016

69. Coverage counsel letter and attachments, Nov. 4, 2015

70. Coverage counsel letter, Sept. 10, 2015

71. Coverage counsel letter, July 22, 2015

72. Insurer litigation exhibit 94-13

73. Insurer litigation exhibit 94-14

74. Coverage Counsel Letter, April 16, 2015, Insurer litigation exhibit 95-2.

75. Response Counsel Letters, Sept. 20, 2016

76. Response Counsel Letter, Oct. 18, 2016

77. Response Counsel Letter, Nov. 15, 2016

78. Response Counsel Letter, April 13, 2017

79. Insurer Response to Interrogatory No. 1, July 11, 2017

80. Conflict of Information for Counsel (Aug 2017) (at CNA.com)

81. August Mack, Litigation Support Invoices, Feb.-May 2016

82. August Mack, Subsurface Investigation and Delineation Work Plan, May 12, 2014

83. August Mack, Subsurface Investigation and Delineation Work Plan, May 12, 2014

84. Correspondence re stormwater violations, Jan. 2013 – May 2013

85. Noncompliance and Bypass Reports, Dec. 2013 – July 2017

## V.    Compensation:

I am being compensated at a rate of $300 per hour for file review, $350 per hour (four hours minimum) for trial and deposition testimony, and $150 per hour for travel. I have no financial interest in the outcome of this issue.

## VI.    Case List:

The following is a list of all other cases in which, during the previous four years, I have testified as an expert at trial or by deposition:

1. *Rovner v. One Beacon,* William Crane, Esq., Pownel Maine Superior Court, Maine (Deposition);

2. *Hanover Insurance v. Claims America,* Gibbs & Burton, Spartanburg, South Carolina, American Arbitration Association (Arbitration Testimony);

3. *Zimmer v. Travelers,* Brick Gentry Bowers Swartz Stoltze & Levis, Des Moines, Iowa, United States District Court for the District Court of Iowa (Trial Testimony);

4. *Dattilo v. Arbella Insurance Company*, Krindler and Krindler, Boston, Massachusetts, Middlesex Superior Court (Trial Testimony);

5. *Centerpoint Properties v. Silver Spoon*, Ohrenberger Associates, Situate, Massachusetts, Quincy District Court (Trial Testimony);

6. *S.C.S. v. Utica Mutual Insurance Co.*, Halloran & Sage, Hartford, Connecticut, United States District Court for  the District of Connecticut (Deposition);

7. *King v. Kentucky Farm Bureau Insurance Companies*, Gess Mattingly & Atchison. PC., Lexington, Kentucky, 36th Judicial District Court (Deposition);

8. *California Insurance Co. v. Valentine*, Law Offices of Grandville Templeton, Baltimore, Maryland,  United States District Court for the District of Maryland (Deposition);

9. *Premier Entertainment Biloxi v. James River Ins Co.*, Balch & Bingham LLP, Gulfport Mississippi United States District Court for the Southern District of Mississippi (Deposition);

10. *Rose Coccia vs. USAA*, Law Offices of Anthony Leone, Providence, Rhode Island, (Arbitration Testimony);

11. *Rodriguez, et al. v. Pilgrim Insurance Company*, Law Offices of Kenneth M. Diesenhof Brockton, Massachusetts, Brockton District Court (Trial Testimony and Deposition);

12. *Wyrick v. Stone Insurance Agency*, Law Offices of Michael J. Auger, Hartford, Connecticut, Hartford Superior Court (Trial Testimony and Deposition);

13. *Mayall v. Commerce Insurance Company*, Conn, Kavanaugh; Cambridge Superior Court, Boston, Massachusetts (Trial Testimony);

14. *Scotts v. Liberty Mutual Insurance Company*, Jones Day, United States District Court for the Southern District of Ohio, Columbus Ohio (Deposition);

15. *Reliastar v. Certain Reinsurers*, Bilzin, Sumberg Baena & Pierce, Miami, Florida (Deposition and Arbitration Testimony);

16. *Ortiz v. Arbella Insurance Company*, Law Offices of Peter Flynn, Lowell, Massachusetts, Superior Court (Trial Testimony);

17. *Pasquale v. Commerce Insurance Company*, Gay and Gay, Taunton, Massachusetts, Superior Court (Trial Testimony);

18. *Gephardt and Smith v. Maryland Port Authority*, Gephardt and Smith, Baltimore, Maryland, Superior Court (Trial Testimony and Deposition);

19. *Oak Island v. Lexington Insurance Company*, Schnader Attorneys, Philadelphia, Pennsylvania, Louisiana Federal Court (Deposition);

20. *State of Connecticut v. Wilcox*, Hassatt and George, Hartford, Connecticut, Superior Court (Trial Testimony);

21. *Rodgers, et al v. Certain Underwriters at Lloyds*, Vann Law Offices, North Carolina Superior Court (Deposition);

22. *Plaquemines Parish School Board v. Industrial Risk Insurance Corp.*, Kanner & Whiteley L.L.C., United States District Court for the Eastern District of Louisiana (Deposition);

23. *Quinchia v. Russo Insurance Agency*, Law Offices of Cahalane and Stefani P.C., Norfolk Superior Court, Massachusetts (Deposition);

24. *Callahan. v. Norfolk & Dedham Group*, Law Offices of Joseph Abromovitz, Norfolk Superior Court, Massachusetts (Trial and Deposition)

25. *Palace Casino Resort v. RSUI*, Law Offices of Zachary & Leggett, Hattiesburg, Mississippi, United States District Court for the District of Mississippi (Deposition);

26. *Dimitruk v. Arbella Mutual*, McGowan and Associates, Norwell, Massachusetts, Norfolk Superior Court (Trial Testimony);

27. *Rivera v. Commerce Insurance Company*, Robert DiTusi, Esq., Hamden Superior Court, Springfield, Massachusetts (Trial Testimony);

28. *Czarnik v. Wendover Financial Services*, Levin, Riback Law Group, Circuit Court of Cook County, Chicago, Illinois (Deposition);

29. *Cape Anne Marina v. Watson Insurance Agency*, Orlando Associates, Boston, Massachusetts, United States District Court for the District of Massachusetts (Trial Testimony);

30. *Gelwan v. Vermont Mutual*, Law Offices of Lloyd W. Gelwan, New York, New York, United States District Court for the Southern District of New York (Trial Testimony).

31. *Cashman v. AIG,* Law Offices of Joseph Abramovitz, Boston Mass, Suffolk Superior Court, Massachusetts (Trial Testimony);

32. *Kingstown Camera v. Gilmartin Ins. Agency,* Law offices of Stephen R White, Providence Rhode Island, Wakefield Superior Court (Trial Testimony);

33. *Bohn v. Vermont  Mutual,* Law offices of John Weingold Pittsfield Massachusetts, (Deposition and Trial Testimony)

34. *Fidelity National Financial Inc., et al. v. National Union Fire Insurance Company*, Hahn Loser Cleveland Ohio United States District Court Southern California, (Deposition)

35. *Cedar St., Associates LLC v. Stamford Insurance Group,* Tooher Wocel & Leydon, Superior Court, Stamford Connecticut (Deposition and Trial)

36. *First Protective Insurance Company v. Underwood Anderson Associates,* Sheehe Associates Miami Florida, Circuit Court in and for Escomba County Florida (Deposition)

37. *Donald Haig v Commerce Insurance Company* McGowan and Associates Norwell Mass, Plymouth Superior Court, Plymouth Massachusetts (Deposition)

38. *Bashada v Liberty Mutual Insurance Company,* Rupert Hart Weeks and Ricciardullii LLP Westfield New Jersey Superior Court of New Jersey Law Division Essex County (Trial)

39. *McLaughlin v. American States Insurance Company* Mitchell and DeSimone Boston Mass, Middlesex Superior Court Massachusetts (Trial)

40. *National Development Group v. Assurance Company of America* Edwards Wildman Palmer LLP Providence RI  United States District Court of the District of Rhode Island (Deposition)

41. *Teika Cooke v. American Family Life Assurance Company* Martin McMann & Associates, Washington, DC United States District Court of District of Columbia (Deposition)

42. *Christine Pantelakis v. State Farm Mutual Insurance Company* Eglet Wall Christiansen, Las Vegas, Nevada United States District Court of Nevada (Deposition)

43. *Levine v. Commerce Insurance Company* Law Offices of Frank L. Fragomenti, Jr. Norfolk Superior Court Norfolk Massachusetts (Trial)

44. *Pro-T LLC vs. C. O. Brown Agency, Inc.* Best & Flanagan Minneapolis Minnesota, Fourth Judicial District, County of Hennepin, Minnesota (Deposition)

45. *George and Dorothy Ring v. Meeker Assoc.* Killian Law Firm Iselin NJ. Superior Court of New Jersey (Deposition)

46. *TDB v. Seneca Insurance Company Plews Shadley Racher & Braun LLP.* Marion Superior Court Indiana (Deposition/Trial)

47. *B&F Jacobson Lumber v. Acuity Ins. Company* Stoltze & Updegraff Iowa District for Monona County (Deposition/Trial)

48. *Dean v. Cincinnati Ins. Company* Troutman Law Firm PLLC United States District Court Western KY. (Deposition)

49. *Joseph Martin v. Arbella Ins Company*  Law Offices of William Aivalikles Superior Court Hillsborough County (Deposition)

50. *Todisco v Pompeo & Sons Ins Agency* Regnante Stero Osborne Attorneys at Law Middlesex Superior Court MA

## VII.   <u>Additional Discovery:</u>

I retain the option to modify and add to my opinion as discovery is developed, as appropriate for purposes of rebuttal, and as set forth in specific sections above.

Paul Amoruso, CPCU
Dated: October 2, 2017

# PAUL F. AMORUSO C.P.C.U.

P.O. Box 981
34 Barstow Street (508) 644-1074 phone, (744) 377-3856 Fax
Mattapoisett, MA  02739
Email:  PFACPCU@COMCAST.NET

---

**SUMMARY**          Senior executive with more than 40 years experience in all aspects of operations and management with special expertise in the insurance industry.

**PROFESSIONAL EXPERIENCE:**

*Paul F Amoruso CPCU and Swift Brook Associates, Mattapoisett*, MA
(2001-Present)
**Consulting**
Provide consulting services to businesses and individuals on insurance and issues.
Clients include Liberty Mutual Insurance, Trust Group Inc. and multiple Law Firms.
- Represent Liberty Mutual Ins. Co. at hearings before the Commissioner of Insurance.
- Provide business guidance and litigation management for Trust Group Inc.
- Testify at trials as to accepted insurance practices see www.insuranceoperations.com
- Provide insight on insurance issues to insurance companies and law firms.
- Provide workers compensation case management evaluations.
- Evaluate insurance company procedures.
- Provide guidance for proper claims handling practices.
- Establish Swift Brook Associates to work on insurance related issues of the Property Casualty and Health Care Industry see www.swiftbrookassociates.com
- Insurance Company conduct review for State of Vermont
- Respond to issues concerning insurance companies and insurance agents

*Ladd Financial Group, Inc.*  West Springfield, MA          (2000-2001)
**Vice President Claims**
At request of the Commissioner of Insurance Massachusetts reorganized the Claims Department of New England Fidelity Insurance Company.
- Established subrogation department creating revenues almost overnight.
- Established automobile appraisal review program.
- Establish universal claims handling procedures for claims investigation, denials and review procedures.
- Created personal and commercial property training program for staff.
- Setup mandatory reserve review system of all open files.
- Setup medical bill review on usual and customary basis with outside contractor.
- Established authority levels for paying and denying claims.

*TRUST GROUP, Inc.,* Taunton, MA          (1989-1999)
**Senior Vice President, Trust Integrity**
Formed Trust Integrity to market fraud control and resource subrogation recovery outside the parent Trust Group Inc.  Proposed fraud control program to the United Sates Department of Human Services (Medicare Integrity Program). Established fraud controls for all of Trust's affiliate companies and submitted business plan to market services to other companies.
- Established Underwriting audit procedures.
- Established agency audit fraud procedures and personally led audit team
- Recruited and organized various components of Trust Integrity.
- Setup fraud control protocol for Medicare audit proposal.
- Organized and generated a $50 million proposal for Medicare Integrity Program.
- Investigated fraud concerning medical providers, putting several out of business.

**Paul F. Amoruso**
**Page 2**

**Senior Vice President Trust Group**

Recruited to launch Trust Group's, Trust Insurance Company, growing it from forty automobile insurance policies to over 225,000 in nine years.

- Expanded from a Massachusetts automobile insurance carrier to a full line commercial and homeowner, multi-state insurance company.
- Technical source for the development of initial computer system to process company's insurance business.
- Wrote personal manual and setup personal policies.
- Setup and administered Underwriting operations.
- Designed and supervised all support functions for company administrative needs.
- Setup call center using ACD and CMS to handle 5,000-7,000 telephone calls daily and channel workflow to proper area of responsibility.
- Established a central administrative support group for all departments eliminating duplication.
- Led technical development for new Windows based claims computer system,
- Worked on Executive Team in the purchase and procurement of new business and licensing issues.
- Led process improvement initiative for all departments.

**Senior Vice President Claims, Trust Insurance**

Built claims department from one person in 1989 to 12 direct reports and a claims staff of over 250

- Established and wrote claims manual for uniform claim handling.
- Established handling guidelines for proper disposition of claims.
- Created medical bill review program.
- Developed criteria and established proper number of case assignments for claims handlers.
- Established payment authority criteria.
- Established initial and follow up reserve guideline procedures.
- Established uniform reserve review on all open files on a periodic basis.
- Established procedural complaint review process to assure management involvement.
- Established appraisal guidelines and review program for physical damage claims.
- Setup and organized Commercial claims department.
- Established and personally directed training program for entry and advanced claims staff.
- Established homeowner appraisal unit cutting appraisal cost 80%.
- Personally administered commercial and property loss program including running training program.
- Established fraud control and subrogation procedures that led Massachusetts in subrogation recovery.
- Setup and administered litigation unit with strict cost controls combining flat fee billing and litigation control while achieving over 95% defense verdicts.
- Developed national salvage program and automated total loss evaluation system.
- Senior hands on technical person for insurance processes.

**Paul F. Amoruso**
**Page3**

*LIBERTY MUTUAL INSURANCE COMPANY,* Boston, MA                    (1969-1989)
**Claims Manager**

- Managed expansion of office from one of the smallest to the thirteenth largest (out of 467) in the United States. Staff grew from 13 to 95.
- Responsible for administration, Automobile first and third party (standard and non-standard) Workers Compensation, Homeowners, and Commercial including Property, Motor Cargo, Pollution, and Liability.
- Worked on New England Division team for Workers Compensation case handling.
- Established first call center group for the processing of new claims.
- Established one of the first specialized fraud units.
- Member of Risk Management Team charged with evaluating risk and modifying potential losses.

**Home Office Products Examiner**
- National claims examiner for all flammable fabrics cases in United States.
- Malpractice and pollution claims.
- Six state responsibility for all litigation and claims issues over Branch authority (Oklahoma, Colorado, Arkansas, Kentucky, Iowa and Minnesota) Automobile, Commercial, Products.
- Handled Personal and Commercial Automobile, Products and General Labiality

**Casualty Claims Adjuster**
- Handled, Personal and Commercial Automobile, Worker's Compensation, Motor Cargo and Crime.
- Served as Property and Commercial Property Specialist for Southeastern Connecticut servicing three offices.
- Served as Worker's Compensation Hearing Representative.
- As Litigation Adjuster, Homeowners and Commercial Property Appraiser and Adjuster, worked on three casualty disaster teams in Florida, Kentucky and Connecticut.

| | | |
|---|---|---|
| **EDUCATION:** | *PROVIDENCE COLLEGE,* Providence, Rhode Island | 1969 |
| | BA, Social Studies | |

**PROFESSIONAL:**   Chartered Property Casualty Underwriter C.P.C.U                1980
Vale Tech Blairsville Pennsylvania Property Appraiser                1972
Commonwealth Automobile Reinsures (CAR)                1991-1998
Automobile Insurer's Bureau (AIB)                1992-1998
Board of Directors Trust Group                1992-1998
Licensed Massachusetts, Connecticut, New Jersey,  Florida, Minnesota, Vermont, Property Casualty Insurance Agent for Personal and Commercial Lines of Insurance
Licensed Public Adjuster
Instructor at The Saval Insurance Education Center                2003 -present
for the Massachusetts Insurance Library