**PAUL F. AMORUSO C.P.C.U.**
P.O. Box 981
8 Old Mattapoisett Neck Road
Phone: (508) 758-3274; Fax: (508) 536-6808

34 Barstow Street
Mattapoisett, MA  02739
Phone: (508) 644-1074; Fax: (744) 377-3856
Email:  pfasrvp@comcast.net

# REBUTTAL AND SUPPLEMENTAL EXPERT REPORT

*Dated: November 6, 2017*

**VALLEY FORGE INSURANCE CO.**
v.
**HARTFORD IRON & METAL, INC.**

**In the United States District Court
Northern District of Indiana
Fort Wayne Division
Cause No.  1:14-CV-006-WCL-SLC**

## **Table of Contents**

I.      Introduction and background..……………………………………………………..... 1

II.     Insurer's three reports fail to show payments that count against policy limits. Customary
        and accepted insurance practices required Insurer to document this information if it
        exists.……...............................................................……………………………...…..2

III.    Available information does not identify payments by Insurer to August Mack
        that count against policy limits..………........……………………………………….... 3

IV.     Available information shows that Insurer's payments to HydroTech relating to
        stormwater do not properly count against policy limits……………………………… 5

V.      Heinze's attempt to construct a "No Insurance/Named Insured" defense
        is an invalid reservation of rights…………….........................……………………… 6

VI.     The Court rejected Heinze's "No Insurance' argument, and Heinze is wrong about
        insurance defense on additional grounds…………………….............……………… 8

VII.    Insurer continues to withhold information about the Coyle Reinsurance Letter, but
        the letter accurately reflects the lack of aggregate limits for the pre-1979 policies........ 10

VIII.   Karls makes a single argument about delay of effective stormwater work.
        The argument provides no valid basis to attribute this delay to Hartford Iron.
        This issue illustrates broader failures of methodology in the Karls and Heinze
        reports…………………...............................................................................…… 13

IX.     The Heinze Attorney Report states lawyer arguments as expert opinions……………..... 21

X.      Documents /information considered................................................................. 23

XI.     Additional discovery............................................................................. 24

I.       Introduction and background

I submitted an expert report on October 2, 2017 regarding insurance coverage and claims handling methods for Hartford Iron & Metal, Inc. (Hartford Iron), which operates a scrap yard in Hartford City, Indiana (Site).

Since then, I have reviewed three expert reports offered by Valley Forge Insurance Company (Insurer). These reports relate to Insurer itself, its related "CNA" insurance companies, and a reinsurer.

Two of the reports are by geologist Robert Karls (Karls Geologist Report) and attorney Bernd Heinze (Heinze Attorney Report), respectively. A third report is from John Goldwater and his supporting staff, and this latter provides a list and allocation of claimed insurance payments (Goldwater Allocation Report).

There is little in these reports that I view as an expert opinion. Instead, the Karls Geologist Report and Heinze Attorney Report mainly re-package "facts" as asserted by Insurer's coverage counsel as part of their extraordinary intervention in the management of Hartford Iron's claim (see Opinion 3.F.3 in my October 2, 2017 report).

The Goldwater Allocation Report is mainly a list of payments Insurer claims to have made. This report also provides an internal allocation of payment responsibility between Insurer and its agent, Resolute Management, Inc. (RMI), but there is no claim that this allocation changes Insurer's obligations to Hartford Iron.

Following below are my further Opinions based on Insurer's reports and my review of additional documents related to them. References identified in my previous report are listed again for convenience only.

II.   <u>Insurer's three reports fail to show payments that count against policy limits.</u>
      <u>Customary and accepted insurance practices required Insurer to document this</u>
      <u>information if it exists.</u>

Taken together, Insurer's reports do not identify grounds for counting any payments by Insurer against Hartford Iron's policy limits.

As explained in my Opinion III.E, the aggregate and occurrence policy limits under Insurer's policies and the parties' settlement agreements apply only to certain claims payments. None of Insurer's three reports identifies a standard for applying claims payments to policy limits.

The Goldwater Allocation Report provides only a list of contractor payments in tiny print (Exhibit 3). This report states in a single sentence on page 8, "All Fees and Disbursements paid to environmental contractors were categorized as 'indemnity'" against policy limits. This is merely a description of a mechanical method, that Goldwater counted every contractor payment against policy limits. The Goldwater Allocation Report provides no basis to conclude that any of these contactor payments are <u>properly</u> categorized in this way.

Insurer's failure to identify any payments that meet the standards to count against policy limits violates customary and accepted insurance practices. These practices require insurers to maintain clear and contemporaneous documentation, as part of their standard claims management, of the basis for counting any payment against policy limits. The fact that Insurer offers only an unsupported mechanical list shows that it failed to keep this necessary documentation.

In the two sections that follow, I discuss particular categories of payments by Insurer to contractors. My discussion of these particular categories is meant to provide specific examples of the broader conclusion regarding Insurer's failure to document any contractor payments that properly count against Hartford Iron's policy limits, not to limit that conclusion.

III.   Available information does not identify payments by Insurer to August Mack that count
       against policy limits.

To respond in part to the perfunctory and mechanical list of contractor payments from Insurer, I
have examined information about payments to contractors in light of the standards identified in
my Opinion III.E. As described in my October 2, 2017 report:

- August Mack failed to prevent illegal discharges of stormwater on approximately
  40 occasions during the period of its work from December 2012 to May 2017

     Ref:    Noncompliance and Bypass Reports, Dec. 2013 – July 2017
             Correspondence re stormwater violations, Jan. 2013 – May 2013

- August Mack installed stormwater controls, and proposed others, that lacked a sound
  engineering basis,

     Ref:    Amended Affidavit of K. Belcredi, pages 3-6, March 2, 2016

- August Mack's work related to stormwater did not comply with the defense plans and
  strategy developed by Insurer's appointed defense counsel, Jamie Dameron.

     Ref:    Affidavit of Defense Counsel (J. Dameron), Feb. 4, 2016
             Affidavit of Defense Counsel (J. Dameron), May 18, 2016
             Affidavit of Defense Counsel (J. Dameron), Feb. 27, 2015
             Defense Counsel Letter (J. Dameron), May 27, 2014
             Defense Counsel Privileged and Confidential Letter, March 24, 2015
             Defense Counsel Privileged and Confidential Letter, April 23, 2015

- August Mack unsuccessfully sought IDEM approval for several proposals relating to
  stormwater, including street paving, a concrete sump, a drainage study, installation of
  electric service, reconfiguration of tanks, and various "winterization" tasks.

     Ref:    IDEM Meeting Sign-In and PowerPoint (February 17, 2015)

- August Mack never implemented the plan by HydroTech Corporation (see below) to
  install a system to provide "total control" of stormwater from the Site.

     Ref:    Affidavit of P. Cory Smith, HydroTech Project Mgr., Feb. 22, 2012

- IDEM required Hartford Iron to install stormwater controls that met the technical
  specifications developed by another contractor, Keramida, Inc. (Keramida), and
  which were substantially completed on or about September 15, 2017. Dameron
  correctly identified the main components of these required stormwater controls,
  including a gravity-fed retention basin and capture of all stormwater at the property
  boundary, in a series of defense plans beginning June 2014. August Mack never
  implemented the technical specifications developed by Keramida.

     Ref:    Affidavit of Defense Counsel (J. Dameron), Feb. 4, 2016

3

- August Mack designed and implemented a sampling program in the "Phase 1" area of the Site that resulted in August Mack's incorrect finding that PCB concentrations in this area are below 1 ppm.

> Add'l ref:    Thompson Envtl., 2-Grids Excavation, Sampling, and Backfilling Report, July 14, 2017

Based on this information, I conclude with reasonable certainty that payments by Insurer related to storm water control that was carried out through August Mack did not meet the standards for Insurer's payments to count against policy limits under Opinions III.E.1 to III.E.8. I similarly conclude that payments by Insurer related to August Mack's investigation in the Phase 1 area did not meet the standards for Insurer's payments to count against policy limits under Opinions III.E.1 to III.E.8.

Customary and accepted insurance practices require insurers to carefully document the basis for counting payments against policy limits at the time those payments are made. Even now, Insurer's three expert reports do not document any task by August Mack, or any payment for such tasks, that may validly be counted against policy limits for Hartford Iron.

4

IV.    Available information shows that Insurer's payments to HydroTech relating to stormwater do not properly count against policy limits.

To respond to the perfunctory and mechanical list of contractor payments from Insurer, I have also examined information about payments by Insurer to a prior contractor, HydroTech Corporation (HydroTech), for work related to the Site through approximately January 2013 and in light of the standards identified in my Opinion III.E. My Opinion is that none of the referenced work at the Site by HydroTech relating to storm water met the standards for Insurer's payments to count against policy limits under Opinions III.E.1 to III.E.8.

Among other things, the References show that HydroTech identified the need to install a system of "total control" of stormwater at the Site in 2010 and that it again sought Insurer's authorization to proceed with this work in both 2011 and 2012. HydroTech was unable to obtain this authorization from Insurer. HydroTech instead carried out a series of alternative measures that proved ineffective and resulted in the 2011 EPA Notice described in my October 2, 2017 Report. The references also show that Insurer continued to refuse authorization to HydroTech to install effective stormwater controls after the 2011 EPA Notice. In February 2012, for example, claims consultant K. Coyle refused HydroTech's further requests to install the required stormwater controls because the matter "will need to be addressed in...litigation."

| | |
|---|---|
| Ref: | Affidavit of P. Cory Smith, HydroTech Project Mgr., Feb. 22, 2012 |
| Add'l ref: | HydroTech correspondence to K. Coyle, Sept. 16, 2011 |
| | HydroTech correspondence to K. Coyle, June 12, 2012 |
| | K. Coyle correspondence Feb. 10, 2012, dep. Exh. 73. |

Based on the information in the references, Insurer has not identified any payments to HydroTech that count against policy limits. As with the August Mack work, I have not seen any documentation that Insurer followed customary and accepted insurance practices by considering the facts set forth in these references before claiming that amounts paid to HydroTech relating to stormwater are to be applied against Hartford Iron's policy limits.

V.    Heinze's attempt to construct a "No Insurance/Named Insured" defense is an invalid reservation of rights.

The Heinze Attorney Report is written more like a legal brief than as an expert opinion. Much of the argument in the report rests on Heinze's spurious position that Insurer has no insurance obligations to Hartford Iron at all.

This argument by Heinze is thoroughly contradicted by the actual claims history, which I discuss here. It is also contradicted by the Court decisions in this matter and by the very nature of the relationship between insurers and their insureds, which I discuss in the next section.

Heinze makes this argument in his opening Summary. He writes (page 6), "Hartford Inc., although a signatory to the Settlement Agreements, is not an insured under any policy issued by VFIC (or its affiliates) because it did not exist at the time the policies were issued, nor was it added to the policies by endorsement or any other agreement." He repeats it at the start of his discussion of "Indiana Bad Faith," where he declares (page 15) that "Hartford Inc. is not the insured in this matter." Based on this premise, Heinze opines that Insurer has no standard insurance obligations to Hartford Iron.

Heinze is advancing what is commonly called the "Named Insured defense." With this defense, an insurer takes the position that it has no policy liability because the person or company asserting the insurance claim is not the same person or company that is named as the insured under the policies. Like other defenses, the Named Insured defense may be used as part of a total denial of an insurer's obligations, or it may be used as part of a reservation of rights as described in my Opinion F.1. Heinze claims that Insurer has no policy obligations to Hartford Iron & Metal, Inc., because Insurer's policies are in the name of the sole proprietors Alan B. Goldberg /dba Hartford Iron & Metal or Louis Goldberg /dba Hartford Iron & Metal, who ran the business before it was incorporated.

I can state with certainty that Heinze is wrong about the Named Insurer defense under customary accepted insurance practices and based on the actual claims management history.

It is absolutely clear that the original insurance claim relating to IDEM's claims of past contamination at the Site was submitted to Insurer by the incorporated business, Hartford Iron & Metal, Inc., on July 7, 2008. This July 7, 2008 notice of claim is the very first reference document in my October 2, 2017 report. The notice of claim states in its opening sentence that it is submitted "on behalf of Hartford Iron & Metal, Inc." to "notify CNA of a claim and request CNA's coverage and defense of this claim."

Insurer responded to the notice of claim with a reservation of rights letter, dated October 28, 2008, which is the second reference in my October 2, 2017 report. In its opening sentence, the reservation of rights letter is explicit that Insurer "agrees to defend Hartford Iron & Metal, Inc. ("Hartford")... pursuant to the reservation of rights set forth below." This is absolutely and without question an agreement by Insurer to provide insurance defense to the incorporated business, subject to a written reservation of rights. Insurer agreed to this defense with actual knowledge of the difference between the incorporated business and the sole proprietorship. As Insurer wrote in the reservation of rights letter, "VFIC can confirm that it issued... policies to

6

Alan B. Goldberg DBA Hartford Iron & Metal, who was insured as an 'individual' according to the computer records."

As is common, Insurer continued this defense of the corporation while reserving its rights to dispute coverage. This continuing defense is shown in the form of retention for defense counsel agreed by the parties under the First Settlement, which specifies that the defense is "to represent Hartford Iron & Metal, Inc." The continuing reservation of rights in the First Settlement is shown in Section 3.3, which states that the "Agreement is not and shall not be construed to be... a waiver or estoppel of defense to coverage."

This defense of the incorporated business by Insurer continued under the Second Settlement, signed in December 2012, with the key change being that Insurer now agreed in Section II-D to "defend and indemnify Hartford Iron [expressly defined to include the incorporated business] without reservation of rights."

Heinze acknowledges this last point, then ignores it for practical purposes. Heinze states (page 8), "As part of the Second Settlement Agreement, VFIC generally agreed... to continue defending Hartford Inc. against claims by the EPA and IDEM, without any reservation of rights." Heinze thus acknowledges the plain terms of the Second Settlement that Insurer was required to continue defending the incorporated business, but without the reservation of rights that Insurer made in response to the corporation's original claim.

This sequence shows that Insurer gave up any reservation of rights against the incorporated business, including the Named Insured defense. The incorporated business (1) submitted its insurance claim in July 2008, (2) received Insurer's commitment to defend it under reservation of rights in October 2008, (3) received Insurer's defense under this reservation of rights through December 2012, and (4) then received Insurer's commitment to continue defense and indemnity of the incorporated business without reservation of rights in the December 2012 Second Settlement.

Based on my experience, this is not a close call. An insurance company cannot receive a claim from someone, defend that person under a reservation of rights, agree to continue the defense and indemnity without a reservation of rights – and then turn around and claim the person wasn't insured after all.

7

VI.    The Court rejected Heinze's "No Insurance' argument, and Heinze is wrong about insurance defense on additional grounds.

Heinze's claim that Insurer has no insurance obligations to the incorporated business, Hartford Iron & Metal, Inc., is wrong for several other reasons, including the following.

1.  The Court rejected Heinze's argument. I do not view it as my role, or any expert's role, to interpret the Court's orders. The Court knows better than any expert what it has decided and why. I find it astounding that Heinze not only claims to be an expert regarding the Court's orders but claims to instruct the Court that he views it as mistaken. He writes on pages 17 and 21 to state his "expert" view that the Court made an "oversight" and "overlooked" legal arguments, and he claims to predict what "the Court will ultimately hold." I take these statements as an admission by Heinze that the Court rejected the legal argument he offers in the guise of expert opinion.

2.  Accrued claims are fully transferable. In my Opinion III.A, I observed that, "On September 4, 2013, Alan B. Goldberg assigned his accrued insurance rights to Hartford Iron & Metal, Inc., the incorporated business. Such assignments are well recognized and are typically valid once the claim has become fixed and accrued, as here." This observation is perfectly straightforward. The Heinze Attorney Report contains four paragraphs (page 16) that boil down to the assertion that the insurance claim for environmental damages at the Site somehow never accrued, and so couldn't be transferred. Heinze is incorrect. Under customary insurance practices, a claim accrues when damage becomes known, even if the full magnitude of the harm remains to be determined. The claim here certainly accrued by the time of the 2009 IDEM Order, which was defended by Insurer itself. The scope of the damage and the liability was further defined when PCBs were identified at the Site in 2010 and when the 2011 EPA Notice was issued. Alan B. Goldberg even continued to own the Site personally at the time of these events. As I observed, his written assignment of insurance rights on September 4, 2013 is a well recognized and valid procedure. The practical issue here is well known. An insurer is entitled to notice going forward when a business reorganizes or sells its interests, so the insurer can assess whether the future risks have changed. This practical issue does not allow insurers to walk away from past coverage and past damage because of the business changes at a later date. The coverage for this past damage, including the present effects of this past damage, is assignable by the insured entity or individual (here, Alan B. Goldberg as sole proprietor).

Add'l ref: Real Estate Lease, March 17, 2006.

3.  <u>Insurer did not "defend" Hartford Iron if Insurer had no duty of good faith in the defense</u>.
    The Heinze Attorney Report is so focused on legal arguments that it ignores the practical
    and ethical reality of insurance defense. It is a practical impossibility for an insurer to
    provide a defense that does not carry with it the duty of good faith. This is true whether
    the defense is provided with a reservation of rights or without reservation. Who could
    possibly rely on a "defense" where the "defender" is an adversary? This would be the fox
    defending the chickens. This is why "coverage counsel is never involved in my
    experience in decisions about environmental investigation or remediation," as I described
    in Opinion F.1. When Heinze argues that there was no insurance obligation, he is saying
    in practical terms that Insurer's promise to "defend" Hartford Iron "without reservation of
    rights" was worthless, or it was even a trap to place Hartford Iron at the mercy of
    opposing coverage counsel acting in the Insurer's interest.

VII.    Insurer continues to withhold information about the Coyle Reinsurance Letter, but that letter accurately reflects the lack of aggregate limits for the pre-1979 policies.

Insurer's three expert reports show that it is continuing to withhold coverage information from Hartford Iron as initially described in Opinion III.D. This includes the grounds used by Kathleen Coyle and coverage counsel at the time that they prepared and transmitted the Coyle Reinsurance Letter in June 2013 and May 2014.

I anticipate that Insurer will still seek to repudiate the Coyle Reinsurance Letter years after the fact, but is withholding its rationale to make it more difficult for me to respond. Accordingly, I am expanding on my previous Opinion III.C as follows.

1.  Manual adjustments were customary. It was common practice during the 1970s and early 1980s for insurers to collect rate information and perform initial calculations, but then issue the policies with premiums that were "manually adjusted" for sales and marketing purposes.

2.  Insurer made manual adjustments for Hartford Iron, which it tried to conceal. Based on a document it tried to conceal, we know that Insurer followed the practice of making manual adjustments as late as 1983. Insurer provided two versions of its Policy Order, dated August 17, 1983. One version, at VFIC 61520, has a black bar that Insurer inserted to cover a hidden block of information. The other version, VFIC 64594, does not contain the black bar and shows that the hidden information consists of Rating Data. This Rating Data includes the critical category for rate modifications (Rate Mods), which is identified as "MAN," for manual. It is clear that Insurer followed the customary practice in the industry, as of 1983 and earlier dates, of making manual rate adjustments for the type of policy issued to Hartford Iron. Based on the blacked-out information, it is also clear that Insurer attempted to withhold information about manual rate adjustments during the 1983-84 period. There is no reason to believe that Insurer disclosed its manual rate adjustments during prior periods.

3.  Insurer did not use the payroll information submitted by Hartford Iron to calculate rates for its September 1, 1976 policy renewal. In my Opinion III.C, I stated that the Coyle Letter shows no aggregate limit for the policy period September 1, 1976 to October 24, 1978, under Policy No. L3414442. Instead, this policy has only $50,000 per year limit per occurrence. Due to the numerous occurrences documented each work day, the total coverage is approximately $210 million for this period alone. My independent evaluation, based on customary accepted insurance practices, is that the Coyle Letter is plainly correct regarding the absence of an aggregate limit for this policy period. I can state with reasonable certainty that the available documentation shows that an adjusted rate was applied. This independent evaluation is based on the following:

    •  The applicable policy form during the 9/1/76–10/24/78 period was Form 6682B.

    •  Under Form 6682, Section III, an aggregate limit applies only if the policy was "rated on a remuneration basis."

    •  Form 6682 defines the term "remuneration" to mean "the entire remuneration earned during the policy period by proprietors and by all employees of the named insured."

- Insurer set the premium for this policy period using its Form 6935A, which changed both the limits of the policy and the premium from the previous year.

- Effective 9/1/76, the policy limits changed from $5,000 per occurrence to $50,000 per occurrence for property damage liability. Form 6935A shows that the rate for Property Damage Liability increased to .478, which makes sense based on the increased limit.

- At the same time, Insurer reduced the "Premium Bases" on Form 6935A from the figure Insurer used in prior years. The reduced "Premium Bases" was "10,500."

- By reducing the Premium Bases, Insurer was able to keep the Revised Premium on Form 6935A essentially unchanged from the prior year, increasing only $6, even though the policy limit had increased 10-fold and the rate for Property Damage Liability increased accordingly.

- Consistent with customary practices at the time, the best interpretation of the Revised Premium on 9/1/76 is that Insurer made a manual adjustment to protect a good customer, with no record of prior claims, against what would otherwise have been a sharp rate increase. An October 6, 1976 letter from Bonham Insurance, which was Insurer's agent, shows that the agent highlighted both the increased policy limit and the fact that the premium had increased only $6. The October 6, 1976 letter also confirms that the premium identified on Form 6935A was actually used by Insurer as the basis for the premium starting 9/1/76.

- Regardless of Insurer's purpose, it is clear that Hartford Iron's property damage premium was not rated from 9/1/76 to 10/24/78, based on "the entire remuneration during the policy period."

- Specifically, on November 13, 1975, Hartford Iron certified to Insurer that its gross payroll was $14,693.75. VFIC 118916. As described below, Insurer used this $14,693.75 payroll figure to compute at least three different premiums for the prior policy period effective 10/24/75. This payroll figure shows that the "Premium Bases" of "10,500" used by Insurer just ten months later could not have been "the entire remuneration earned during the policy period" for the 9/1/76 renewal.

- Insurer calculated at least four different premiums for the prior policy period from 10/24/75 to 9/1/76. The initial calculation was for a 3 year premium of $264.00, with no payroll information shown. VFIC 61479 and 61480. A second calculation was for a 3 year premium of $218, with a 15,000 Premium Bases. VFIC 61479, 61482-84. A third calculation shows a premium of $145 per year and lists the $14,964 payroll figure in the Premium Bases. VFIC 61491-92. Insurer then made a fourth calculation as part of a "revised" statement of adjusted premium, still using the $14,694 payroll figure, but showing a total premium of $105 per year. VFIC 61498-99.

- These four different calculations do show Insurer using the payroll figure for Hartford Iron for the 1975 renewal, but using it to calculate alternative premiums that differed by as much as 91% ($76 per year under the second calculation v. $145 per year under the third). In my opinion, these differing calculations in 1975 show the heavy hand of manual adjustment, even though they ostensibly use payroll information. These differing calculations in 1975 also show why Insurer did not even nominally use the actual payroll figure for Hartford Iron as part of the subsequent renewal on 9/1/76.

- The above independent analysis is separately confirmed by the admissions in the Coyle Reinsurance Letter and in her deposition testimony. As described in Opinion III.A, Insurer admits in the Coyle Reinsurance Letter, "there is no PD [property damage] aggregate limit for the early Hartford Iron policies," specifically referencing the 1975 through 1978 period above. This letter was relied upon by both Insurer and its re-insurer for allocation purposes. It was sent by Coyle at separate times, had the input of sophisticated coverage counsel, and Coyle confirmed its accuracy as recently as her February 2017 deposition.

- Based on the lack of aggregate limits for the 1975-78 period, it would be very unusual for prior policy periods to have such limits, even if they nominally used payroll figures for initial premium calculations.

- Based on the lack of aggregate limits for the 1975-78 period, it would be very unusual for prior policy periods to have such limits, even if they nominally used payroll figures for initial premium calculations.

- Under customary accepted practice, both today and extending back to the 1970s and before, insurers are thoroughly aware that ambiguities about policy terms and coverages are to be construed against them. This practice applies to any claim of aggregate limits for Insurer's policies prior to 1979 and further confirms my conclusion, as well as Insurer's own conclusion in the Coyle Reinsurance Letter, that aggregate limits did not apply to these policies.

      Add'l ref:      Form 6935A, Limits Changed, September 1, 1976
                      Letter from Bonham Insurance, October 6, 1976

VIII.    Karls makes a single argument about delay of effective stormwater work. The argument
provides no valid basis to attribute this delay to Hartford Iron. This issue illustrates
broader failures of methodology in the Karls and Heinze reports.

The Karls Geologist Report makes a single argument that effective stormwater work at the Site
by the contractors Keramida, Inc. (Keramida) and Thompson Environmental, Inc. (TEI) was
delayed. The argument provides no valid basis to attribute such delay to Hartford Iron.

Karls states this argument in a single sentence in his summary of Opinions as follows (page 2):
"The retention basin and treatment system (as designed by Keramida) could have been installed
within 8 to 12 months of [Insurer's] July 22, 2015 approval, or between March and the end of
July 2016." The parenthesis is by Karls. He then states this argument in the body of his report
(page 14) in highly qualified fashion as follows:

> Assuming: 1. Keramida was ready to begin work installing the collection and
> retention basin in December 2014 (as described in their November 3, 2014 letter to
> Dameron); 2. Valley Forge approved work starting as early as July 22, 2015; and
> 3. Thompson Environmental, Inc. has completed a bulk of the planned work within
> seven months, the retention basin and treatment system reasonably could have
> been installed within 8 to 12 months, or between March and the end of July 2016.

As described below, this argument is defective in several ways.

To start, it is important to understand why the task of installing a stormwater retention basin and
capture system is so important. As described in my Opinion F.3, this task carried out the defense
plan and strategy identified by Insurer's appointed defense counsel (J. Dameron) in June 2014.
This task consisted of the only controls ever proposed or implemented at the Hartford Iron site to
provide a sound engineering for control of stormwater. This task also provided the only set of
stormwater controls for the Site approved by IDEM.

Specifically, Keramida submitted an initial design to IDEM, and the agency responded with
detailed regulatory comments on July 14, 2015. Keramida incorporated these comments, met
with IDEM technical staff, and obtained agency agreement for a revised design dated
December 7, 2015. Keramida stopped all work on the project soon after this date.

On or about August 1, 2016, Insurer's claims director J. Alpine ended what was in practical
terms a year-long freeze of most contractor payments by Insurer (other than payments to August
Mack). On or about this August 1 date, Alpine without explanation paid a series of contractor
charges, in the total amount of $81,184.08 and extending back over the previous 12 months.
Once this payment freeze ended, TEI soon began required sampling and then construction to
build the effective stormwater controls as specified in Keramida's revised plans. As Karls
acknowledges (page 14), TEI completed and put into operation the retention basin portion of this
work at the end of May 2017. This date is squarely within the "8 to 12 months" time frame as
quoted above from Karls.

As described below, the argument from Karls about this important work provides no valid
basis to attribute delay to Hartford Iron.

1. Karls says nothing about the supposed fault of Hartford Iron regarding this task, including the failure of Insurer's coverage counsel to negotiate terms with Keramida in 2015.

Karls does not and cannot attribute fault to Hartford Iron for the timing of TEI's construction of the effective stormwater controls. In particular, Karls does not and cannot attribute fault to Hartford Iron for the failure of Insurer's coverage counsel, as well as its claims consultant K. Coyle, to come to terms with Keramida to build the stormwater controls in 2015.

As I described in Opinion III.F.3(c-g), Insurer departed from customary, accepted practices by using its coverage counsel to set required terms and conditions for work by Keramida on dates that include July 22, 2015, September 10, 2015, and November 4, 2015. The scope and detail of the terms and conditions from coverage counsel are extraordinary in my experience (see Nov. 4, 2015 attachments). Even with this detail, the terms state that they are not complete, but must be incorporated in contracts to be developed by coverage counsel with additional terms that were never provided. The accusatory tone and arguments in these transmittals from coverage counsel are also extraordinary in my experience as a matter of claims management. The tone and arguments undermine any reason to think that the terms themselves are reasonable and, if accepted, would be implemented by Insurer in a fair and good faith manner.

The key point is that, regardless of what Insurer might think of the terms it proposed through coverage counsel, Keramida chose not to accept them. Keramida's senior vice-president, Kristen Belcredi, testified by affidavit (page 6, March 2, 2016) that "KERAMIDA cannot rely on necessary payment from CNA, and KERAMIDA does not accept [the] terms that CNA is imposing." The capitalized letters are from the original. Her testimony (pages 3-4) shows Keramida's concerns included:

- disagreement with the terms themselves;

- language from coverage counsel that Insurer "does not approve" Keramida's design;

- payment problems in the past from Insurer, including two Keramida invoices from summer 2015 that J. Alpine eventually paid on or about August 1, 2016; and

- three subpoenas that Insurer's coverage counsel served on Keramida that caused "financial strain" from legal costs as well as loss of time by senior management.

In addition to the above, K. Belcredi stated her dissatisfaction with a one hour phone call she had with claims consultant K. Coyle on September 14, 2015 regarding the planned stormwater work. Keramida also participated in mediation with Insurer on November 12, 2015, where Keramida again refused Insurer's terms. As S. Goldberg testified, Hartford Iron did not set requirements regarding Keramida's acceptance or refusal of the terms from Insurer's coverage counsel. In a court filing in January 2017, Keramida stated through its attorney that it withdrew from the project "due to the ongoing conduct of representatives of Valley Forge."

As I explained previously, in my experience, environmental contractors and insurance defense lawyers want very much to work on complex, multi-year projects like the work at Hartford Iron. The suspensions of work or withdrawal by environmental contractors and defense counsel here are very unusual. Installing a stormwater control system paid by insurance is the kind of project that environmental consultants such as Keramida are normally eager to accept. The sequence here shows that Keramida withdrew from the project despite these normal incentives, and it shows that the cause was Keramida's dissatisfaction with the terms and conduct from Insurer's coverage counsel, with the communications from K. Coyle, and with Insurer's position in mediation.

The Karls Geology Report does not attribute fault to Hartford Iron relating to this sequence. The above facts show why. From an insurance claims management perspective, and I believe from other perspectives as well, Hartford Iron was not responsible for the failure of Insurer and Keramida to come to terms.

Insurer later dropped its demand to impose detailed terms on the contractor building the stormwater controls. Soon after J. Alpine ended Insurer's freeze on most contractor payments, Hartford Iron and TEI signed a single page agreement for TEI's continuing work. TEI then continued the work of building the stormwater system under Keramida's design, as approved by IDEM, with J. Alpine's review and approval of costs as the project went along. The unusual terms imposed by Insurer's coverage counsel in 2015 were an unnecessary deal killer.

> Add'l ref:    Deposition of S. Goldberg, 449-451, Oct. 19, 2017
> Non-Party Keramida, Inc. Response, 1:15mc103, page 2, Jan. 31, 2017
> TEI contract letter, Nov. 15, 2016.
> C. Shere Declaration, May 19, 2016

2. Claims director J. Alpine ended Insurer's freeze on most contractor payments on or about August 1, 2016, allowing TEI's construction of the effective stormwater controls as well as other work required by IDEM.

As I described in my prior report, ordinary and customary standards for insurance payment of charges for defense, remediation, and other environmental work is within thirty days of invoicing. Insurer's claims director J. Alpine agreed in his deposition, "I don't see a reason why within -- a bill couldn't be reviewed within less than 30 days and paid in less than 30 days."

Insurer violated ordinary and customary claims management practices by failing to timely pay charges for the defense contractors Keramida, CH2M Hill, TEI and Muncie Paving. On or about August 1, 2016, J. Alpine ended Insurer's year long freeze on most contractor payments (other than payments to August Mack). On that date, J. Alpine paid a series of overdue charges for each of these contractors, in the total amount of $81,184.08, including charges extending to 12 months earlier. Alpine provided no explanation for this year long freeze or for the timing of his belated payment.

To return to the words in Karls' report, he writes: "The retention basin and treatment system (as designed by Keramida) could have been installed within 8 to 12 months of [Insurer's] July 22,

2015 approval, or between March and the end of July 2016." This statement is wrong. It is <u>not</u> true that the effective stormwater controls "could have been installed... between March and the end of July 2016," because Insurer continued to freeze most contractor payments during this period.

3. <u>Even after J. Alpine ended the payment freeze to contractors, Insurer failed to provide Hartford Iron the required legal defense to implement the work.</u>

Prior to August 1, 2016, it was impossible as a practical matter for TEI or others to build the effective stormwater controls, due to the year-long freeze on most contractor payments identified above. After August 1, 2016, this work remained unusually difficult from the perspective of claims management.

One of the main causes of this difficulty is that, as described in my prior report, Insurer's appointed defense counsel J. Dameron remained suspended from all or almost all defense tasks from July 15, 2015 to late July 2017 due to Insurer's continued refusal to pay long-overdue defense fees. Insurer also refused to pay for defense work by the attorneys (Shere & Shere, LLP) who were Hartford Iron's choice of defense counsel.

The Karls Geologist Report and Insurer's other expert reports choose to ignore the inevitable impact on all aspects of work at the Site from the fact that Insurer did not meet its obligation to provide Hartford Iron with a standard insurance defense, due to this nonpayment as well as obstruction of defense counsel's work, demands for privileged documents, and attempts to fire defense counsel outright.

4. <u>Karls does not recognize that Keramida substantially revised its technical specifications as of December 7, 2015 to meet IDEM requirements. His lack of knowledge about the facts illustrates the broader failure in his report and the Heinze report to use reliable references and valid methodology to express opinions about claims management.</u>

As described below, the Karls Geology Report and the separate Heinze Attorney Report fail to use methods and reference sources that are reliable regarding the basic facts.

Regarding the effective stormwater controls, Karls does not appear to realize that IDEM's approval applies to revised technical specifications set forth in Keramida's Updated Design Elements for Storm Water System, December 7, 2015. As a result, Karls makes basic mistakes and never expresses any opinion about construction of the controls as approved by the agency.

For example, Karls shows his misunderstanding of the work when he says that "inexplicably, Keramida's projected costs for its proposal almost doubled" between the period of its initial design in November 2014 and an updated costs estimate in September 2015, as its revisions were in progress. Karls does not realize that the specifications for the size of a gravity-fed retention basin for the stormwater "almost doubled" between these two periods in response to IDEM's requirements. He also does not realize that Keramida changed from a shallow "trench drain"

design to capture water at the property boundary to a system of buried HDPE pipe in lined, gravel bedding. He also does not take account of differences that appear on the face of Keramida's cost estimates, including projected costs for the first six months of operations ($360,000) that appear only in the latter, more detailed estimate.

There is nothing "inexplicable" about the revised cost figures from Keramida, as Karls claims. Karls is a geologist and environmental consultant, yet he failed to learn the facts by reviewing the pertinent Keramida documents. Instead, the "references" he cites in his report (page 9 and footnotes) regarding the "inexplicable" costs consist only of letters from Insurer's coverage counsel. To be clear, Karls finds Keramida's cost estimate "inexplicable" because Karls relied on letters from Insurer's coverage lawyers, the same lawyers litigating this case, for his understanding of Keramida's work, not Keramida's reports regarding that work.

This is a problem that runs throughout the Karls Geology Report and the separate Heinze Attorney Report. Time and again, these reports claim to state expert opinions based on facts as described in letters from Insurer's coverage lawyers. Lawyers are supposed to base their  Again, coverage lawyers have no valid role in claims management under customary accepted insurance practices. Insurer's claims consultant K. Coyle admitted this point in her own testimony. Karls and Heinze repeatedly state opinions based on unreliable references that may not be used as part of customary claims management, much less used as a reliable basis for expert opinion on the subject.

| | |
|---|---|
| Add'l ref: | Keramida's Updated Design Elements for Storm Water System, December 7, 2015 |
| | Keramida, Summary of Storm Water Management System Cost Estimates and Tables, September 3, 2015 |
| | Keramida, Response to IDEM Comment Letter, August 13, 2015 |
| | Keramida, Storm Water Management Design Summary, November 3, 2014, and Unit Cost Estimate |

5. Insurer's proposal for a special master was not needed to build effective stormwater controls and would have caused further delay.

As stated above, August 1, 2016 was the key date for purposes of effective contractor work at the Site, because that is when J. Alpine ended Insurer's year-long freeze on most contractor payments.

I have also examined a proposal on October 13, 2016, about two months later, from Insurer's coverage counsel R. Hodyl. The letter describes Insurer's proposal "that the management of the Site's remediation should be assigned to a Special Master at this time." Hodyl claims in the letter that Hartford Iron's unwillingness to agree with this procedure was causing "additional delays in the installation of the Keramida storm water management system."

At the same time, Hodyl also explained Insurer's position about what the special master would do. Hodyl wrote, "we do not anticipate that the special master will be required to do much, at least initially," beyond providing "his or her recommendation regarding what costs are reasonable and necessary."

Hodyl also described the special master's role as only "to make recommendations" and "only on a prospective basis." Hodyl wrote that the special master "shall have no authority with regard to past defense or remediation costs and expenses." He also wrote that the special master would "have no authority regarding any issues pertaining to any insurance policy" for Hartford Iron and "no authority in connection with the determination of the parties' rights, duties, and obligations under the settlement agreements." He further explained that any recommendations by the special master could be appealed by any party to the court and that a number of other issues about "the appointment and day-to-day duties" of the special master would still need to be resolved.

The Heinze Attorney Report (page 13) offers expert opinions of the Court proceedings related to this special master issue. These Opinions appear framed to fit into Karl's claim that Hartford Iron was somehow at fault for delays in building the effective stormwater controls.

I do not express any opinion about the Court proceedings or litigation filings about this issue, because I do not view it as within the proper scope of expert reports and testimony, regardless of whether the expert is a lawyer like Heinze or a non-lawyer like me.

I do have an Opinion about attorney Hodyl's claim, apparently endorsed by attorney Heinze, that the terms and procedures that Hodyl describes in his letter were needed to prevent "additional delays in the installation of the Keramida storm water management system."

The fact is that construction of effective stormwater controls and other contractor work required by IDEM went ahead after August 1, 2016, with reasonable speed by all appearances, without the use of Hodyl's proposed special master.

Based on Hodyl's description, this master would not have provided any claims management benefit after J. Alpine unfroze contractor payments beginning August 1, 2016. Alpine himself worked with a separate reviewer to evaluate whether TEI's cost estimates identified charges that were reasonable and necessary. A similar review of costs by a master would almost certainly have been duplicative and slower.

Hodyl himself wrote that the master would not be expected to do much. Hodyl himself wrote that the master would only give "recommendations," so it is hard to see how the master would be able to accomplish anything of value unless the parties agreed with the result anyway. I am quite certain that making claims management decisions subject to appeal to the Court would add cost and delay from an insurance perspective, and I suspect (though express no opinion) from a legal perspective as well.

In fact, I don't see how the special master could have done anything useful given Hodyl's conditions that the master would not have authority over any insurance or settlement issues, which together provide the entire reason that Insurer was obligated to do anything.

Again, my opinion here is based only on the terms for the special master as described by coverage counsel in his correspondence. Unlike Heinze, I am not interpreting any decisions by the Court or predicting any future decisions. I only know that the procedure described by Hodyl could not have accelerated the environmental work that was done by TEI after August 1, 2016. From a claims management perspective, those procedures would be a major headache and interference at best.

Add'l reference:    Coverage counsel letter (R. Hodyl), October 13, 2016
                    Defense counsel letter (M. Shere), October 5, 2016 and attachment
                        [stating questions that the coverage counsel letter answers]

6. Under Insurer's insurance policies and the arguments of coverage counsel, Hartford Iron could not reasonably advance substantial funds for effective contractor work in response to Insurer's failure to meet its obligations.

Discovery in this case has continued since my original report. As part of the recent discovery, Insurer's coverage counsel made a new argument related to Karls' opinion attributing fault to Hartford Iron related to the effective stormwater work by TEI after August 1, 2016. Coverage counsel argued that Hartford Iron should have paid for the work itself in response to Insurer's failure to meet its obligations and then sought reimbursement, whether by agreement or litigation.

For better or worse, standard insurance policies are written to prevent policyholders such as Hartford Iron from taking this course.

By the mid 1980's, Insurer's standard policy form CG 00 01 11 85 stated in Section IV.2.d, "No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." CNA/Hartford 009327. Identical language appears in Insurer's standard policy form for subsequent years as well. CNA/Hartford 009233.

This standard policy language effectively prevents policyholders from "incurring any expense" without the insurer's prior consent. The risks are simply too great that such expenditures, even if justified and effective, will later be deemed a payment made "voluntarily" and so outside of policy coverage.

Insurer's coverage counsel were well aware of this policy language and sought to use it against Hartford Iron, even as they denied any policy obligations. For example, these lawyers warned Hartford Iron on May 8, 2015:

With respect to the conduct of the remediation, please note that Valley Forge has no obligation to pay costs incurred without its consent under Indiana law, regardless of whether there may be a conflict of interest preventing it from controlling the defense. Accordingly, Hartford Iron is running a substantial risk that it is incurring uninsured financial responsibility for the costs of any remediation measures that it decides to incur without obtaining Valley Forge's input and consent.

In fact, going back to January 2012, claims consultant K. Coyle used similar language to refuse stormwater controls that HydroTech identified as necessary at the time. In her words, "Funding for any work undertaken by Hartford Iron without VFIC's approval will be the sole responsibility of Hartford Iron."

The parties' actual experience at the Site is that the costs to meet IDEM's requirements for stormwater control and for remediation have grown to well above $10 million. Hartford Iron could not reasonably have paid out any substantial portion of this amount and then sought reimbursement later. This conclusion applies even if the expenditure could have accelerated the work or taken it off a misguided or ineffective path. This conclusion also applies regardless of whether Hartford Iron had direct access to these kinds of funds, or would have needed to raise the money by borrowing at unfavorable rates against all of its assets.

Add'l ref:            Policy form CG 00 01 11 85, CNA/Hartford 009327
                      Policy form CG 00 01 11 88, CNA/Hartford 009233
                      Coverage counsel letter (J. Michaels), May 8, 2015
                      Deposition of S. Goldberg, pages 231-240, Oct. 18, 2017
                      K. Coyle Correspondence, Jan. 12, 2012, dep. exh. 72

IX.    The Heinze Attorney Report states lawyer arguments as expert opinions.

Much of the Heinze Attorney Report, perhaps the great majority, consists of legal arguments, not expert opinion about insurance claims management or other topics concerning Hartford Iron's claims. In addition to the points above, a few examples further show his methods and the resulting errors.

1.  Heinze's legal argument about "independent contractors" ignores the actual role of Insurer in controlling the defense and environmental work, including "all aspects of stormwater collection and treatment."

In the final argument in his report (page 32), Heinze cites and quotes four legal cases that he describes as stating the obligations that "Indiana law" applies to the relationship of a "principal" and "independent contractor." His argument is also swollen with legal expressions, such as "legally cognizable" and "there is no factual evidence in the record." As a matter of claims management, I can am aware of several facts "in the record" that differ completely from Heinze's argument.

These facts include that Insurer departed from customary and accepted practice by using coverage counsel to assert "an ongoing right to control.... all aspects of stormwater collection and treatment," as coverage counsel wrote on July 22, 2015. I will not attempt to argue cases and Indiana law with Mr. Heinze. I will state that my opinions take coverage counsel at their word that Insurer chose to control "all aspects" of meeting a complex regulatory obligation at an operating industrial site, which it did primarily through August Mack. Heinze ignores the assertion and exercise of this control by Insurer.

Additional facts confirm Insurer's authority over "all aspects" of the stormwater work. For example, Insurer's appointed defense counsel J. Dameron wrote in August and September 2015 that August Mack's proposal to install a concrete sump was contrary to her defense plans and the stormwater requirements identified by Keramida. Insurer's claims consultant wrote in response that Insurer "controls the defense" and "has determined to move forward with the sump." In her deposition, Coyle confirmed that this determination was her own decision. Coyle also testified that she was the one who determined that it was not "a concern" if the sump would later have to be removed to make way for the Keramida stormwater controls. In this sequence, Coyle exercised actual authority over how to control storm water at the site, and she overrode both defense counsel and Keramida in doing so.

A few months later, in February 2015, Coyle and coverage counsel personally participated in a meeting with IDEM to seek the agency's approval for the sump and a series of other detailed stormwater control steps (including street paving, a drainage study, installation of electric service, reconfiguration of tanks, and various "winterization" tasks). As described in K. Belcredi's affidavit, each of these steps sought to override Keramida's plans. This sequence shows just what Insurer's coverage counsel wrote, that Insurer controlled all aspects of stormwater collection and treatment. As discussed above, this control did not end until on or about August 1, 2016, when J. Alpine ended the freeze on contractor payments to carry out the plans of Keramida and defense counsel.

References:    Defense counsel (J. Dameron) correspondence, September 24, 2015
Defense counsel (J. Dameron) correspondence, September 16, 2015
Defense counsel (J. Dameron) correspondence, August 5, 2015
Coverage counsel letter (J. Michaels), page 5, July 22, 2015.
Affidavit of K. Belcredi, Keramida, July 21, 2015
IDEM Meeting Sign-In and PowerPoint, February 17, 2015
Coyle Deposition, day 2, 160-61 and exh. 62

2.  <u>Heinze's legal argument about "any evidence" of "damages" ignores the regulatory
action taken by IDEM and the testimony of Insurer's appointed defense counsel.</u>

Heinze buries a number of his legal arguments in the midst of other opinions. For example, in a
single paragraph (page 31), really a single sentence, he declares that he has "not located any
evidence" of "any damages" caused by Insurer, including "any negative action or enforcement
by IDEM." This legal assertion by Heinze appears under an italicized heading about "any
Damages or Losses," but nothing about "damages" appears in Heinze's detailed "Summary of
Conclusions" (page 3-4)

Heinze's argument ignores the additional claims management costs that resulted from Insurer's
failure to meet its obligation to prevent illegal stormwater discharges. As described in my prior
report, this failure resulted in approximately forty separate violation days reported to regulatory
agencies from January 2013 through July 2017. IDEM responded by requiring a remediation
level for PCBs in soil of 1 ppm "due to the recent PCB impacted storm water events" in a
Remediation Work Plan letter on February 26, 2014. Insurer's appointed defense counsel (J.
Dameron) testified that the impact of this 1 ppm standard was to "basically go from excavating
less than half the site to the entire site, and that's millions, if not ten million dollars [in]
additional cost of remediation."

Heinze's assertion that there is no "evidence in the record" about this "damage" is just a lawyer
making a legal argument. It is not an expert opinion about the impact of documented stormwater
violations on the cost of the eventual remediation at the Hartford Iron Site.

References:    IDEM, Remediation Work Plan letter, Feb. 26, 2014
Testimony of Defense Counsel (J. Dameron), page 120, March 9, 2015

X.    Documents /information considered

In addition to the documents identified in my October 2, 2017 report, the following lists the documents that support my opinions or were considered by me in forming them:

1. Thompson Envtl., 2-Grids Excavation, Sampling, and Backfilling Report, July 14, 2017

2. HydroTech correspondence to K. Coyle, Sept. 16, 2011

3. HydroTech correspondence to K. Coyle, June 12, 2012

4. K. Coyle correspondence Feb. 10, 2012, dep. exh. 73

5. Real Estate Lease, March 17, 2006.

6. Form 6935A, Limits Changed, September 1, 1976

7. Letter from Bonham Insurance, October 6, 1976

8. Deposition of S. Goldberg, Oct. 19, 2017

9. Non-Party Keramida, Inc. Response, 1:15mc103, Jan. 31, 2017

10. TEI contract letter, Nov. 15, 2016.

11. C. Shere Declaration, May 19, 2016

12. Keramida's Updated Design Elements for Storm Water System, December 7, 2015

13. Keramida, Summary of Storm Water Management System Cost Estimates and Tables, September 3, 2015

14. Keramida, Response to IDEM Comment Letter, August 13, 2015

15. Keramida, Storm Water Management Design Summary, November 3, 2014, and Unit Cost Estimate

16. Coverage Counsel letter (R. Hodyl), October 13, 2016

17. Defense Counsel letter (M. Shere), October 5, 2016 and attachment

18. Policy form CG 00 01 11 85, CNA/Hartford 009327

19. Policy form CG 00 01 11 88, CNA/Hartford 009233

20. Coverage Counsel letter (J. Michaels), May 8, 2015

21. Deposition of S. Goldberg, Oct. 18, 2017

22. K. Coyle Correspondence, Jan. 12, 2012, dep. exh. 72

XI.    Additional discovery

I retain the option to modify and add to my opinion as discovery is developed and as appropriate for purposes of further rebuttal.

Paul Amoruso, CPCU
Dated: October 2, 2017